EXHIBIT 1

**BETWEEN:**

## EURASIAN NATURAL RESOURCES CORPORATION LIMITED

<u>Claimant</u>

-and-

## THE DIRECTOR OF THE SERIOUS FRAUD OFFICE

<u>Defendant</u>

---

## PARTICULARS OF CLAIM

---

### THE PARTIES

1.  The Claimant, Eurasian Natural Resources Corporation Limited ("**ENRC**"), was at all material times the parent company of a diversified natural resources group with (inter alia) extensive mining operations. ENRC has its origins in a number of mining companies based in Kazakhstan. It also has indirect subsidiaries which operate in Africa. It was listed on the London Stock Exchange from 12 December 2007, became a member of the FTSE 100 on 12 March 2008, and was de-listed on 25 November 2013.

2.  The Serious Fraud Office (the "**SFO**") is a non-ministerial department of state constituted under s. 1(1) of the Criminal Justice Act 1987 (the "**1987 Act**"). The Defendant, the director of the SFO (the "**Director**"), is responsible and vicariously liable for the acts and omissions of the SFO's officers, staff and contractors particularised below. By s. 1(3) of the 1987 Act, the Director may investigate any suspected offence which appears to him/her on reasonable grounds to involve serious or complex fraud. By s. 2 of the 1987 Act, the Director has powers to issue a notice to persons requiring them to provide information and produce documentation with respect to any matter relevant to such an investigation. By s. 2A of the 1987 Act, the Director has the same power to issue notices in order to determine whether to start an investigation under s. 1(3) of the 1987 Act.

3. Mr Richard Alderman was the director of the SFO between 2008 and 20 April 2012. He was succeeded by Mr David Green QC, who held office until April 2018. Mr Mark Thompson was interim director between April and August 2018, whereupon he was replaced by the SFO's current director, Ms Lisa Osofsky.

OTHER RELEVANT INDIVIDUALS

4. In December 2010, ENRC instructed Mr Neil Gerrard ("**Mr Gerrard**") to advise it in relation to an anonymous whistle-blowing email sent to it about one of its indirect subsidiaries, a Kazakh company called JSC Sokolov-Sarbay Mining Production Association ("**SSGPO**" and the "**2010 Whistle-Blowing Email**"). Mr Gerrard was a partner/member of DLA Piper UK LLP ("**DLA**") until April 2011, whereupon he became a partner/member of Dechert LLP ("**Dechert**"). The retainer to advise ENRC moved with Mr Gerrard from DLA to Dechert (the "**Retainer**"), and subsequently expanded in the circumstances described below. The Retainer was terminated by ENRC on 27 March 2013.

5. Between 2011 and 2013, the SFO's employees included:

   5.1. <u>Keith McCarthy</u>. Mr McCarthy joined the SFO in 2008 and was appointed as the SFO's Chief Investigator in September 2009. He left the SFO on 9 December 2011.

   5.2. <u>Richard (Dick) Gould</u>. Mr Gould joined the SFO in about 2008, and had become the interim head of its proceeds of crime unit by late 2011/early 2012. Thereafter, Messrs Gould and Thompson had day-to-day conduct of the Review Process (as defined below) until about late 2012/early 2013. Mr Gould left the SFO in 2015.

   5.3. <u>Mark Thompson</u>. Mr Thompson is introduced above. He joined the SFO in 2004 and was promoted to lead the SFO's proceeds of crime unit in about September 2012. Mr Thompson remains employed by the SFO as the Chief Operating Officer.

   5.4. <u>Phillippa Williamson</u>. Ms Williamson was appointed as the SFO's Chief Executive Officer shortly after Mr Alderman became the Director. She left the SFO on 16 April 2012.

5.5. <u>Ian McCall</u>. Mr McCall was appointed as the SFO's Head of Technology Services, Intelligence and Proceeds of Crime area (also referred to as Specialist Services) after Mr Alderman became the Director. He left the SFO following Mr Alderman's departure in April 2012.

5.6. <u>James RH Coussey</u>. Mr Coussey was by early 2013 at the latest a senior prosecutor employed by the SFO. He left the SFO in 2018.

**THE FACTS**

**(1)   Mr Alderman**

6. By August 2011, Mr Alderman was under substantial pressure to obtain a high-profile conviction or civil recovery order/civil settlement following a period during which the SFO had been subjected to significant judicial and other criticism. Such criticism continued after August 2011, and took place in parallel to the events complained about in these proceedings, as described below. ENRC relies on the following facts and matters:

6.1. In **February 2010**, the SFO entered into an agreement with BAE Systems Plc ("**BAE**") pursuant to which BAE admitted breaching its duty to keep accounting records and agreed to pay £29.5 million for the benefit of the people of Tanzania and a £500,000 fine. The settlement was subject to substantial internal, public and parliamentary criticism because **(i)** it followed the SFO announcing on 1 October 2009 that it was seeking the Attorney General's consent to pursue BAE for corruption offences (and not breach of a duty to keep accounting records), **(ii)** the sum which BAE agreed to pay was regarded by SFO employees working on the case as manifestly insufficient and **(iii)** the terms of the agreement were, as the House of Commons International Development Committee later concluded, *"deficient"* in a number of respects and *"astonish*[ing]*"* in another.

6.2. In **early 2010**, the SFO entered into an agreement with Innospec Ltd ("**Innospec**") pursuant to which Innospec would plead guilty to the charge of conspiracy to corrupt contrary to s. 1 of the Criminal Law Act 1977 and would pay the sum of US$12.7 million by way of fine and civil settlement. By a judgment dated 26 March 2010, Thomas LJ held that **(i)** a penalty of US$12.7 million was *"wholly inadequate"*, **(ii)** the

court was essentially presented with a *fait accompli*, **(iii)** Mr Alderman's agreement to the fine was ultra vires and not in accordance with *"basic constitutional principles"*, and **(iv)** *"no such arrangements should be made again"*.

6.3. In **July 2010**, the SFO failed to secure the conviction of two former directors of the Imperial Consolidated Group following an eight-month re-trial, and Mr Alderman was forced to make a public statement defending the SFO's decision to pursue the investigation and two trials at a reported cost of £10 million.

6.4. In **March 2011**, the SFO obtained and executed search warrants at the homes of Messrs Robert and Vincent Tchenguiz and at the offices of a company associated with them (the "**Warrants**"). The SFO also procured the arrest of Messrs Tchenguiz. The Warrants were executed in a dawn raid of which the press had been given prior notice (the "**Raid**"). The legality of the Warrants and Raid were subsequently challenged in judicial review proceedings instituted in May 2011. Thereafter:

   a    Mr Green conceded that it was inappropriate for the press to have been given advance notice of the Raids.

   b    The Divisional Court: **(i)** quashed the Warrants, on the basis that the SFO had failed properly to present the without notice application at which they were made; **(ii)** concluded that the SFO's policy (followed during the Raid) of using its own lawyers to assess whether documents were subject to legal professional privilege ("**LPP**") was misconceived; and **(iii)** concluded that Mr Alderman acted unlawfully when issuing a notice under s. 2(3) of the 1987 Act on 22 December 2011, observing that it was *"not easy to understand"* why Mr Alderman acted as he did. Indemnity costs were awarded against the SFO on the basis that (inter alia) Mr Alderman had *"wholly failed to discharge* [his] *duty …"*.

   c    In July 2014, the SFO settled cases brought by the Tchenguiz brothers and associated companies and trusts in which it was alleged that the SFO had committed the tort of misfeasance in public office when it obtained and executed the Warrants and investigated the Tchenguiz brothers. The SFO paid £4.5 million in damages together with £3 million towards the claimants' costs of the

4

proceedings. Mr Green issued a public apology, stating that *"the SFO has changed a great deal since March 2011"*.

7. On **20 April 2012**, Mr Alderman stepped down as Director. His personal conduct over the course of his directorship was characterised by a lack of candour, professionalism and diligence. In addition to the other matters relied upon herein:

   7.1. Mr Alderman was lackadaisical in his note-taking, accepting when he appeared before the Public Accounts Committee (the "**PAC**") on 7 March 2013 that he frequently made *"scribbled notes during the course of meetings"*.

   7.2. Mr Alderman was hostile to the professional note-taking practices of his Chief Investigator, Mr McCarthy. On more than one occasion Mr Alderman refused to countersign Mr McCarthy's notes of difficult conversations to confirm that they constituted an accurate record.

   7.3. The conduct and integrity of Mr Alderman and the SFO under Mr Alderman's leadership was subjected to significant criticism by:

       a   The PAC, which in July 2013 concluded (inter alia) that Mr Alderman: **(i)** procured the SFO to make *"irregular"* redundancy and severance payments of £464,905 to Ms Williamson and £49,885 to Mr McCall in c. March 2012, having failed to follow due process and having disregarded legal advice available to him; and **(ii)** was responsible for a *"catalogue of errors"* which was a *"case study in how not to run a public body"*.

       b   Mr Green, who during the course of the hearing before the PAC in March 2013 was forced *"categorically"* to deny certain evidence given by Mr Alderman.

       c   The Attorney General, who, commenting on the PAC's conclusions, stated that **(i)** the events described in the PAC's report were a *"matter of profound concern"* and **(ii)** the Treasury Solicitor, Sir Paul Jenkins, and an official at the Attorney General's Office *"did not accept the truth"* of certain assertions made by Mr Alderman in connection with Ms Williamson's redundancy.

d    The Civil Service Code Standing Committee, which in March 2014 concluded that the SFO's senior managers in October and November 2010 contravened the Civil Service Code provisions on integrity, honesty and objectivity when providing information to the Attorney General's Office to enable the Attorney General to answer a parliamentary question on the SFO's consultancy spend. The senior managers are not individually identified but will have included Mr Alderman.

## (2)    The SFO's Self-Reporting Guide

8.  On 21 July 2009, the SFO published guidance in relation to corporate self-reporting in cases of overseas corruption (the "**Self-Reporting Guide**"). The guide stated that:

    8.1. The benefit of self-reporting was that, in appropriate cases, it would lead to a civil settlement as well as *"the opportunity to manage with* [the SFO] *the issues and any publicity proactively"*.

    8.2. The SFO wanted to settle self-referral cases *"civilly wherever possible"*.

    8.3. Subject to satisfactory initial responses, the SFO would discuss the scope of any further investigation needed with a self-reporting company, such investigation to be carried out by the company's professional advisers at the company's expense.

    8.4. The SFO would discuss the results of such investigation with the company and its advisers, following which settlement terms would be negotiated. They could include **(i)** restitution by way of civil recovery, **(ii)** monitoring of the company by an independent person, **(iii)** a programme of culture change and **(iv)** a *"discussion … about individuals"* (sic).

9.  The Self-Reporting Guide was misconceived: **(i)** it failed to address what Mr Alderman later accepted in December 2009 was the *"key issue"* of LPP, **(ii)** notwithstanding Mr Alderman's appreciation of this deficiency, the guide was not *"revised following feedback and in the light of experience"* (as it promised on page 2), and **(iii)** the Self-Reporting Guide had no statutory underpinning and was issued by Mr Alderman without any parliamentary or other consultation or scrutiny. The Self-Reporting Guide was withdrawn in October 2012 shortly after Mr Alderman left office.

### (3) Mr Gerrard's relationship with SFO officers

10. By June 2011, Mr Gerrard had a good working relationship with Messrs Alderman, Gould, McCarthy and Thompson. Further:

    10.1.     Mr Gerrard had a close friendship with Mr Alderman. He frequently said as much and stated in around March/April 2011 that he could call Mr Alderman *"at any time"*. Mr Gerrard also stated on a number of occasions in 2011 and 2012 that the SFO would have raided ENRC's offices but for the fact that he was acting for the company, and that when he entered a room SFO employees *"stand up"*. Later, in September 2011, Mr Alderman selected Mr Gerrard as the practitioner whom he would invite to host a breakfast event at which Mr Alderman and the Solicitor General would speak. Mr Alderman proposed that the event be attended by *"key players"* amongst Mr Gerrard's colleagues, clients and contacts. Further, as is pleaded below, Messrs Alderman and Gerrard had substantial telephone and other contact in connection with ENRC. This was highly unusual: Mr Alderman rarely involved himself in the day-to-day conduct of cases; and Mr Gerrard repeatedly made disclosures to Mr Alderman which were plainly contrary to ENRC's interests.

    10.2.     Mr Gerrard also had a close friendship with Mr Gould. Mr Gerrard boasted that he and Mr Gould *"go back a long way"* (or words to that effect) and that he could *"trust"* Mr Gould. He also stated, in about late 2011, that when Mr Gould retired from the SFO, he could be sure of a *"big fuck off job"* at Dechert. Later, as pleaded below, Messrs Gerrard and Gould had repeated and improper telephone and other contact in connection with ENRC during which Mr Gerrard repeatedly made disclosures to Mr Gould which were plainly contrary to ENRC's interests. Some of that contact took place by way of text messages sent to and from Mr Gould's personal mobile telephone (and not Mr Gould's SFO-issued Blackberry), a method of communication contrary to SFO policy.

### (4) ENRC enters into a Review Process

11. Contact was made between ENRC and the SFO and an initial meeting held on 3 October 2011 in the following circumstances:

11.1.     Mr Gerrard left DLA to join Dechert in **April 2011** in acrimonious circumstances: DLA instituted arbitration proceedings against him in May 2011 following a disagreement as to Mr Gerrard's notice period and/or period of gardening leave. A number of DLA's lawyers followed Mr Gerrard to Dechert over the following months.

11.2.     Between December 2010 and August 2011 (at the earliest), the scope of the Retainer related to the 2010 Whistle-Blowing Email (see paragraph 4 above) and two discrete further issues raised by ENRC's internal affairs department and auditors. In particular, the Retainer did not extend to ENRC's assets and operations in Africa. This was a cause of intense frustration for Mr Gerrard, who wanted the Retainer to be substantially extended so that he and his new firm would benefit from the additional fees that he hoped to generate.

11.3.     On 5 April, 23 May, 15 June (twice) and 5 July 2011, Mr Eric Joyce MP raised criticisms of ENRC's conduct in Parliament.

11.4.     In about **July 2011**, Mr Alderman asked Mr McCarthy to review a box of documents consisting of open source material and intelligence regarding ENRC. The documents had been collated by the SFO's Intelligence Unit and apparently included certain statutory "suspicious activity reports" (the "**SARs**") filed by ENRC itself and its professional advisers in accordance with the Proceeds of Crime Act 2002 when ENRC acquired certain companies operating in Africa between 2009 and 2010. ENRC reserves its right to plead further in this regard following disclosure. Mr Alderman told Mr McCarthy that he wanted Mr McCarthy to assess the material and the progress that the SFO had made in relation to ENRC. He further told Mr McCarthy to "*get it going*". By "*it*", Mr Alderman was referring to the SFO's investigations into ENRC. This was a highly unusual request: this was the only occasion, since Mr McCarthy was appointed as the SFO's Chief Investigator in September 2009, on which Mr Alderman had asked Mr McCarthy to review Intelligence Unit material in this way.

11.5.     Towards the **end of July 2011**, Mr McCarthy reported to Mr Alderman that the Intelligence Unit material raised grounds for concern about ENRC's compliance systems, but did not provide a sufficient basis to open a criminal investigation into ENRC's conduct under the SFO's statutory powers.

8

11.6.   At the **end of July 2011**, Mr Gerrard orally informed Mr Cameron Findlay (a business and security consultant retained by ENRC) that he wished to leak sensitive information to the press in order to *"kick start"* an expansion of the scope of the Retainer. Mr Gerrard sought Mr Findlay's assistance. Thereafter:

a   Mr Findlay, in turn, sought the assistance of his colleague, Mr Rob Trevelyan. Mr Trevelyan contacted a freelance journalist known to him and met him at c. 10.30am on 28 July 2011 at the Cadogan Hotel to discuss the matter.

b   At about 2pm on 1 August 2011, the freelance journalist met Mr David Robertson (a Times journalist) at the offices of The Times in Wapping. Mr Robertson expressed interest in the contents of the documents proposed to be provided. This indication was passed back through Mr Trevelyan to Mr Findlay and thence to Mr Gerrard.

c   In early August 2011, Mr Gerrard orally instructed Mr Findlay to collect a package from the reception of Dechert's offices. Mr Gerrard told Mr Findlay that it would contain the documents he wanted to be leaked to the press. Mr Findlay went to Dechert's offices and collected a sealed envelope from reception. Mr Findlay then met Mr Trevelyan in a park near ENRC's offices and gave him the sealed envelope.

d   At about 11am on 3 August 2011, Mr Trevelyan met the freelance journalist at the Cadogan Hotel and gave him the sealed envelope. It contained: **(1)** Two reports prepared by solicitors acting for ENRC, the pages of which were headed "*Legally Privileged – prepared for the purpose of obtaining legal advice*" or "*Subject to Legal Professional Privilege*"; **(2)** The 2010 Whistle-Blowing Email; and **(3)** A letter dated 29 March 2011 from DLA to the ENRC Audit Committee, marked *"Privileged & Confidential"* (the "**2011 Leaked Material**").

e   On the afternoon of 4 August 2011, the freelance journalist met Mr Robertson and handed him the 2011 Leaked Material.

11.7.    On **9 August 2011**, The Times published an article written by Mr Robertson using certain of the confidential and privileged information contained in the 2011 Leaked Material (the "**August 2011 Article**"). The headline was *"Copper giant calls in outsiders to examine corruption claims"* and the article contained (inter alia) information relating to the scope and progress of the investigations that had been carried out by DLA and by a previous firm of solicitors. For the avoidance of doubt, and save insofar as the content of the 2011 Leaked Material has entered the public domain, that material remains privileged and no reliance is placed on its substantive content in these proceedings.

11.8.    On **9 August or the early morning of 10 August 2011**, Mr Alderman approached Mr McCarthy and stated that the August 2011 Article presented the SFO with an opportunity for the SFO to contact ENRC. By 11.17am on 10 August 2011, on Mr Alderman's instructions Mr McCarthy had produced a draft letter to ENRC's General Counsel which (inter alia) **(i)** made reference to recent media reports concerning allegations of corruption and wrongdoing at ENRC, **(ii)** drew attention to the Self-Reporting Guide and **(iii)** invited ENRC's representatives to attend the SFO's offices to discuss ENRC's *"governance and compliance programme and its response to the allegations as reported"*. The said letter was sent the same day (the "**August 2011 Letter**").

11.9.    It is to be inferred from the facts and matters pleaded below that Mr Alderman had been provided by Mr Gerrard with the 2011 Leaked Material (or, alternatively, the substance of the confidential and privileged matters addressed in the August 2011 Article) prior to the publication of the August 2011 Article (the "**First Unauthorised Contact**"):

a    Mr Alderman's involvement with the ENRC case and his instructions to Mr McCarthy to draft the August 2011 Letter were unusual. Mr Alderman was typically hands off and unconcerned by the detail of the SFO's case load.

b    The August 2011 Letter was produced with unusual speed, the morning after the August 2011 Article was published. Mr Alderman was typically unavailable to discuss matters with SFO staff on short notice.

c     Mr Gerrard has declined unequivocally to deny that he had contact with the SFO in relation to ENRC prior to ENRC's receipt of the August 2011 Letter, instead stating that he has *"no recollection"* of any such contact.

d     Mr McCarthy's notes of his communications with Mr Alderman in late July/early August 2011 have been deliberately suppressed or destroyed: see below.

e     The First Unauthorised Contact took place **(1)** at a time when Mr Gerrard was frustrated by the limited ambit of the Retainer, and **(2)** shortly after Mr McCarthy had informed Mr Alderman that there was insufficient evidence to open an investigation into ENRC.

f     Mr Alderman held at least two telephone calls and one "private" meeting with Mr Gerrard in August/September 2011, before ENRC had notified the SFO that Mr Gerrard acted for it: see below. On those occasions, Mr Gerrard made more disclosures which were plainly contrary to ENRC's interests and which he had no instructions or authority to make: see below.

g     Mr Alderman deliberately downplayed the fact of his prior contact with Mr Gerrard when he met ENRC on 3 October 2011: see below.

h     In about late 2011, Mr Alderman gave instructions for the ENRC case to be kept *"off the books with no case* [ie electronic] *drive"* because it was *"very messy"*: see below.

i     Messrs Gerrard and Alderman were close friends: see above.

j     Mr Alderman has acted with a want of integrity on other occasions: see paragraph 7 above.

11.10.     Mr Gerrard had no instructions or authority to provide to Mr Alderman the material referred to in sub-paragraph 11.9, which was plainly contrary to ENRC's interests.

11.11.     On **19 August 2011**, ENRC's General Counsel (Beat Ehrensberger) responded to the August 2011 Letter. He stated that he would be happy to meet with Messrs Alderman and McCarthy and that he may *"invite one or more of ENRC's advisors to the meeting to assist me"*. He did not name those advisors.

11.12.     In **August 2011**, following the publication of the August 2011 Article and the SFO's letter of the next day, Mr Gerrard met Messrs Findlay and Trevelyan at the Chelsea Brasserie on Sloane Square. As he approached the table, he rubbed his hands and said *"right boys, I'm in rape mode"*; he also stated that he was planning to *"screw these fuckers* [sc. ENRC]*"* for millions of pounds. Mr Gerrard acted as aforesaid because the August 2011 Article and August 2011 Letter would allow him substantially to expand the Retainer.

11.13.     In the week of **29 August 2011**, Messrs Gerrard and Alderman spoke by telephone (the "**Second Unauthorised Contact**"). Furthermore:

a     The SFO has disclosed an undated attendance note produced by Mr Alderman, which appears to relate to the Second Unauthorised Contact. It records that Mr Gerrard alleged to Mr Alderman (inter alia) that **(i)** Jones Day, ENRC's corporate advisers, were *"too close"* to a transaction that Mr Gerrard wanted to include in the scope of Dechert's investigation, **(ii)** if ENRC's main shareholders decided to de-list the company from the FTSE 100 and go *"offshore"* this would be because of increased *"oversight"*, **(iii)** the US Department of Justice was interested in investigating ENRC, **(iv)** ENRC had a *"Russian culture"*, and **(v)** *"they* [sc. ENRC] *need to understand* [that they have a] *big problem"* (the "**August 2011 Attendance Note**"). The said disclosures were plainly contrary to ENRC's interests.

b     Mr Gerrard failed to document the call, ie he either took no attendance note of the call, or has lost, suppressed or destroyed any note that he did take. Where we hereafter allege that a person "**Failed to Document**" a call or meeting, we mean that the individual in question either took no attendance note of the call or meeting or that any note that was taken has been lost, suppressed or destroyed.

c    The call was unauthorised, ie Mr Gerrard **(i)** was not authorised by ENRC to make the call or to disclose information about ENRC to the SFO during the course of the same and **(ii)** did not inform ENRC about the said call.    Where we hereafter allege that a call or meeting was "**Unauthorised**", we mean that Mr Gerrard **(i)** was not authorised to make the call or attend the meeting or to disclose information about ENRC to the SFO during the course of the same and **(ii)** did not inform ENRC about the said call or meeting.

11.14.    In the week of **5 September 2011**, Mr Alderman instructed Mr McCarthy to contact Mr Gerrard and arrange a meeting regarding ENRC. Mr McCarthy responded by email as follows: *"Sorry but what has [N]eil Gerrard got to do with ENRC?  Is he acting for them or providing information in a different professional capacity?"*

11.15.    On about **23 September 2011**, Mr Alderman held a telephone call with Mr Gerrard in advance of a meeting that had been arranged for 26 September 2011. The SFO has disclosed a redacted version of the attendance note taken by Mr Alderman of that call, which records that Mr Gerrard told him that Mr Gerrard was *"60-70%"* of his way through the *"Kaz inv"* (presumably the Kazakh investigation), which involved forensic investigation, an email review and interviewing people.  Mr Gerrard Failed to Document this Unauthorised call (the "**Third Unauthorised Contact**").

11.16.    In the event, a meeting took place between Messrs Alderman, McCarthy and Gerrard on **26 September 2011**.  Mr Gerrard had stated that he wished to discuss a *"private"* issue and the meeting was categorised as *"private"* in the SFO's internal records. Furthermore **(i)** Messrs Gerrard and Alderman Failed to Document the meeting and **(ii)** Mr McCarthy's notes of the meeting have been suppressed or destroyed. It is to be inferred from the matters pleaded herein that Mr Gerrard made further disclosures at this meeting that were plainly contrary to ENRC's interests; such disclosures were made without instructions or authority  (the "**Fourth Unauthorised Contact**").

11.17.    On **30 September 2011**, Messrs Gerrard and McCarthy spoke by telephone. According to Mr McCarthy's contemporaneous note of the call, Mr Gerrard said that **(i)** the *"Client knows he came to see SFO!  Told them it was serious",* **(ii)** there were *"various factions in* [the] *company"* and tension between two other law firms retained by ENRC, and **(iii)**

Mr Gerrard "*propose*[d] *to play it low key*". Mr McCarthy also asked Mr Gerrard to explain his "*areas of concern*". Mr Gerrard Failed to Document this Unauthorised call (the "**Fifth Unauthorised Contact**").

11.18.    In the event, ENRC did not disclose to the SFO that Mr Gerrard was instructed on its behalf until at or shortly before the October 2011 Meeting, as defined in the following sub-paragraph.

11.19.    A meeting was held between the SFO and ENRC on **3 October 2011** (the "**October 2011 Meeting**"). It was attended by (inter alios) Messrs Alderman, McCarthy and Gerrard and by ENRC's General Counsel. A note disclosed by the SFO shows that at the outset of the meeting the SFO (through, it is assumed, Mr Alderman) told ENRC's General Counsel that **(i)** the "*SFO were concerned with the Corporate and Director levels*"; **(ii)** the "*SFO could give no assurance that it would not take enforcement action*"; and **(iii)** "*ENRC should take the matter very seriously*". The note also records that **(iv)** the SFO "*stressed that* [ENRC] *needed to satisfy the SFO that the company had adequate* [anti-bribery] *procedures*"; **(v)** the SFO "*needed to see*" evidence from ENRC on "*how they obtain, pursue contracts and deal with issues of facilitation payments*"; and **(vi)** Mr Alderman asked Mr Gerrard to "*explain his role*".

11.20.    However:

a    as the SFO **(i)** was "*not conducting a formal criminal investigation*" into ENRC at that point and **(ii)** had not served a notice under s. 2A of the 1987 Act on ENRC, Mr Alderman's demand that ENRC needed to produce evidence to the SFO and was required to satisfy the SFO that its anti-bribery procedures were adequate was unwarranted and *ultra vires*; and

b    Mr Alderman did not explain that he had had the First to Fourth Unauthorised Contacts with Mr Gerrard. It is to be inferred that Mr Alderman **(i)** decided to suppress the fact and extent of his prior contact with Mr Gerrard because he knew that Mr Gerrard had made disclosures to the SFO which were plainly contrary to ENRC's interests and which he had no instructions or authority to make because **(ii)** he wished to use that information and further information that he believed

14

would be forthcoming from Mr Gerrard for the purposes of negotiating a high-value civil settlement/civil recovery order from ENRC.

11.21.   On **6 October 2011**, ENRC's General Counsel wrote to Messrs Alderman and McCarthy stating that ENRC would revert to the SFO after he had raised the matters discussed at the October 2011 Meeting with its board. He added that Messrs Alderman and McCarthy should contact him *"directly"* if they wished to raise any further points.

11.22.   On **7 October 2011**, Mr Gerrard telephoned Mr McCarthy. In an email to Mr Alderman that day, Mr McCarthy reported that he had just spoken to Mr Gerrard who **(i)** *"confirmed that our tactics worked"*, **(ii)** confirmed that ENRC's *"main Board are to meet early next week and* [ENRC] *will make a voluntary disclosure to us next week"*, **(iii)** told him that ENRC would complete a full forensic audit, and **(iv)** *"indicated that there were lots of red flags"* and *"lots to tell"*. Statement (iv) was plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this call and was not authorised to make the disclosures referred to at (ii) to (iv) (the **"Sixth Unauthorised Contact"**). As to (i), ENRC has no knowledge or information as to the "tactics" to which Mr McCarthy was referring, including as to whether or not those tactics were shared between Mr Gerrard and the SFO. ENRC reserves the right to plead further to such tactics on disclosure.

11.23.   On **21 October 2011**, Mr Gerrard spoke to Mr McCarthy by telephone (the **"Seventh Unauthorised Contact"**). ENRC's knowledge of the contents of the call is limited to the fact that Mr Gerrard alleged to Mr McCarthy that the October 2011 Meeting *"truly shook the company"*. This statement was plainly contrary to ENRC's interests. Further:

a   Mr Gerrard Failed to Document this Unauthorised call (save that Mr Gerrard was authorised to tell the SFO when ENRC next expected to be in contact).

b   Mr McCarthy's note of the call has been suppressed or destroyed by SFO staff as described below.

11.24.    In about **late 2011**, Mr Alderman gave instructions to Mr McCall (the SFO's then Head of Technology and Specialist Services) that ENRC's case was *"very messy"* and that he should *"keep the investigation off the books with no case* [ie electronic] *drive."* As a result, internal emails sent in relation to ENRC were headed *"Project X"*. (For the avoidance of doubt, whilst Mr Thompson was later to state that this instruction came from Mr McCall, it is inherently improbable that Mr McCall was not acting at Mr Alderman's direction or with his knowledge and approval.) Mr Alderman's instruction breached the SFO's internal rules and guidelines, which required that all (non-privileged) case-related documents generated or received by SFO staff should be saved onto an electronic case file as it was potentially relevant and disclosable material in criminal proceedings pursuant to the Criminal Procedure and Investigations Act 1996 (the "**1996 Act**") and its Code of Practice (the "**CPIA Code**").

11.25.    On **9 November 2011**, ENRC, acting on the advice of Mr Gerrard, informed the SFO that it would **(i)** conduct a further review of its operations and **(ii)** engage with the SFO regarding the results of that review (the "**Review Process**").

11.26.    On **9 December 2011**, Mr McCarthy left the SFO. Before his departure, he indexed and numbered his notebooks and placed them into a large box which was sealed with heavy tape (which seal was signed by Mr McCarthy so that it would be clear if it was ever broken). The box included Mr McCarthy's beige notebook for the period 21 July to 30 November 2011 (the "**Beige Notebook**"). The Beige Notebook contained notes of Mr McCarthy's review of the Intelligence Unit materials, his discussions with Mr Alderman (including those which followed the publication of the August 2011 Article), and his initial discussions with Mr Gerrard.

11.27.    The Beige Notebook has subsequently been suppressed or destroyed by SFO staff:

a    The current whereabouts of the Beige Notebook are unknown.

b    The Beige Notebook is said by the SFO to have been signed out of the SFO's archives by Ms Williamson in March 2012 (ie at about the same time as Mr

16

Alderman awarded her the irregular redundancy and severance package described above). However, Ms Williamson *"categorically"* denies removing the Beige Notebook from the SFO's archives and has *"affirm*[ed]*"* that any signature in any *"booking out process"* is not hers.

    c    A senior SFO employee, John Gibson, told the High Court by witness statement dated 21 September 2016 that Mr McCarthy's notebooks for the period 1 August 2011 to 31 March 2013 had been reviewed. That was false: the Beige Notebook, the only notebook used by Mr McCarthy over that period, has been suppressed or destroyed and so could not be reviewed. Mr Gibson's evidence was given despite the fact that **(i)** the SFO had discovered in 2012 that the Beige Notebook was missing and **(ii)** an SFO lawyer working on the litigation with ENRC had been made aware of this in 2015.

11.28.    The facts and matters described in this paragraph are hereinafter referred to as the **"Initial Contact"**. For the avoidance of doubt, the Initial Contact and the other matters of which complaint is made herein are pleaded on the basis of information currently available to ENRC. ENRC reserves the right to plead further following disclosure and/or further information becoming available to it.

### (5) Conduct of the Review Process

12.    Between 30 November 2011 and 28 November 2012, seven further meetings were held between ENRC and the SFO. Those meetings took place on 30 November and 20 December 2011 and on 5 March, 10 May, 18 June, 20 July and 28 November 2012. Further, between November 2011 and March 2013, representatives of the SFO interacted with Mr Gerrard in the improper ways particularised below (the **"Review Contact"**):

12.1.    Shortly before the ENRC/SFO meeting scheduled to take place at 3.30pm on **30 November 2011**, Messrs Gerrard and Thompson spoke by telephone. Mr Gerrard informed Mr Thompson that **(i)** there were *"some issues* [sc. for Mr Gerrard] *in advising them* [sc. ENRC]*"*, **(ii)** ENRC needed to be *"full and frank on all issues"* in the course of the Review Process, **(iii)** *"the emphasis had been on Africa but that information is emerging that may indicate problems in other jurisdictions too"* and that he was *"concerned that any such issues should be included in the scope of this process"* and **(iv)** it would be helpful if ENRC would be

made aware at the meeting to be held later that day *"of the SFO's position that full and frank disclosure was required"*. These allegations were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call (the "**Eighth Unauthorised Contact**").

12.2. On **13 December 2011**, Mr Gerrard spoke with an SFO employee called Hannah von Dadelszen. During the conversation, Mr Gerrard referred to **(i)** the falsification and destruction of documents by ENRC's agents or employees, **(ii)** ENRC's General Counsel having been involved in mergers and acquisitions that Mr Gerrard considered should be the subject of the Review Process, **(iii)** Jones Day having been involved in deals that Mr Gerrard considered should be the subject of the Review Process, **(iv)** the fact that the Review Process *"shouldn't be economical"*, **(v)** the fact that ENRC had put *"more"* pressure on Mr Gerrard regarding the scope of his investigation, **(vi)** the fact that ENRC's audit committee was *"odd"* and that Mr Gerrard was involved in a *"weird situation"*, and **(vii)** that Mr Gerrard wanted a *"quiet meeting"* with Mr Thompson and/or Ms von Dadelszen before the formal SFO/ENRC meeting to be held on 20 December 2011. These allegations were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call (the "**Ninth Unauthorised Contact**").

12.3. On the morning of **19 December 2011**, Mr Thompson met with Mr Gerrard at the Crowne Plaza Hotel in Blackfriars. The Crowne Plaza Hotel was selected because it was suitable for a *"quiet meeting"*, as is to be inferred from the matters pleaded herein and in particular:

a    This is what Mr Gerrard said that he wanted.

b    Mr Thompson has stated on oath that the Crowne Plaza Hotel was chosen because it was equidistant between the SFO's and Dechert's offices. This is wrong: the hotel was 3 minutes on foot from Dechert's offices and just over 20 minutes on foot from the SFO's then offices. Mr Thompson could have as easily gone to Dechert's offices, which were also just over 20 minutes on foot from the SFO's then offices.

c       The meeting took place without Mr Sion Richards, another solicitor acting for ENRC (and a partner in the firm Jones Day LLP), who **(i)** had attended the October 2011 Meeting and the meeting on 30 November 2011 on ENRC's behalf and **(ii)** was to Mr Thompson's knowledge going to attend the further SFO/ENRC meeting scheduled for 20 December 2011.

d       Mr Thompson's attendance note of the meeting failed to record any of the seven matters pleaded in the immediately following sub-paragraph, which Mr Thompson instead relayed orally to Ms von Dadelszen the same day. Had Mr Thompson considered the seven disclosures to have been lawfully made, it is inconceivable that he would not have recorded them himself.

12.4.       At the 19 December meeting, Mr Gerrard alleged to Mr Thompson that: **(i)** there was an *"attritional battle"* being waged within ENRC, **(ii)** ENRC had *"change*[d] [its] *mind regularly"*; **(iii)** he had been provided with *"backdated paperwork"* and *"obstructed"*, **(iv)** ENRC's Russian office *"operates intermediaries for insiders to skim profit"* and that 24% of its sales were *"missing"*, **(v)** there had been *"UN sanction breaches"* in relation to companies called the Central African Mining and Exploration Company (**"CAMEC"**) and Camrose Resources (**"Camrose"**) (mining companies that operated in Africa in which ENRC had indirect interests and in respect of which the SARs referred to at paragraph 11.4 had been filed), **(vi)** he had *"no comment"* to make about timeframes, though he noted that the process was *"not going to be wrapped up quickly"*, and **(vii)** he had heard *"nothing about* [a] *commitment to anti-corruption"*. These disclosures were plainly contrary to ENRC's interests and Mr Gerrard Failed to Document this Unauthorised meeting (the "**Tenth Unauthorised Contact**").

12.5.       Later on **19 December 2011**, Mr Gerrard held a telephone conversation with Mr Alderman, instigated by Mr Alderman. Mr Gerrard alleged to Mr Alderman that **(i)** there had been *"red flags"* in relation to a *"books and records"* review of ENRC's African operations, **(ii)** there had been *"v odd"* large consultancy payments with no paperwork and **(iii)** there were *"Russian issues"*. These disclosures were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call (the "**Eleventh Unauthorised Contact**").

12.6.    On **20 December 2011**, representatives of the SFO and ENRC met at the SFO's offices. The meeting was attended by, inter alios, Messrs Gerrard and Thompson. Mr Gerrard informed the SFO that **(i)** ENRC's investigation into its African operations had four limbs, one of which was *"sanctions"*, but **(ii)** ENRC *"had nothing to currently voluntarily report"*. This was contrary to Mr Gerrard's allegation to Mr Thompson of the previous day that there had been *"UN sanction breaches"* in Africa.

12.7.    It is to be inferred from an email sent by Mr Alderman on **26 January 2012** that Mr Gerrard had at least one telephone conversation with Mr Alderman about ENRC in or about January 2012. Messrs Gerrard and Alderman Failed to Document these Unauthorised call(s). ENRC has no knowledge as to what was discussed during the said call(s) and reserves its right to plead further in this regard following disclosure.

12.8.    On **5 March 2012**, representatives of the SFO and ENRC met at the SFO's offices. ENRC's professional advisers gave a presentation covering numerous topics as a result of which it was agreed that **(i)** Mr Gerrard would focus on completing an investigation into the activities of SSGPO in Kazakhstan and report back to the SFO in June 2012 and **(ii)** Mr Gerrard would progress work in relation to African issues and provide an update as to progress in June 2012. Mr Gould repeatedly stated that the review of Kazakh issues would be the *"litmus test"* for ENRC (the "**March 2012 Meeting**").

12.9.    On **14 March 2012**, Mr Gerrard met Mr Thompson at a venue currently unknown to ENRC. The said meeting was instigated by Mr Gerrard, who wanted to see the rapid expansion of his investigation into African issues. At the meeting, Mr Gerrard made allegations about **(i)** possible due diligence issues surrounding the acquisitions of Camrose and CAMEC (including internal audit reports), **(ii)** the alleged need for Mr Gerrard's team to access e-mail servers in London and Zurich, and **(iii)** concerns allegedly held by Mr Gerrard about an excavator purchased by an ENRC subsidiary. Allegations (i) and (iii) were plainly contrary to ENRC's interests. Point (ii) was contrary to ENRC's interests because it would require ENRC unnecessarily to expend considerable sums of money. Further, Mr Gerrard Failed to Document this Unauthorised meeting (the "**Twelfth Unauthorised Contact**").

12.10.    On about **23 March 2012**, Mr Gould held a telephone conversation with Mr Gerrard. No attendance note was taken of the meeting by either man and ENRC reserves the right to plead further following disclosure. In an email sent by Mr Gould to Mr Thompson later the same day, Mr Gould reported that Mr Gerrard was *"full of beans – which in itself is a worry as it normally means he is up to no good."*

12.11.    On **31 March 2012**, Mr Gerrard held a further conversation with Mr Gould. He alleged that **(i)** ENRC was doubting the thoroughness needed, in particular the need to conduct searches of London and African email servers, **(ii)** ENRC's Chairman needed some help regarding how seriously the SFO viewed analysis of (inter alia) email servers and *"what's going to be req*[uired] *to settle"*, and **(iii)** there was *"endemic fraud & commercial corruption in Kaz"* (by which Mr Gerrard was alluding to ENRC's Kazakh operations). These allegations were Unauthorised and plainly contrary to ENRC's interests (the "**Thirteenth Unauthorised Contact**").

12.12.    On **10 May 2012**, Messrs Thompson and Gould of the SFO met Mr Gerrard and ENRC's Chairman, Mehmet Dalman. During the said meeting **(i)** Mr Thompson stated that it was the SFO's perception that *"progress had been slow and that nothing substantive had been reported yet"* and **(ii)** Mr Gould stated that the approach of Jones Day and Beat Ehrensberger (ENRC's General Counsel) had been defensive and that they were too close to some of the transactions about which there were concerns. It is to be inferred that the said statements were pre-agreed between Messrs Thompson and Gould and Mr Gerrard (in about early May 2012, but as to which ENRC has no further knowledge and in relation to which it reserves the right to plead further following disclosure (the "**Fourteenth Unauthorised Contact**")), to further Mr Gerrard's agenda of seeking to expand the scope of the Retainer, by reason of the facts and matters set out herein, including the following:

a    The said statements were contrary to the matters discussed at the March 2012 Meeting, at which it had been agreed that a report on Kazakhstan would be produced in <u>June</u> 2012 and at which no questions were raised over the involvement of Jones Day and/or Beat Ehrensberger.

b    There was no basis for the SFO to state that Jones Day had been defensive or too close to some of the transactions about which there were concerns: **(i)** the SFO had never expressed this view in any previous meetings with ENRC; **(ii)** there is no indication in the SFO's internal material relating to Mr Gould's two previous meetings with Jones Day (on 20 December 2011 and 5 March 2012) that Jones Day had been "defensive" or were perceived to have been so; and **(iii)** Jones Day had only acted as ENRC's corporate lawyers in relation to its acquisition of an interest in Chambishi (see paragraph 12.15 below), which (as at 10 May 2012) was not part of the Review Process and in which the SFO had not indicated any interest. Mr Gould should not have made such an allegation against a major international law firm absent strong evidence, which (for the reasons given herein) he did not have.

c    The said statements reflected information provided by Mr Gerrard to the SFO during the Second, Ninth, Twelfth and Thirteenth Unauthorised Contacts.

d    There were disagreements between ENRC and Mr Gerrard between April and early June 2012 as to Mr Gerrard's attempts unnecessarily to expand the scope of his investigation.

e    Mr Gerrard was close friends with Mr Gould and had the irregular contact with Messrs Thompson and Gould particularised herein.

f    Messrs Thompson and Gould pre-agreed statements and produced documents in consultation with Mr Gerrard on other occasions: see paragraphs 12.13, 12.14 and 12.23 below.

12.13.    On **15** and **18 June 2012**, Mr Gerrard spoke with Mr Thompson on at least two occasions (which, together with the email exchanges described below, are referred to as the "**Fifteenth Unauthorised Contact**"). Thereafter:

a    Mr Thompson composed a draft letter and provided it to Mr Gerrard for his approval by email sent at 10.52 am on 18 June 2012. Mr Thompson's email stated: *"Neil – Letter as promised. Regards, Mark."* (the "**18 June Email**", emphasis supplied).

b   It is to be inferred that Mr Gerrard intimated his approval to the terms of the draft letter, which was then re-sent to him (with three sets of typographical corrections) by email at some stage after 10.52 am (the "**June 2012 Letter**" and "**Second 18 June Email**").

c   Mr Thompson did not wish to disclose the nature of his contact with Mr Gerrard, and so (on a date unknown to ENRC) deleted the 18 June Email and Second 18 June Email from both his mailbox and also from his "Deleted Items" folder. As there is no honest explanation for an SFO member of staff acting in this manner, it is to be inferred that the said conduct was dishonest.

d   Mr Thompson also omitted to refer to the 18 June Email, Second 18 June Email or his telephone contact with Mr Gerrard on about 18 June 2012 in his 74-page witness statement dated 1 February 2016 in proceedings instituted by the SFO in 2016 seeking a declaration that ENRC had no privilege in certain documents (the "**Privilege Proceedings**"), which purported to give a detailed account of his involvement with the SFO's investigation into ENRC.

e   In the June 2012 Letter Mr Thompson stated that ENRC needed to provide the SFO with an update and *"agree the immediate steps necessary for* [ENRC] *to continue to avail itself of our Protocol on Self-Reporting"*. Mr Thompson then emphasised: **(i)** *"The need for a frank and thorough formal report of any wrong-doing that has been discovered"*, **(ii)** *"The requirement that the SFO is satisfied that the scope of the investigation has not been restricted"*, and **(iii)** *"The Board of Directors have demonstrably committed to the process."*

f   It is to be inferred that the June 2012 Letter was drafted by Mr Thompson in consultation with Mr Gerrard, to further Mr Gerrard's agenda of seeking to expand the scope of the Retainer, by reason of the facts and matters set out herein including the following:

    i   Mr Thompson sent a draft of the June 2012 Letter to Mr Gerrard for his approval.

ii    Mr Thompson sought to destroy all electronic copies of the 18 June Email and Second 18 June Email because he wanted to hide his contact with Mr Gerrard on that date.

iii   Points (i) and (ii) of the June 2012 Letter (as set out in (e) above) furthered Mr Gerrard's agenda of seeking to expand the scope of the Retainer and are contrary to the references to proportionality contained in the Self-Reporting Guide.

iv    There was a marked change in tone between Mr Thompson's email to Mr Gerrard of 12 June 2012 (*"How are things progressing? Can we fix a meeting date for your latest findings?"*) and, six days later, the terms of the June 2012 Letter (a meeting was needed to *"agree the immediate steps necessary for* [ENRC] *to continue to avail itself of our Protocol on Self-Reporting"*).

v     By reason of the matters pleaded in paragraph 12.12(a)-(f).

g    Messrs Gerrard and Thompson Failed to Document the Unauthorised calls that formed part of the Fifteenth Unauthorised Contact.

12.14.   At a meeting held between representatives of the SFO and ENRC later on **18 June 2012**, Messrs Thompson and Gould stated as follows: **(i)** any delay or obstruction of Mr Gerrard's investigation would be viewed *"very negatively"*, **(ii)** it was *"essential"* for *"investigation findings"* to be disclosed in the near future, **(iii)** unless electronic data was secured and reviewed within a short period of time, Mr Gould would order a raid on ENRC's premises, **(iv)** if Mr Gerrard's investigation was being restricted in scope then *"Mr Gould would recommend that a criminal investigation be commenced by the SFO"*, and **(v)** the SFO was concerned by the conduct of Jones Day and Beat Ehrensberger. It is to be inferred that the said points were pre-agreed with Mr Gerrard by Messrs Thompson and Gould, to further Mr Gerrard's agenda of expanding the scope of the Retainer, by reason of the matters pleaded herein including the matters pleaded in paragraphs 12.12(a)-(f) and 12.13(f).

12.15.	As a result of the matters referred to in paragraphs 12.12 to 12.14, the scope of Mr Gerrard's investigation was widened considerably (to include **(i)** the acquisition by ENRC of an interest in CAMEC, **(ii)** the acquisition by ENRC of an interest in the Chambishi copper and cobalt mine (owned by Chambishi Metals Plc, "**Chambishi**") and **(iii)** the running of wide search terms over data obtained from ENRC's London server and over data obtained and brought into the jurisdiction from its South African servers). Subsequently, at a meeting held between Messrs Gould and Thompson of the SFO and various ENRC representatives on **20 July 2012**, Mr Gerrard made a presentation to the SFO in relation to the Kazakh aspects of his investigation and provided an update in relation to the African aspects of the same.

12.16.	In **July 2012**, Mr Green (who had recently become Director) received an anonymous letter from a whistle-blower (the "**July 2012 Whistle-Blowing Letter**"). The letter, which is detailed and prima facie credible, principally concerned allegations made against Mr Gerrard and an SFO employee identified as "Dick". It contended that Mr Gerrard had recently stated that:

a	He had been given information by an SFO employee about companies and individuals that were the subject of SFO investigations; his main contact was a man he identified as *"Dick"*; and the information included copies of case notes and SFO investigation strategies. Mr Gerrard claimed that the information allowed him to obtain instructions from the subject of the SFO's investigation. The said allegations were allegations of serious criminal wrongdoing, including the commission of the offence of perverting the course of justice and an offence under section 4(1) and (2)(b) of the Official Secrets Act 1989.

b	As part of *"the agreement"* with the SFO he could guarantee that his clients would never be investigated and that *"he could change a criminal investigation into a civil settlement"*.

c	Mr Gerrard claimed to have *"fucked"* any relationship that the SFO had with the law firm Jones Day by *"judicious leaking"* of material.

d	He **(i)** had worked on the Alstom case, **(ii)** knew that the SFO was going to investigate the Barclays LIBOR scandal, **(iii)** had negotiated a low civil settlement in the Halliburton case and **(iv)** had the ability to influence and in some cases change government policy (the "**Additional Allegations**").

12.17.	Following receipt of the July 2012 Whistle-Blowing Letter, the SFO's response was (it has asserted) to have a *"senior member of staff"* speak to *"the person believed to be the subject of the allegation"* (the "**2012 Whistle-Blowing Investigation**"). This response was desultory because:

a	No written record exists recording how the SFO responded to the July 2012 Whistle-Blowing Letter.

b	The SFO failed to follow its own complaints procedure (as published on its website), which required allegations of criminal misconduct such as those contained in the July 2012 Whistle-Blowing Letter to be referred to an independent reviewer.

c	The SFO failed to note that the allegations relating to Jones Day and *"Dick"* (which was an obvious reference to Mr Gould) were supported by:

   i	Criticisms that Mr Gerrard had made (and was shortly to repeat) of Jones Day during the Second, Ninth, Fourteenth and Seventeenth Unauthorised Contacts.

   ii	Mr Gould's email of 23 March 2012.

   iii	Criticisms that Mr Gould had made of Jones Day at the SFO/ENRC meeting held on 10 May 2012.

   iv	The fact that the SFO had been told by Mr Gerrard on 18 June 2012 that *"Jones Day were no longer involved"* in the Review Process.

d	The SFO failed to note that the Additional Allegations were supported by:

i      The fact that Mr Gerrard acted for a former Alstom employee.

ii     The fact that the SFO was setting up its LIBOR investigation in early July 2012.

iii    The fact that the civil settlement in the Halliburton case was for £7 million (as compared with a US$559 million settlement with the US Department of Justice and Securities and Exchange Commission), and was entered into by a former Halliburton subsidiary called M.W. Kellogg Limited which had been represented by DLA at a time when Mr Gerrard was one of its partners.

iv    The following facts: **(1)** Mr Gerrard was a close friend of Mr Alderman, **(2)** Mr Gerrard had been invited to host the November 2011 breakfast event on deferred prosecution agreements for Mr Alderman and the Solicitor General, **(3)** Mr Gerrard had been shortlisted in about late 2011 to become the next director of the SFO and **(4)** one of Mr Gerrard's fellow partners at DLA and Dechert was married to the then Deputy Prime Minister (on whose behalf a briefing in relation to the SFO's investigation of ENRC was sought in December 2011).

12.18.    On **6 August 2012**, Mr Gerrard telephoned Messrs Gould and Thompson to discuss ENRC (the "**Sixteenth Unauthorised Contact**"). Messrs Gerrard, Gould and Thompson Failed to Document these Unauthorised calls. Further, emails disclosed by the SFO relating to the said calls have been heavily redacted (and ENRC reserves its right to plead further once un-redacted copies have been disclosed).

12.19.    On **20 August 2012**, Mr Gerrard held a meeting with Mr Gould at Dechert's offices. During the said meeting Mr Gerrard alleged to Mr Gould that **(i)** Mr Gerrard was kept at *"arm's length"* from investigating certain issues by Jones Day, **(ii)** US$35 million was *"taken out in cash"* by a company called Metalkol and then allegedly turned up in an *"offshore account"*, **(iii)** *"How do we pay 35 million [with] no background docs"* and **(iv)** *"CAMEC/Camrose stinks"* (the "**Seventeenth Unauthorised Contact**"). These allegations were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised meeting, though a note was made by a Dechert assistant solicitor.

12.20.	On **4 October 2012**, Mr Gerrard telephoned Mr Thompson of the SFO and stated (inter alia) that he had discovered that *"£35 million in cash* [had been withdrawn] *from ENRC company accounts in the past, and these sums have not been satisfactorily accounted for"* (the "**Eighteenth Unauthorised Contact**"). This allegation was plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call.

12.21.	On **10 October 2012**, the day after the Self-Reporting Guide had been withdrawn by the SFO, Mr Gerrard arranged and thereafter met Mr Gould for lunch at a public house called Shaws Booksellers close to Dechert's offices (the "**Nineteenth Unauthorised Contact**"). When Mr Gerrard's secretary was arranging the booking, she explained that Mr Gerrard *"likes Shaws Booksellers which* [is] *close to our offices and is out of the way."* (emphasis supplied) (the "**Booksellers Email**") Mr Gerrard suggested an "*out of the way*" venue because he and Mr Gould appreciated that their meeting was improper. Messrs Gerrard and Gould Failed to Document this Unauthorised meeting. Further:

a	It is to be inferred that Mr Gerrard paid for Mr Gould's lunch (because **(i)** Mr Gerrard invited Mr Gould and made the booking, **(ii)** Mr Gerrard's income was considerably higher than Mr Gould's and **(iii)** Mr Gerrard wanted to thank Mr Gould for acting in the ways described above). But Mr Gould did not record this fact in the SFO's gifts and hospitality register.

b	Mr Gould deleted the Booksellers Email from both his "Inbox" and "Deleted Items" folders, as is to be inferred by the fact that **(i)** the said email (and any response thereto by Mr Gould) would have fallen to be disclosed by the SFO in the Privilege Proceedings, **(ii)** the said material has not been disclosed and **(iii)** Mr Gould double-deleted email records of his communications with Mr Gerrard on other occasions: see paragraph 12.23 below.

12.22.	On **28 November 2012**, a meeting was held between representatives of ENRC and various representatives of the SFO (including Messrs Thompson and Gould). At that meeting, Mr Gerrard principally provided an update as to the progress of his investigation into ENRC's African activities.

12.23.    On **12 December 2012**, after the Self-Reporting Guide had been withdrawn, Dechert wrote to the SFO seeking written confirmation of the status of ENRC's relationship with the SFO and in particular confirmation that (should the SFO and ENRC not reach an equitable settlement) any report submitted to the SFO would not be used against ENRC or its affiliates in any criminal proceedings. More specifically:

a    Messrs Gould and Gerrard held a conversation on or around the morning of 12 December 2012 in which they discussed the content of a letter to be sent by Dechert to the SFO addressing the above matters.

b    At 13.24 on 12 December 2012, Mr Gerrard sent an email to Mr Gould (addressing him as "*Dick*"), attaching a draft letter and asking Mr Gould to call him on his mobile telephone to discuss the same (the "**First 12.12.12 Email**"). It is to be inferred from the matters described below that Mr Gould made that telephone call shortly after receiving the First 12.12.12 Email. Further, the draft letter attached to that email **(i)** was headed "*Privileged & Confidential Dechert Work Product*", **(ii)** started with the words "*Dear Dick*", and **(iii)** was not on Dechert notepaper (the "**Draft December 2012 Letter**").

c    Later, at 14.40 on 12 December 2012, Mr Gerrard sent a further email to Mr Gould (the "**Second 12.12.12 Email**"). The Second 12.12.12 Email commenced with the words *"Dear Mr Gould"* (and not *"Dear Dick"*) and contained no request from Mr Gerrard that Mr Gould should call him on his mobile phone. The Second 12.12.12 Email attached a letter which differed from the Draft December 2012 Letter in the following ways: **(i)** it was not headed *"Privileged & Confidential Dechert Work Product"*, **(ii)** it started with the words *"Dear Mr Gould"*, and **(iii)** it was on Dechert notepaper (the "**Final December 2012 Letter**"). It is to be inferred that the changes to the Draft December 2012 Letter followed the conversation between Messrs Gerrard and Gould proposed in the First 12.12.12 Email, during which Mr Gould told Mr Gerrard not to refer to him as "*Dick*" because this salutation would betray the close relationship between the two men.

d    Mr Gould replied to the Second 12.12.12 Email on 20 December 2012, attaching a draft notice given under s. 72(1) of the Serious Organised Crime and Police Act

2005 (the "**S. 72 Notice**" and "**20.12.12 Email**"). It is to be inferred that the said document was provided by Mr Gould following communication(s) with Mr Gerrard during which Messrs Gerrard and Gould agreed that the draft notice was not to be shared with ENRC: when Mr Gerrard forwarded the email to members of his team at Dechert, he stated *"This document is for our purposes only"*. At about the same time, Mr Gerrard also told Mr Gould that he had collected 18 files of so-called *"hot documents"*, as recorded in a subsequent email from Mr Gould to Mr Patrick Rappo, the SFO's then head of bribery and corruption, and Mr Thompson on 8 February 2013.

e    Mr Gould did not wish to disclose **(i)** the fact that he had received the First 12.12.12 Email or the Draft December 2012 Letter, **(ii)** the fact that he had sent the 20.12.12 Email or **(iii)** the fact of his prior and subsequent telephone calls with Mr Gerrard. Accordingly, on a date unknown to ENRC, he deleted the said emails and documents from (as appropriate) both his mailbox and also from his "Sent" or "Deleted Items" folder. As there is no honest explanation for an SFO member of staff acting in this manner, it is to be inferred that the said conduct was dishonest.

f    Messrs Gerrard and Gould Failed to Document the conversations referred to at (a), (c) and (d) above, which were Unauthorised (the "**Twentieth Unauthorised Contact**"). Further, Mr Gerrard did not disclose the First 12.12.12 Email or the 20.12.12 Email to ENRC.

12.24.    On about **11 January 2013**, Mr Gerrard informed Mr Gould by telephone that there was allegedly some evidence of the involvement of ENRC's London-based CFO in a dubiously awarded contract in Kazakhstan (the "**Twenty-first Unauthorised Contact**"). The said allegation, which Mr Gerrard was not authorised or instructed to make, was plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this call.

12.25.    By letter dated **21 January 2013** sent by Mr Rappo, the SFO refused to provide ENRC with the confirmation sought by the Final December 2012 Letter (the "**January 2013 Letter**"). The SFO instead took the position that it would not **(i)** make any prosecution decision until it had seen Dechert's full reports, **(ii)** confirm in advance that those reports were subject to LPP, or **(iii)** give any advance confirmation as to the use it

might make of Dechert's reports. This decision was taken at a meeting held earlier that day, at which the SFO's General Counsel asked what Messrs Thompson and Gould had been told by Mr Alderman and the *"previous senior team"*. Mr Thompson responded that he had been told that it was a *"very messy case"* and that he should *"keep the investigation off the books with no case drive"*.

12.26.    On about **28 January 2013**, Mr Gerrard held at least one telephone call with Mr Gould (the "**Twenty-second Unauthorised Contact**"). Messrs Gerrard and Gould Failed to Document these Unauthorised call(s). ENRC has no knowledge or information as to the matters discussed by the two men and reserves the right to plead further following disclosure.

12.27.    On **27 February 2013**, Messrs Gerrard and Thompson spoke by telephone (the "**Twenty-third Unauthorised Contact**"). Mr Gerrard alleged to Mr Thompson that: **(i)** SSGPO's outsourced stripping contracts had been consistently inflated and/or fraudulent by about 30%, **(ii)** there was insufficient evidence to amount to relevant criminality for the SFO's purposes in respect of SSGPO, but that some sort of civil action or referral to the UKLA could be considered, **(iii)** his work was still in draft form and subject to expert agreement and ENRC board approval, **(iv)** ENRC's board was *"nervous"* following receipt of the January 2013 Letter and, as a consequence, Mr Gerrard requested an extension of time *"to report properly"* in relation to his Kazakh investigation until the end of March 2013, **(v)** the situation in Africa was complicated, but more concerning for ENRC's board than the situation in Kazakhstan, **(vi)** he had taken his work as far as he could without there being a risk to any investigation which the SFO might wish to carry out (which Mr Thompson understood to mean a risk of losing evidence or alerting potential suspects), and **(vii)** he would like to attend the SFO's offices to explain further. These statements were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call.

12.28.    On **28 February 2013**, Mr Gerrard called Mr Thompson again (the "**Twenty-fourth Unauthorised Contact**"). Mr Gerrrard alleged that: **(i)** he had received a new whistle-blower report which suggested that the management of SSGPO was implicated in criminal conduct, **(ii)** there were *"massive problems on sanctions"* in Africa, and that it appeared that ENRC had conspired to breach various sanctions and dealt with sanctioned individuals until very recently, **(iii)** the information provided by ENRC to

the SFO at the March 2012 Meeting in relation to sanctions *"may have been misleading"* such that Mr Gerrard wanted a meeting with the SFO to get a steer as to whether he should keep investigating sanctions, **(iv)** a *"corrupt"* payment of £35 million had been made by ENRC to Mr Daniel Gertler, **(v)** arrangements concerning promissory notes with a value of $125 million were *"bemusing"*, **(vi)** he did not want to continue his work to the detriment of any future investigation by the SFO, and **(vii)** there were relevant emails and documents to which he had been denied access. These statements were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document this Unauthorised call.

12.29.   On **13 March 2013**, Mr Gerrard telephoned Mr Rappo (the "**Twenty-fifth Unauthorised Contact**"). He told him that he had identified *"significant evidence of wrongdoing"* and that he would be recommending to ENRC's board the suspension of one or two individuals pending his continuing investigation. Mr Gerrard also alleged (inter alia) **(i)** US sanctions breaches, **(ii)** European sanctions breaches, **(iii)** that he had *"hard evidence"* that *"35 million"* had been given to Mr Gertler and *"material to suggest that this had gone on as bribes"*, and **(iv)** that ENRC's lawyers had aided and abetted criminality and had misled the SFO and HM Treasury. Later that evening, Mr Gerrard telephoned Mr Rappo and told him that ENRC was having a board meeting the next day and that Dechert *"expect*[ed] *a rough ride"*. These allegations were plainly contrary to ENRC's interests. Further, Mr Gerrard Failed to Document these Unauthorised calls.

12.30.   On **27 March 2013** ENRC terminated the Retainer. The next day, Mr Gould telephoned Mr Gerrard and held a 14 minute conversation with him. Save that it is to be inferred that they discussed ENRC, the termination of the Retainer, the 18 files of so-called "*hot documents*" held by Dechert (referred to in paragraph 12.23(d) above) and the Dechert Disclosure Notice (as defined in paragraph 13 below), ENRC has no knowledge or information as to the matters discussed by the two men and reserves the right to plead further following disclosure (the "**Twenty-sixth Unauthorised Contact**"). Messrs Gould and Gerrard Failed to Document this Unauthorised call.

13. On 28 March 2013, the SFO served a notice under s. 2A of the 1987 Act on Dechert, requiring it to provide a wide range of documents to the SFO (the "**Dechert Disclosure Notice**"). It is to be inferred that the Dechert Disclosure Notice was directed at, *inter alia*,

obtaining the 18 files of so-called "*hot documents*" referred to in paragraph 12.23(d) above. The Dechert Disclosure Notice was later re-issued under s. 2 of the 1987 Act and varied.

14. On 25 April 2013, the SFO announced that the Director had accepted ENRC plc for criminal investigation.

15. Between late March and early June 2013, correspondence ensued between the SFO, Dechert and ENRC's new advisers, Fulcrum Chambers Ltd ("**Fulcrum**"), regarding how Dechert could comply with the Dechert Disclosure Notice in a manner that protected ENRC's LPP.

### (5) The June 2013 Material

16. On about 4 June 2013, the SFO received a package addressed to the "*ENRC investigation*". It was hand-delivered and contained the following:

    16.1.    An eight-page letter written by Mr Gerrard to ENRC's then General Counsel, Beat Ehrensberger, in April 2013 (the "**April 2013 Letter**").

    16.2.    A draft of a 27-page presentation made by Dechert to the SFO in July 2012, which (for the avoidance of doubt) was not the same document as had been presented to the SFO on 20 July 2012.

    16.3.    Reports or extracts from two reports (the "**Reports**") prepared by well-known firms of English solicitors, with each page of the Reports marked as being legally privileged.

17. The documents identified in the preceding paragraph are hereinafter referred to as the "**June 2013 Material**". The SFO accepted by letter dated 16 October 2018 that the June 2013 Material contains privileged information. That privilege is maintained and no reliance is placed in these proceedings on the substantive content of the privileged material, nor on any description of or reference to that content in any derivative material (which is also privileged).

18. The June 2013 Material was reviewed by Mr Coussey on about 6 June 2013. He recorded, in a file note bearing that date, that the said material had been *"posted … by Dechert"* and that *"Clearly this material ought to be put on to our data base"* (the "**Coussey File Note**"). It is to be inferred that the June 2013 Material was, as Mr Coussey had proposed, placed onto the SFO's case database and thereafter used in its investigation. In any event, the Coussey File Note was distributed amongst the investigation team (a copy has recently been found in the filing cabinet of the current case controller Jonathan Mack; and further digital copies have been located).

19. Even a cursory review of the June 2013 Material would have revealed that it was subject to LPP: see paragraph 16 above. Further, there was nothing to suggest that ENRC had waived privilege:

    19.1.    ENRC had (as the SFO knew) terminated Dechert's retainer; accordingly Dechert had no authority to waive ENRC's privilege.

    19.2.    A waiver of LPP in June 2013 was inherently unlikely given that a criminal investigation had recently been announced.

    19.3.    The SFO's receipt of the June 2013 Material followed extensive correspondence in which ENRC had sought to protect LPP in material held by Dechert.

    19.4.    The June 2013 Material was provided anonymously and, it was to be inferred from this fact, by a person acting against the interests of ENRC. The same inference is to be drawn by the unusual manner in which the June 2013 Material was provided (by hand but in an envelope bearing three unfranked stamps).

20. Despite these matters, the June 2013 Material was not dealt with in accordance with the SFO's Operational Handbook or in a manner that would protect ENRC's LPP. In particular: **(i)** it was not placed into a sealed blue bag so that its status could be determined by agreement or by independent counsel, **(ii)** it and the Coussey File Note were instead placed onto the SFO's database and/or otherwise made available to the team investigating ENRC and **(iii)** members of the investigation team who reviewed the June 2013 Material were not removed from the team.

21. Thereafter:

21.1.    From c. November 2014, ENRC pressed the SFO for records of communications with Dechert.  Neither the June 2013 Material nor the Coussey File Note was provided, and their existence was concealed from ENRC.

21.2.    Between about January and July 2018, ENRC's solicitors made a number of more general criticisms of the SFO's conduct.  They culminated in ENRC sending a letter before action to the SFO in contemplated judicial review proceedings on 12 July 2018.

21.3.    On 26 September 2018, and only in the course of this correspondence, the SFO informed ENRC for the first time that it had received the June 2013 Material.  It was eventually provided to ENRC on 16 October 2018 (c. 5 ½ years after its receipt by the SFO).

**(6) The Investigation Decision and Website Statement**

22. As pleaded above, on 25 April 2013 the SFO announced that ENRC had been accepted for investigation (the "**Investigation Decision**").  ENRC's legal advisers, Fulcrum, were informed of the Investigation Decision at a meeting with the SFO held on that day, at which it was agreed that the decision would not be made public until 13:00 in recognition of the market sensitivity of any announcement. Despite that agreement, prior to the public announcement of the Investigation Decision, Bloomberg sought comment from ENRC about the fact that the SFO had launched an investigation. It is to be inferred that the source of Bloomberg's information was an employee of the SFO, given that those at ENRC and Fulcrum who were aware of the Investigation Decision **(i)** were in a meeting together immediately following the meeting between the SFO and Fulcrum and **(ii)** did not disclose the fact of the investigation to anyone outside that meeting.

23. At about the same time as the Investigation Decision, the SFO's website was updated to state that the investigation would focus on *"allegations of fraud, bribery and corruption relating to the activities of the company or its subsidiaries in Kazakhstan and Africa"* (the "**Website Statement**", emphasis supplied).

24. In fact, the SFO decided in about June-October 2013 not to continue its investigation into Kazakhstan but refused until at least 28 December 2015 to amend the Website Statement so as to omit reference to Kazakhstan. It is to be inferred that it acted as aforesaid because it feared the negative publicity associated with dropping its Kazakh investigation:

24.1. Even before the Investigation Decision was made, Mr Green had serious doubts as to whether ENRC or its subsidiaries had perpetrated any fraud, bribery and corruption in Kazakhstan. On 21 January 2013, he stated that *"… the possible fraudulent activity in Kazakhstan was largely on the company itself."*

24.2. On 28 February 2013, Mr Gerrard provided the SFO with his 438-page final report on his investigation into possible fraudulent activity in Kazakhstan (the "**Dechert Report**"). It concluded that the vast majority of fraudulent activity in Kazakhstan was perpetrated against ENRC. The SFO has not suggested that the report was incomplete.

24.3. On 22 March 2013, Mr Coussey produced a 36-page analysis of the Dechert Report. Later, and in any event by June 2013, Mr Coussey concluded that the allegations of wrongdoing in Kazakhstan were unlikely to be investigated by the SFO.

24.4. When a notice was served under s. 2 of the 1987 Act on Fulcrum on 8 October 2013, documents relating to ENRC's Kazakh operations were excluded from its scope.

24.5. On 25 October 2013, the SFO stated in writing that they would not *"… rule out an investigation in the future into ENRC plc's activities in Kazakhstan …."* (emphasis supplied).

24.6. At a meeting held on 19 June 2014 between Forensic Risk Alliance Ltd ("**FRA**") and the SFO, John Gibson (who by this stage was the SFO's case controller) stated that the SFO were not investigating Kazakhstan *"at the moment"* and that data relating to Kazakhstan could be taken *"offline"* and instead held as *"a backup"*.

24.7. On 13 March 2015, in a call with Mr John Missing (a lawyer acting for ENRC), Mr Gibson stated that it was *"fair"* for ENRC to ask whether the SFO would formally announce the discontinuance of its Kazakh investigation.

24.8.     On 16 March 2015, Mr Matthew Wagstaff (who was Joint Head of Bribery at the SFO) stated in a meeting held with Lord Goldsmith QC (a lawyer acting for ENRC) that the SFO had decided not to proceed with its investigation into Kazakhstan and that he was surprised that ENRC had not been informed.

24.9.     On 19 March 2015, Mr Gibson confirmed at a meeting held with Mr Missing and Mr Newcomb of Fulcrum that Messrs Gibson and Wagstaff understood why ENRC wanted formal confirmation that the Kazakh investigation had been closed. Messrs Gibson and Wagstaff expressed concern as to the use to which the said confirmation would be put.

24.10.    Nevertheless, by letter dated 27 March 2015 the SFO refused to confirm that their investigation into ENRC's Kazakh operations had been concluded. The SFO merely confirmed that they were not at present *"actively investigating* [ENRC's] *Kazakh operations"*.

24.11.    It was only on 14 May 2015 that the SFO confirmed in a letter intended to be shared with ENRC's stakeholders that it was not at present actively investigating any of ENRC's operations in Kazakhstan. Even then (as noted above), the SFO did not amend the Website Statement so as to exclude reference to Kazakhstan for at least another seven months.

25. No charges have been brought against ENRC, despite c. six years having elapsed since the announcement of the Investigation Decision (which itself followed over eighteen months of engagement between ENRC and the SFO).

## THE CLAIMS

### (1)     Inducing breach of contract and/or fiduciary duty

<u>The obligations owed by Dechert and Mr Gerrard</u>

26. The following terms were implied into the Retainer:

26.1.    That Dechert would only act in respect of the subject matter of the Retainer in accordance with ENRC's instructions.

26.2.    That Dechert would not act in respect of the subject matter of the Retainer in a manner contrary to ENRC's interests. Further, that it would act only in the interests of ENRC and that it would not permit that duty to conflict with its own interests or the interests of a third party.

26.3.    That Dechert would protect and preserve all confidential and privileged information and documentation belonging to ENRC.

26.4.    That Dechert would disclose all material matters to, and not keep relevant information secret from, ENRC.

27. Further, as ENRC's solicitors, both Dechert and Mr Gerrard owed fiduciary obligations to ENRC, including:

27.1.    A duty only to act in the best interests of ENRC, and not to permit that duty to conflict with their own interests or the interests of a third party.

27.2.    A duty of confidentiality.

The SFO's knowledge of the Retainer etc.

28. The SFO (including, for the avoidance of doubt, Messrs Alderman, Gould, Thompson and Green) had knowledge of the Retainer, its terms, and the fiduciary obligations owed to ENRC:

28.1.    Dechert was at all material times a well-known firm of solicitors and Mr Gerrard was at all material times a high-profile solicitor.

28.2.    It would have been obvious from Mr Gerrard's interactions with the SFO in around August 2011 that he was instructed by ENRC.

28.3.    ENRC informed the SFO that Dechert and Mr Gerrard were acting for it on 3 October 2011.

28.4.    It is common knowledge that solicitors owe their clients **(i)** the contractual duties and **(ii)** the fiduciary duties pleaded above. In view of its function, resources and the qualifications of its staff (many of whom, including Mr Alderman, were qualified lawyers), it is to be inferred that the SFO had such knowledge.

Complaints about the Initial Contact

29. The following complaints are made about the Initial Contact:

29.1.    <u>Dechert (acting by Mr Gerrard) and Mr Gerrard were acting against ENRC's interests, in breach of the Retainer and in breach of fiduciary duty:</u>

a    Mr Gerrard leaked confidential and privileged material to The Times and took great care to disguise his involvement in this flagrant breach of duty: see paragraph 11.6 above.

b    Mr Gerrard leaked confidential and privileged material to the SFO: see paragraphs 11.9-11.10 above.

c    Mr Gerrard conducted himself as aforesaid at the Chelsea Brasserie: see paragraph 11.12 above.

d    Mr Gerrard **(i)** repeatedly made allegations about ENRC which were plainly contrary to ENRC's interests, and thereby failed to act in accordance with those interests; **(ii)** did so without ENRC's consent, and thereby failed to act in accordance with ENRC's instructions; **(iii)** failed to report the fact that he had made such statements to ENRC, and thereby acted in his own interests and against the interests of ENRC; and **(iv)** acted as aforesaid to enlarge the scope of the Retainer, and thereby acted in his own interests and against the interests of ENRC: see the First to Seventh Unauthorised Contacts, pleaded above.

29.2.    The SFO (acting by Mr Alderman) was aware (alternatively, turned a blind eye to the fact) that Dechert/Mr Gerrard was acting against ENRC's interests and therefore acting in breach of the Retainer and in breach of fiduciary duty. This inference is to be drawn from the facts pleaded above, including the following:

a    At no point prior to 12 December 2012 did Dechert/Mr Gerrard seek to agree any terms as to the uses which the SFO could make of information disclosed to it by Dechert/Mr Gerrard.

b    Mr Alderman was provided by Mr Gerrard with the 2011 Leaked Material (or, at the very least, advance notice of the privileged and confidential content of the August 2011 Article): see paragraphs 11.8-11.9 above.

c    Thereafter, Mr Alderman had direct contact with Mr Gerrard to discuss ENRC *before* ENRC informed the SFO that Mr Gerrard was instructed on its behalf: see the Second, Third and Fourth Unauthorised Contacts.

d    The statements made by Mr Gerrard to the SFO about ENRC during the Initial Contact were plainly not statements that a solicitor acting in his client's interest would have made. For example, Mr Gerrard **(1)** criticised other lawyers instructed by ENRC and certain of the company's shareholders (Second Unauthorised Contact), and **(2)** alleged that **(i)** ENRC needed to understand that it had a *"big problem"* (Second Unauthorised Contact); **(ii)** there was *"lots to tell"* and there were *"lots of red flags"* (Sixth Unauthorised Contact); and **(iii)** the October 2011 Meeting *"truly shook"* ENRC (Seventh Unauthorised Contact).

e    Mr Alderman issued instructions to keep the ENRC investigation *"off the books"* because it was *"very messy"*: see paragraphs 11.24 and 12.25 above.

f    Mr Alderman made improper demands and intentionally downplayed the fact and circumstances of his prior contact with Mr Gerrard at the October 2011 Meeting: see paragraphs 11.19 to 11.20 above.

g       No reference was ever made to the Unauthorised Contacts in any of the meetings with the SFO attended by ENRC.

h       The Beige Notebook, which contained Mr McCarthy's notes of his involvement with the ENRC matter between July and November 2011, has been deliberately suppressed or destroyed by SFO staff: see paragraph 11.27 above.

i       At and around the time of the Initial Contact, the SFO's director and staff frequently acted in breach of relevant rules, legal requirements and standards of good practice: see paragraphs 6 and 7 above.

29.3.   <u>The SFO (acting by Mr Alderman) induced, procured or encouraged Mr Gerrard to act in breach of his and Dechert's obligations to ENRC:</u>

a       The SFO knew from the moment of the First Unauthorised Contact that Mr Gerrard was acting improperly: see paragraph 29.2 above. It should have refused to accept the 2011 Leaked Material (or such other privileged and confidential material as was provided to it in about August 2011); returned that material to ENRC; and informed ENRC of the circumstances in which that material had been offered to it. When it failed to take these steps, the SFO induced, procured or encouraged Mr Gerrard to act in breach of duty.

b       The SFO had and continued to have repeated contact with Mr Gerrard, in the absence of any other ENRC representative, and in the knowledge that Mr Gerrard had acted and was acting in breach of duty: see paragraph 29.2 above. It made notes of those further contacts, asked questions of Mr Gerrard, and used the information that he was providing. By so doing, the SFO induced, procured or encouraged Mr Gerrard to act in breach of duty.

c       The SFO (in particular, Mr Alderman) **(i)** agreed to and in September 2011 held a *"private"* meeting with Mr Gerrard, **(ii)** intentionally downplayed the fact and circumstances of its prior contact with Mr Gerrard at the October 2011 Meeting, and **(iii)** did not inform ENRC that its solicitor was repeatedly making statements about it that were plainly contrary to its interests. By so doing, the SFO induced,

procured or encouraged Mr Gerrard to act in breach of duty. Further, and as is pleaded below, by so acting the SFO failed to comply with its duties to act independently, with objectivity and with good faith, and to protect ENRC's confidential information and LPP.

Complaints about the Review Contact

30. The following complaints are made about the Review Contact:

30.1.   Dechert (acting by Mr Gerrard) and Mr Gerrard were acting against ENRC's interests, in breach of the Retainer and in breach of fiduciary duty:

a   Mr Gerrard **(i)** repeatedly made allegations about ENRC which were plainly contrary to ENRC's interests, and thereby failed to act in accordance with those interests; **(ii)** did so without ENRC's consent, and thereby failed to act in accordance with ENRC's instructions; **(iii)** failed to report the fact that he had made such statements to ENRC, and thereby acted in his own interests and against the interests of ENRC; and **(iv)** acted as aforesaid to enlarge the scope of the Retainer, and thereby acted in his own interests and against the interests of ENRC: see the Eighth to Twenty-Sixth Unauthorised Contacts, pleaded above.

b   On three occasions, Mr Gerrard pre-agreed with Messrs Thompson and Gould that they would make written or oral statements to ENRC that would give ENRC cause to expand the scope of the Retainer: see paragraphs 12.12 to 12.14 above. By so acting, Mr Gerrard acted in his own interests and against the interests of ENRC.

c   During the Twentieth Unauthorised Contact, Mr Gerrard sent Mr Gould a privileged letter (the Draft December 2012 Letter) and agreed with Mr Gould that the S. 72 Notice would be provided to him for Dechert's internal purposes only. By so acting, Mr Gerrard acted in his own interests and against the interests of ENRC.

30.2.    <u>The SFO (acting by Mr Alderman, Mr Gould and Mr Thompson) was aware (alternatively, turned a blind eye to the fact) that Dechert/Mr Gerrard was acting against ENRC's interests and therefore acting in breach of the Retainer and in breach of fiduciary duty.</u>   This inference is to be drawn from the facts pleaded above and in particular that:

a    The SFO knew or was reckless as to whether Mr Gerrard was acting in this manner when the Initial Contact was made: see above.

b    At no point prior to 12 December 2012 did Dechert/Mr Gerrard seek to agree any terms as to the uses which the SFO could make of information disclosed to it by Dechert/Mr Gerrard.

c    No reference was ever made to the Unauthorised Contacts in any of the meetings with the SFO attended by ENRC.

d    The statements made to the SFO against ENRC's interests during the Review Process were plainly not statements that a solicitor acting in his client's interest would have made. For example, Mr Gerrard alleged to the SFO that:

i    There were *"issues"* for Mr Gerrard in advising ENRC (Eighth Unauthorised Contact); that the Review Process *"shouldn't be economical"*, that there had been falsification and destruction of documents, that ENRC was putting *"more"* pressure on Mr Gerrard as to the scope of his investigation, and that ENRC's audit committee was *"odd"* (Ninth Unauthorised Contact); that there was an *"attritional"* battle being waged within ENRC, that he had been obstructed and provided with backdated paperwork, and that ENRC changed its mind *"regularly"* (Tenth Unauthorised Contact); that there were *"Russian issues"* within ENRC (Eleventh Unauthorised Contact); that ENRC's General Counsel and certain of ENRC's external lawyers were too close to transactions that Mr Gerrard was investigating (Fourteenth Unauthorised Contact); that Jones Day kept him at *"arm's length"* from investigating certain matters (Seventeenth Unauthorised Contact); and that there were relevant

documents to which Mr Gerrard had been *"denied"* access (the Twenty-fourth Unauthorised Contact).

ii     That there was *"endemic"* fraud and corruption within ENRC's Kazakh operations (Thirteenth Unauthorised Contact); that there had been *"UN sanction breaches"* by ENRC and that ENRC had a *"massive"* sanctions problem (Tenth and Twenty-fourth Unauthorised Contacts); that ENRC had made a *"corrupt"* £35 million cash payment and that promissory notes entered into by ENRC were *"bemusing"* (Twenty-fourth Unauthorised Contact); that ENRC's lawyers had aided and abetted criminality (Twenty-fifth Unauthorised Contact); and that (if Mr Gerrard continued his work) this would be to the detriment of any criminal investigation launched by the SFO (Twenty-third and Twenty-fourth Unauthorised Contacts).

e     Mr Gould stated in March 2012 that Mr Gerrard was probably *"up to no good"*: see paragraph 12.10 above.

f     On three occasions, Mr Gerrard pre-agreed with Messrs Thompson and Gould that they would make written or oral statements to ENRC that would give ENRC cause to expand the scope of the Retainer: see paragraphs 12.12 to 12.14 above

g     Mr Thompson dishonestly sought to delete evidence concerning the manner in which the June 2012 Letter had been drafted: see the Fifteenth Unauthorised Contact.

h     In and after July 2012, the SFO conducted a desultory investigation into the allegations contained in the July 2012 Whistle-Blowing Letter about Mr Gerrard and his relationship with "Dick".

i     Mr Thompson attended a *"quiet meeting"* with Mr Gerrard in December 2011 and Mr Gerrard met with Mr Gould at an *"out of the way"* public house in October 2012: see the Tenth and Nineteenth Unauthorised Contacts.

j    Messrs Gerrard and Gould agreed the terms of the Final December 2012 Letter via a process that involved Mr Gerrard sending Mr Gould a draft letter headed *"Privileged & Confidential Dechert Work Product"*.

k    Mr Gould produced the S. 72 Notice for Mr Gerrard and Dechert's *"[internal] purposes only"*.

l    Mr Gould dishonestly sought to delete evidence concerning **(i)** the Nineteenth Unauthorised Contact, **(ii)** the manner in which the Final December 2012 Letter was drafted and **(iii)** the fact that he had sent the S. 72 Notice to Mr Gerrard.

m    Mr Gould routinely used his personal mobile phone to send and receive text messages to/from Mr Gerrard. Mr Gould's use of his personal mobile phone in this manner was contrary to SFO policy. No records of such communications have been produced to ENRC by the SFO or by Dechert, who maintain that they have been deleted and cannot be restored.

n    Between 2011 and 2013, the SFO's director and staff frequently acted in breach of relevant rules, legal requirements and standards of good practice: paragraphs 6 and 7 above are repeated.

30.3.    The SFO (acting by Mr Alderman, Mr Gould and Mr Thompson) induced, procured or encouraged Mr Gerrard to act in breach of his and Dechert's obligations to ENRC:

a    The SFO knew that Mr Gerrard was acting improperly: see paragraph 30.2 above. The SFO nonetheless had repeated contact with Mr Gerrard throughout the Review Process in the absence of any other ENRC representative. The SFO made notes of those contacts, asked questions of Mr Gerrard, and used the information that he was providing. By so doing, the SFO induced, procured or encouraged Mr Gerrard to act in breach of duty.

b    Further, the SFO:

i    on at least two occasions held "quiet"/"out of the way" meetings with Mr Gerrard in the absence of any other ENRC representative (the Tenth and Nineteenth Unauthorised Contacts),

ii   on at least three occasions made statements to ENRC that were pre-agreed with Mr Gerrard to further his agenda of expanding the scope of his Retainer: see paragraphs 12.12 to 12.14 above,

iii  assisted Mr Gerrard in drafting the Final December 2012 Letter: see paragraph 12.23 above,

iv   produced the S. 72 Notice and sent it to Mr Gerrard for his internal purposes only (ie knowing and intending that it would not be shared with ENRC), and

v    did not inform ENRC that its solicitor was repeatedly making allegations about it that were plainly contrary to its interests.

By so doing, the SFO (acting by Mr Alderman, Mr Gould and Mr Thompson) induced, procured or encouraged Mr Gerrard to act in breach of duty. Further, and as is pleaded below, by so acting the SFO failed to comply with its duties to act independently, with objectivity and with good faith, and to protect ENRC's confidential information and LPP.

Intention/recklessness on the part of the SFO

31. It is to be inferred from the matters pleaded herein and in paragraphs 29.2, 29.3, 30.2, 30.3, 38-39, 42-43, 46, 50, 51 and 52 that the SFO intended to cause the aforesaid breaches of contract and fiduciary duty and/or was recklessly indifferent as to whether their actions would cause such breaches. It acted as aforesaid because it wanted to achieve the end of a substantial civil settlement from, and/or a criminal conviction against, ENRC.

**(2)    Misfeasance in public office**

32. The SFO is liable to compensate ENRC for the losses suffered as a result of the misfeasance in public office committed by it and its employees and contractors, in particular Messrs Alderman, Gould, Thompson, Coussey and Green. This liability arises from the SFO's unlawful acts and omissions, carried out with knowledge or "subjective" reckless indifference

46

as to (a) the lawfulness of those acts and omissions, and (b) the probability of harm being caused to ENRC as a result of those acts and omissions.

## The SFO's obligations

33. As a public body with the statutory power under the 1987 Act to enquire into and investigate allegations of serious and complex fraud and (where appropriate) to bring proceedings in respect of the same, the SFO was under a continuing duty to persons affected by any such enquiry, investigation or proceeding:

    33.1.      to act strictly in accordance with its powers (the "**Powers Duty**");

    33.2.      to act independently, objectively and in good faith (the "**Independence Duties**");

    33.3.      to preserve documents, evidence, information and intelligence produced or received by it (in particular in light of the disclosure duties imposed on investigators and prosecutors by the 1996 Act, the CPIA Code, and associated regulations, rules of court and Attorney General's guidelines) (the "**Evidence Duty**"); and

    33.4.      to protect the LPP and confidentiality of any affected third party (the "**LPP Duty**") (collectively, the "**Duties**").

34. To the extent that the SFO acted in breach of the Duties, or otherwise committed tortious conduct or acted *ultra vires*, it acted unlawfully for the purposes of the tort of misfeasance in public office.

35. At all material times, the SFO and its staff and contractors **(i)** owed ENRC the obligations described above and **(ii)** acted as public officers.

## Misfeasance: the Initial Contact

36. <u>Unlawful acts</u>.  When the Initial Contact was made, the SFO acted unlawfully in the following ways:

36.1.     During the First Unauthorised Contact, the SFO (acting by Mr Alderman) was provided with the 2011 Leaked Material (or, at the very least, the confidential and privileged matters addressed in the August 2011 Article). The said information was provided to Mr Alderman and thereafter used by him in circumstances where it was clear that **(i)** Mr Gerrard was acting contrary to his client's interests and instructions and **(ii)** the material was subject to LPP: see paragraph 29.2 above. The SFO should have refused to accept the said material and reported the matter to ENRC: see paragraph 29.3 above. It did not do so. Accordingly, by its involvement in the First Unauthorised Contact the SFO (acting by Mr Alderman) acted in breach of the Independence and LPP Duties.

36.2.     The SFO (acting by Mr Alderman) thereafter had at least two telephone conversations and one meeting with Mr Gerrard, defined above as the Second, Third and Fourth Unauthorised Contacts. On those occasions, Mr Gerrard made allegations about ENRC that were (as Mr Alderman knew) plainly contrary to ENRC's interests: see paragraph 29.2 above. The SFO should have refused to hold the said conversations and meetings with Mr Gerrard and should have reported Mr Gerrard's conduct to ENRC. It did not do so and instead encouraged Mr Gerrard to act in breach of duty: see paragraph 29.3 above. Accordingly, by its involvement in the Second to Fourth Unauthorised Contacts the SFO (acting by Mr Alderman) acted in breach of the Independence Duties and committed the torts of inducing breach of contract/fiduciary duty.

36.3.     The Beige Notebook has been deliberately suppressed or destroyed by the SFO. No investigator acting independently, objectively, in good faith and in accordance with his duty to preserve evidence would have acted in this manner. The SFO (acting by employee(s) whose identity(ies) are currently unknown to ENRC) therefore acted in breach of the Independence and Evidence Duties.

36.4.     The SFO (acting by Mr Alderman) gave an instruction to *"keep the investigation* [into ENRC] *off the books with no case* [ie electronic] *file"* because the case was *"very messy"*. No investigator acting independently, objectively, in good faith and in accordance with his duty to preserve evidence would have issued this instruction. The SFO therefore acted contrary to the Independence and Evidence Duties.

36.5.    During the October 2011 Meeting, the SFO (acting by Mr Alderman) made the demands particularised at paragraphs 11.19 and 11.20 above. They were improper because the SFO had neither sufficient evidence to open a criminal investigation into ENRC nor had served a notice as required by s. 2A of the 1987 Act. Accordingly, the SFO (acting by Mr Alderman) acted *ultra vires* and in breach of the Powers and Independence Duties.

36.6.    During the October 2011 Meeting, the SFO (acting by Mr Alderman) deliberately downplayed the extent of Mr Alderman's prior contact with Mr Gerrard. Mr Alderman did so by: **(i)** omitting to make any reference to the fact or content of the First to Fourth Unauthorised Contacts; and **(ii)** asking Mr Gerrard to explain his role (whereas Mr Alderman knew what Mr Gerrard's role was by reason of his involvement in the said contacts). By so acting, the SFO (acting by Mr Alderman) breached the Independence Duties because it deliberately concealed from ENRC the fact that its solicitor had been acting wrongfully.

37. But for the said unlawful actions, the SFO would not have sent the August 2011 Letter, ENRC would not have agreed to enter into the Review Process, and the SFO, having insufficient evidence to open a criminal investigation, would have been unable to take any further action against ENRC.

38. Knowledge or subjective recklessness of unlawful acts. The SFO's employees, and in particular Mr Alderman, knew and believed at all material times that the SFO owed the Duties. The Duties are **(i)** self-evident, **(ii)** imposed by statute and authority and **(iii)** acknowledged by the SFO's own Operational Handbook and the CPS Code for Crown Prosecutors.

39. The SFO (in particular, Mr Alderman) knew that the Initial Contact was unlawful in the respects particularised in paragraph 36 above. Alternatively, the SFO and Mr Alderman were recklessly indifferent as to whether the Initial Contact was unlawful as aforesaid. Pending disclosure, ENRC relies upon the following:

39.1.    It is to be inferred from the circumstances of the First to Fourth Unauthorised Contacts that Mr Alderman knew that Mr Gerrard had been instructed by ENRC but was acting in breach of the terms of the Retainer/fiduciary duty and in particular his

duties to act in ENRC's interests and to protect ENRC's confidential and privileged information. Alternatively, Mr Alderman was recklessly indifferent as to the said conduct of Mr Gerrard. There is no other plausible explanation for Mr Alderman receiving **(i)** the 2011 Leaked Material (or at the very least, advance notice of the matters contained in the August 2011 Article) and **(ii)** the disclosures made during the Second and Fourth Unauthorised Contacts. Paragraphs 29.2 and 29.3 are repeated.

39.2. The Beige Notebook has been deliberately destroyed or suppressed by SFO employee(s). Such actions are, by their very nature, dishonest. Paragraph 7 above is repeated.

39.3. By its very nature, Mr Alderman's decision to keep the ENRC investigation *"off the books"* because it was *"messy"* was either dishonest or subjectively reckless.

39.4. It is to be inferred that Mr Alderman made unjustified demands at the October 2011 Meeting because **(i)** he was desperate for the SFO to take action in relation to ENRC but **(ii)** he knew that the SFO had insufficient evidence to open a criminal investigation. Accordingly, Mr Alderman's unlawful conduct in making the said demands was deliberate or subjectively reckless in character.

39.5. It is to be inferred that Mr Alderman deliberately downplayed the extent of his prior contact with Mr Gerrard at the October 2011 Meeting because he knew that Mr Gerrard had been acting in breach of his duties to ENRC. Accordingly, Mr Alderman's unlawful conduct was deliberate or subjectively reckless.

Misfeasance: the Review Process

40. <u>Unlawful acts</u>. During the Review Process, the SFO acted unlawfully in the following ways:

40.1. Mr Gerrard repeatedly made disclosures to the SFO (acting through Messrs Alderman, Gould and Thompson) that were plainly contrary to ENRC's interests: see the Eighth to Twenty-sixth Unauthorised Contacts. The SFO through at least Messrs Alderman, Thompson and Gould knew that Mr Gerrard was acting against ENRC's interests: see paragraph 30.2 above. The SFO should have refused to have the said

contacts and should have reported Mr Gerrard's conduct to ENRC. It did not do so and instead encouraged Mr Gerrard to act in breach of duty: see paragraph 30.3 above. Accordingly, by holding the said unauthorised contacts, and in making and sharing records of and otherwise using the matters divulged by Mr Gerrard, the SFO (acting by Messrs Alderman, Gould and Thompson) breached the Independence Duties and committed the torts of inducing breach of contract/fiduciary duty.

40.2.    On 18 June 2012, the SFO (acting by Mr Thompson) drafted the June 2012 Letter in consultation with Mr Gerrard. The said letter was drafted in circumstances where it was clear that Mr Gerrard was acting contrary to his client's interests and instructions to further his own agenda of seeking to expand the scope of the Retainer: see paragraph 12.13 above. By so acting, the SFO (acting by Mr Thompson) breached the Independence Duties.

40.3.    On a date unknown to ENRC on or after 18 June 2012, Mr Thompson sought permanently to delete the 18 June Email to hide the fact that he had had improper contact with Mr Gerrard on that date in connection with the drafting of the June 2012 Letter: see paragraph 12.13 above. That act was contrary to the Evidence and Independence Duties.

40.4.    On 10 May and 18 June 2012, the SFO (acting by Messrs Thompson and Gould) made statements to ENRC representatives that had been pre-agreed with Mr Gerrard and which furthered Mr Gerrard's agenda of seeking to expand the scope of the Retainer: see paragraphs 12.12 and 12.14 above. By so acting, the SFO (acting by Messrs Thompson and Gould) breached the Independence Duties.

40.5.    In July 2012, the SFO failed to follow its own complaints procedure when credible allegations of criminal wrongdoing were anonymously made against Mr Gerrard and "Dick" in the July 2012 Whistle-Blowing Letter: see paragraphs 12.16 to 12.17 above. The said decision was contrary to the Independence Duties.

40.6.    On 12 December 2012, **(i)** Mr Gerrard sent Mr Gould a draft letter headed *"Privileged & Confidential Dechert Work Product"* and **(ii)** Mr Gould thereafter reviewed that privileged document and settled the final version of the December 2012 Letter in consultation with Mr Gerrard: see paragraph 12.23(a)-(c) above. Later, on 20 December

2012, Mr Gould sent the S. 72 Notice for Mr Gerrard's own purposes (ie knowing and intending that it would not be shared with ENRC): see paragraph 12.23(d) above. By so acting, the SFO (acting by Mr Gould) breached the LPP and Independence Duties.

40.7. On a date unknown to ENRC on or after 12 December 2012, the SFO (acting by Mr Gould) sought permanently to delete the First 12.12.12 Email and the 20.12.12 Email to hide the fact that he had had improper contact with Mr Gerrard on those dates: see paragraph 12.23(e) above. Further, on a date unknown to ENRC, the SFO (acting by Mr Gould) sought permanently to delete the Booksellers Email. Those acts were contrary to the Evidence and Independence Duties.

40.8. Mr Gould breached SFO policy by communicating with Mr Gerrard via text messages sent from his personal mobile telephone. Those acts were contrary to the Evidence and Independence Duties.

40.9. The SFO failed to bring the above matters to the attention of ENRC, as it should have done at the meetings held with ENRC's representatives on 30 November and 20 December 2011, and 5 March, 10 May, 18 June, 20 July and 28 November 2012. Its failure to do so breached the Independence Duties.

41. But for the said unlawful actions **(i)** the Review Process would have been substantially narrower in scope and duration and **(ii)** no criminal investigation would have been instituted in relation to ENRC: see paragraph 53 below.

42. <u>Knowledge or subjective recklessness of unlawful acts.</u> The SFO's employees, and in particular Messrs Alderman, Gould, Thompson and Green, knew and believed at all material times that the SFO owed the Duties. The Duties are **(i)** self-evident, **(ii)** imposed by statute and authority and **(iii)** acknowledged by the SFO's own Operational Handbook and the CPS Code for Crown Prosecutors.

43. The SFO (in particular, Messrs Alderman, Gould, Thompson and Green) knew that the Review Contact was unlawful in the respects particularised in paragraph 40 above. Alternatively, the SFO and the said individuals were recklessly indifferent as to whether the Review Contact was unlawful as aforesaid. Pending disclosure, ENRC relies upon the following facts and matters:

43.1.    Mr Alderman: paragraph 39 above is repeated.

43.2.    Mr Gould:

a    Repeatedly received and made use of information provided by Mr Gerrard in circumstances where Mr Gerrard was plainly acting against the interests of ENRC. Further, he encouraged Mr Gerrard to provide such information: paragraph 30.3 above is repeated.

b    Continued to act as aforesaid notwithstanding that he had formed the view, by 23 March 2012, that Mr Gerrard may be *"up to no good"*.

c    Delivered a message to ENRC at the meetings held on 10 May and 18 June 2012 that had been pre-agreed with Mr Gerrard and which furthered Mr Gerrard's agenda of expanding the scope of the Retainer.

d    Failed, when he discussed the July 2012 Whistle-Blowing Letter with a more senior member of SFO staff, to confirm the close nature of his relationship with Mr Gerrard, and to confirm or disclose his concerns as to Mr Gerrard's conduct and that the whistle-blower's allegations in relation to Mr Gerrard's treatment of Jones Day were essentially correct.

e    Agreed to and thereafter met Mr Gerrard at an *"out of the way"* public house on 10 October 2012 and sought permanently to delete the Booksellers Email.

f    Received the Draft December 2012 Letter from Mr Gerrard (marked *"Privileged & Confidential Dechert Work Product"*), and used the same to finalise the Final December 2012 Letter in consultation with Mr Gerrard.

g    Sought permanently to delete the First 12.12.12 and 20.12.12 Emails so as to disguise the true nature of the Twentieth Unauthorised Contacts.

h    Produced the S. 72 Notice on or about 20 December 2012 in consultation with Mr Gerrard and for Mr Gerrard's own purposes.

i    Communicated with Mr Gerrard using an unauthorised method of communication.

j    Failed to make, suppressed or destroyed attendance notes of (at least) the Twentieth, Twenty-first and Twenty-second Unauthorised Contacts.

43.3.    Mr Thompson:

a    Repeatedly received and made use of information provided by Mr Gerrard in circumstances where Mr Gerrard was plainly acting against the interests of ENRC. Further, he encouraged Mr Gerrard to provide such information: paragraph 30.3 above is repeated.

b    Acted as aforesaid notwithstanding that he had been told, in or around late 2011, that it was a *"very messy case"* and that the investigation should be *"kept off the books with no case drive"*.

c    Acted as aforesaid at (inter alia) a *"quiet meeting"* held on 19 December 2011 at the Crowne Plaza Hotel.

d    Gave false evidence relating to the manner by which the Crowne Plaza Hotel was selected as the venue for the Tenth Unauthorised Contact.

e    Failed to record in his own attendance note what Mr Gerrard had told him at the Crowne Plaza Hotel because he knew that the disclosures had been unlawfully made.

f    Continued to act as aforesaid after he was told on 23 March 2012 that Mr Gerrard may be *"up to no good"*.

g    Delivered a message to ENRC at the meetings held on 10 May and 18 June 2012 that had been pre-agreed with Mr Gerrard and which furthered Mr Gerrard's agenda of expanding the scope of the Retainer.

h    Drafted the June 2012 Letter in consultation with Mr Gerrard so as to send a pre-agreed message to ENRC which furthered Mr Gerrard's agenda as pleaded above.

i    Sought permanently to delete the 18 June Email so as to disguise the Fifteenth Unauthorised Contact.

43.4.    The SFO breached the Independence Duties when dealing with the July 2012 Whistle-Blowing Letter. Mr Green knew of or was recklessly indifferent as to the said unlawfulness:

a    The allegations contained in the July 2012 Whistle-Blowing Letter were so serious (potentially amounting to the offence of perverting the course of justice and an offence under section 4(1) and (2)(b) of the Official Secrets Act 1989) and prima

facie credible that they cried out for independent investigation (as was required by the SFO's own complaints procedure).

b   The allegations contained in the July 2012 Whistle-Blowing Letter were corroborated by multiple pieces of information available to the SFO: see paragraph 12.17 above.

c   No written record was kept recording how the SFO responded to the July 2012 Whistle-Blowing Letter.

Misfeasance: the June 2013 Material

44. Unlawful acts. The SFO breached the LPP and Independence Duties when it:

44.1.   Failed to place the June 2013 Material in a blue bag so that its status as privileged material could be confirmed by independent counsel.

44.2.   Uploaded the June 2013 Material onto its database and otherwise made it available to the team investigating ENRC.

44.3.   Failed, between June 2013 and August 2018, to alert ENRC to the fact that it had the June 2013 Material in its possession.

45. But for the said unlawful actions, the SFO would not have used ENRC's confidential and privileged material for the purposes of its investigation. Furthermore, the SFO should immediately have informed ENRC of its receipt of the June 2013 Material; and the SFO's failure to do so meant that ENRC was deprived for over five years of the ability to investigate and take appropriate remedial action against the persons involved in providing the June 2013 Material to the SFO.

46. Knowledge or subjective recklessness of unlawful acts. The SFO and Mr Coussey knew that the SFO had failed to follow its own Operational Handbook and its duty to protect ENRC's confidential information and LPP. Alternatively, the SFO and Mr Coussey were recklessly indifferent as to the said unlawfulness. In particular:

46.1.	Mr Coussey was an experienced senior prosecutor within the SFO and so would have been fully aware of the importance of preserving LPP and the requirements laid down by SFO's Operational Handbook in relation to the same.

46.2.	Mr Coussey was involved in correspondence sent in the months before the SFO received the June 2013 Material relating to how ENRC's LPP could be protected.

46.3.	The June 2013 Material was self-evidently subject to LPP. Further, it was obvious that LPP had not been waived. Paragraph 19 above is repeated.

46.4.	Notwithstanding the above, Mr Coussey recommended that the June 2013 Material should be added to the SFO's database. In the premises, he either deliberately ignored the existence of LPP belonging to ENRC or acted with reckless indifference as to the same.

Misfeasance: the Investigation Decision and Website Statement

47.	Unlawful acts. The SFO breached the Independence Duties in failing to **(i)** provide prior to 14 May 2015 any form of public confirmation that it was not actively investigating ENRC's operations in Kazakhstan and **(ii)** remove from its website reference to its investigation into ENRC's Kazakh operations until at least 28 December 2015, because:

47.1.	The SFO had decided not to continue that investigation at some point between June and October 2013.

47.2.	ENRC had been pressing the SFO for formal confirmation that the SFO was no longer investigating ENRC's operations in Kazakhstan from 14 November 2013.

47.3.	The SFO and/or members of its staff understood why ENRC wanted formal confirmation that the investigation into Kazakhstan had been closed.

48.	It is to be inferred that the SFO delayed in providing the said confirmation, and declined to update its website, because it feared the negative publicity associated with dropping the Kazakh investigation.

49. But for the said unlawful actions, the SFO would have confirmed that it had closed its investigation into Kazakhstan in about June-October 2013 and removed reference to a Kazakh investigation from its website, and ENRC would not have sustained some of the consequential losses claimed below.

50. <u>Knowledge or subjective recklessness of unlawful acts.</u> The SFO (and in particular the case controller with day-to-day conduct of the ENRC investigation) knew or was subjectively reckless as to its unlawful conduct because:

    50.1.    The SFO and its case controllers knew, and stated, that they were no longer investigating Kazakh allegations. Paragraph 24 above is repeated.

    50.2.    The apparent continuation of the investigation into ENRC's operations in Kazakhstan was damaging to ENRC's business. This was self-evident, but was also confirmed by Fulcrum's letter to the SFO dated 14 November 2013.

    50.3.    The interests of ENRC in having public confirmation of the cessation of the investigation overrode the desire on the part of the SFO to avoid negative publicity.

<u>Knowledge or subjective recklessness as to serious risk of loss</u>

51. The SFO (and in particular Messrs Alderman, Gould, Thompson, Green and Coussey) knew, as a result of information in the public domain as well as their involvement with ENRC, that:

    51.1.    ENRC was a large publicly traded mining company with the characteristics described in paragraph 1 above.

    51.2.    ENRC was going to, and did in fact, incur substantial legal and other professional fees in connection with the Retainer, the Initial Contact, the Review Process and the SFO's subsequent investigation into its conduct. The said professional fees included (without limitation) those incurred by ENRC in respect of computer, data processing and hosting specialists, translators, accountants, forensic consultants, and solicitors, counsel and other legal advisers.

52. In the premises, the SFO took each of the unlawful acts set out above with knowledge of, or with recklessness as to, the serious risk of loss to ENRC.

## LOSS AND DAMAGE

53. The SFO's wrongful conduct has caused ENRC loss and damage. But for that conduct:

53.1.     ENRC would not have agreed to enter the Review Process on 9 November 2011.

53.2.     Alternatively, the Review Process would have been substantially narrower in scope and duration:

   a     It would have excluded Kazakh issues.

   b     It would not have continued beyond the meetings of 30 November 2011, alternatively 20 December 2011 or 5 March, 10 May, 18 June, 20 July or 28 November 2012, at which meetings the SFO should have informed ENRC of its prior unlawful conduct.

   c     It would have been limited to **(i)** ENRC's systems and controls, **(ii)** the completion of FRA's books and records review in Africa and **(iii)** a targeted review of due diligence associated with the Camrose and CAMEC acquisitions, to involve interviews with professional advisers, members of the board and senior management.

   d     The scope of Mr Gerrard's investigation would not have been widened in around June 2012.

   e     The Dechert Disclosure Notice would not have been served.

53.3.     In any event, the SFO would not have announced a criminal investigation into ENRC's conduct in April 2013 or pursued such an investigation thereafter. This is because, without the information that was reported to it by Mr Gerrard, the SFO would not have been able to pursue a criminal investigation or any other enforcement action against ENRC. Pending disclosure, ENRC relies upon the following facts and matters:

a   Mr McCarthy's advice to Mr Alderman in late July 2011. Paragraphs 11.4-11.5 above are repeated.

b   An internal SFO email dated 26 October 2011, which expressed a similar conclusion to that reached by Mr McCarthy.

c   An internal SFO report mis-dated 20 November 2012 (written on about 20 December 2012), which stated that the alternative to the Review Process was to *"seek international co-operation into allegations which are insufficiently detailed as to make a mutual legal assistance request redundant"* and that the Review Process would enable the SFO to progress proceedings which *"would normally be beyond the organisation's ability to orchestrate and/or investigate"*.

d   The UK had no mutual legal assistance treaty with Kazakhstan until 2016.

e   The UK has never had a mutual legal assistance treaty with the Democratic Republic of Congo, the jurisdiction in which Camrose and CAMEC operate.

54. As a result of the SFO's conduct, ENRC has incurred the following categories of loss and damage.

55. **Unnecessary legal fees**. Such legal fees relate to work carried out by Dechert, Addleshaw Goddard, Jones Day, Herbert Smith, Fulcrum, Debevoise & Plimpton, Quinn Emanuel Urquhart & Sullivan and Signature Litigation, together with work carried out by counsel and overseas lawyers (including Arent Fox). The said fees were incurred in relation to the Review Process and (after 25 April 2013) the SFO's criminal investigation. The quantum of the said fees is in excess of US$63 million as of 1 March 2019 and losses of this category continue to accrue.

56. **Unnecessary fees/expenses incurred/paid to others**. Such fees and expenses relate to work carried out by KPMG, PwC, Bridge2 Limited, Deloitte, FRA, Transperfect Translation Ltd, Bluewater Partners Limited, FCM Travel Solutions, Travelcorp International, ATP Corporate Travel, London Legal Imaging Solutions, Nuix Technology UK Ltd, MGA Technology Ltd, Jemskyl Ltd and the Risk Advisory Group. The said fees and expenses were incurred/paid in relation to the Review Process and (after 25 April 2013) the SFO's

criminal investigation. The quantum of the said fees and expenses is in excess of US$30 million as of 1 March 2019 and losses of this category continue to accrue.

57. **Lost management time**. The SFO's conduct has caused significant disruption to ENRC's business. Management and employee time has been spent liaising with, responding to, collating information for, attending meetings and interviews with and otherwise engaging with Mr Gerrard, Dechert and the SFO. As a result, management and employees have been diverted from their normal duties; their time would otherwise have been spent developing, promoting and generating revenue for ENRC.

58. **Exemplary damages**. The conduct of the SFO was arbitrary, oppressive and/or unconstitutional, and requires an award of exemplary damages. In support of that claim, ENRC relies upon all the facts and matters set out above, and in particular:

58.1. The SFO's inducement of Dechert and Mr Gerrard to breach their obligations to ENRC. Paragraphs 29 and 30 above are repeated.

58.2. The SFO's failure to act independently and objectively, in good faith and in a manner that would protect ENRC's confidential and privileged information.

58.3. The knowledge and/or subjective recklessness by SFO staff as to the unlawfulness of their acts.

58.4. The SFO's desire to force ENRC to enter into a substantial civil recovery settlement with the SFO following the Review Process, notwithstanding that (prior to the commencement of that process) its Chief Investigator had concluded that there was not a sufficient basis to open a criminal investigation into ENRC's conduct under the SFO's statutory powers.

58.5. Mr Alderman's conduct at the October 2011 Meeting.

58.6. Mr Alderman's instruction in about late 2011 to "*keep the investigations off the books with no case drive*", in breach of the SFO's internal rules and guidelines.

58.7. The suppression or destruction of the Beige Notebook.

58.8.    The covert coordination of actions in relation to ENRC by the SFO and Mr Gerrard, in particular: the drafting of the June 2012 Letter; the deletion by Mr Thompson of the 18 June Email and Second 18 June Email and his failure to refer to these emails in his 74-page witness statement in the Privilege Proceedings; the drafting of the Final December 2012 Letter; and the deletion by Mr Gould of the First 12.12.12 Email and the 20.12.12 Email.

58.9.    The making of statements to ENRC that had been pre-agreed with Mr Gerrard and which furthered his agenda of expanding the scope of the Retainer: see paragraphs 12.12 to 12.14 above.

58.10.    The failure by the SFO properly to investigate the July 2012 Whistle-Blowing Letter.

58.11.    The failure by the SFO to deal with the June 2013 Material, the content of which is and remains privileged, in accordance with the SFO's Operational Handbook.

58.12.    The SFO's refusal formally to discontinue the Kazakh investigation and withdraw or amend its public statements regarding that investigation, notwithstanding its internal decision to discontinue it.

59. **Consequential losses**. The Website Statement and the ongoing criminal investigation have damaged ENRC's reputation and resulted in further losses in the form of its failure or loss of a chance to **(i)** enter into business transactions with, or on more advantageous terms with, third parties who have been put off by the said statement and investigation and associated negative publicity and **(ii)** borrow funds from, or on more advantageous terms from, lenders who have declined to deal with ENRC and/or demanded increased rates of interest for the same reasons. Such losses are continuing and are presently incapable of precise calculation; ENRC will contend that they should be assessed at an enquiry as to damages after issues of liability, direct losses and exemplary damages have been determined.

60. ENRC borrowed on commercial terms the money from which it drew the funds spent on unnecessary legal and other fees and expenses. ENRC paid interest at a rate of at least 6.1% per annum on such borrowing. ENRC claims compound interest at such rate, either as damages at common law or by way of equitable remedy.

61. Further or alternatively, ENRC claims simple interest on such sums as are awarded to it, pursuant to s. 35A of the Senior Courts Act 1981 and/or the court's equitable and/or inherent jurisdiction, at such rate(s) and over such period(s) as the court deems just.

## DECLARATIONS

62. ENRC seeks declarations that **(i)** the SFO is not entitled to publish, disclose, divulge or otherwise make use of any confidential and privileged material which was disclosed to the SFO by Dechert and/or Mr Gerrard in breach of duty, including but not limited to the June 2013 Material and **(ii)** that members of the SFO's staff who reviewed the said material should be removed from the team investigating ENRC.

**AND** the Claimant claims:

(1) Damages as aforesaid.

(2) Declaratory relief as aforesaid.

(3) Interest.

(4) Costs.

(5) Such further or other relief as the Court deems appropriate.

**STEPHEN SMITH QC**
**TIM AKKOUH**
**JACK RIVETT**
**Erskine Chambers**

**RICHARD LISSACK QC**
**ROBIN BARCLAY**
**Fountain Court Chambers**

**Statement of Truth**

The Claimant believes that the facts stated in these Particulars of Claim are true.

Full name:                    Felix Vulis

Position:                     Director

Signed:

Dated:                        **25** March 2019