IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF EURASIAN NATURAL RESOURCES CORPORATION LIMITED FOR AN ORDER UNDER 28 U.S.C. § 1782 TO TAKE DISCOVERY FROM PHILLIP VAN NIEKERK<br><br>Applicant. | Case No. 8:19-cv-01843-PJM |

## AMENDED DECLARATION OF MICHAEL GORDON ROBERTS

Pursuant to 28 U.S.C. § 1746, Michael Gordon Roberts declares as follows:

1. I am admitted to the roll of solicitors in England and Wales. I am a partner at Hogan Lovells International LLP, a law firm in the United Kingdom that represents Eurasian Natural Resources Corporation Limited ("ENRC"), which is the Applicant in this action. I have personal knowledge of the facts set forth herein, except where otherwise indicated.

### I. Background Facts

2. ENRC is a corporation duly incorporated in England and Wales. ENRC's ultimate parent company is Eurasian Resources Group S.a.r.l. ("ERG"), a corporation registered in Luxembourg.

3. In December 2010, ENRC engaged David Neil Gerrard ("Gerrard"), at the time a partner at the law firm DLA Piper UK LLP, to conduct a discrete investigation of alleged wrongdoing by an ENRC subsidiary in Kazakhstan.

4. In April 2011, Gerrard became a partner at Dechert LLP ("Dechert"), and ENRC continued to retain him at the new firm.

5. On August 9, 2011, *The Times* (a London newspaper) published an article about allegations of corruption relating to ENRC (the "August 2011 Article"). The August 2011 Article was based on confidential and privileged documents that had been leaked to the press without ENRC's consent. On August 10, 2011, Keith McCarthy ("McCarthy"), at the time the Chief Investigator at the Serious Fraud Office of the Government of the United Kingdom ("SFO"), wrote to ENRC inviting it to a meeting to discuss its governance and compliance program and its response to the allegations as reported.

6. Subsequently, in November 2011, ENRC, acting on Gerrard's advice, informed the SFO that it would conduct a further review of its operations and engage with the SFO regarding the results of that review (the "Review Process").

7. Dechert's retainer was terminated at the end of March 2013. On April 25, 2013, the SFO announced that it had opened a criminal investigation into ENRC (the "Investigation"). Some nine and a half years after its commencement, and almost twelve years since the SFO first wrote to ENRC (as set out at paragraph 5 above), the Investigation remains open, although neither ENRC nor any current or former ENRC officer or employee has been charged with, let alone convicted of, any criminal offense. The SFO has declined to confirm whether it regards ENRC as a victim or suspect of any alleged offenses.

8. On August 4, 2019, an email was sent from *sam@thetruthprovider.com* to five SFO email addresses, copied to a large number of generic and individual email addresses associated with enquiry agents, law firms and barristers' chambers (the "Truth Provider Email"). The Truth Provider Email attached a *.pdf file* containing over 2,200 pages of email communications and attachments (the "Truth Provider Documents") apparently sent to or from Mark Hollingsworth, a self-described freelance journalist ("Hollingsworth"). The Truth Provider Documents contain

references to Hollingsworth having "an inside track on the ENRC investigation" and "an inside source at the SFO who [was] briefing [him] off-the-record on their investigation into ENRC… ."

## II. The 2019 Proceedings

9. In March 2019, ENRC brought proceedings against the SFO in the English courts (the "2019 Proceedings"). A true and correct copy of the Particulars of Claim in that proceeding (as amended) is attached hereto as **Exhibit 1**.

10. In broad terms, ENRC's contention in the 2019 Proceedings is that, both in advance of the August 10, 2011 letter from the SFO, and subsequently in the course of the Review Process, Gerrard had extensive contact with SFO officers that ENRC did not authorize and that in those communications Gerrard made disclosures to the SFO which were plainly contrary to ENRC's interests on at least thirty occasions (the "Unauthorized Contacts"). By engaging in the Unauthorized Contacts with Gerrard, the SFO knew that Gerrard was acting in breach of his duties to his client and induced, procured or encouraged Gerrard to act in breach of his duties.

11. ENRC contends that it is to be inferred that Richard Alderman ("Alderman"), the SFO's Director at the time, and Gerrard were in contact in advance of the August 2011 Article, and that Gerrard then instigated the leak which led to the August 2011 Article in order to "kick start" the investigation. Further, ENRC contends that, in light of various matters including the close relationship between Gerrard and Alderman and the unusual speed with which the SFO then wrote to ENRC (on August 10, 2011, the very day after the August 2011 Article was published), it is to be inferred that Alderman had been provided by Gerrard with the leaked material reported in the August 2011 Article, or alternatively its substance, before the August 2011 Article was published. Alderman then used the August 2011 Article to justify sending a letter to ENRC.

3

12.     Among other things, ENRC also relies on: the fact that the SFO had "quiet" meetings with Gerrard in what were described as "out of the way" places, including a hotel and a public house, during the course of which the SFO pre-agreed self-serving messages with Gerrard; the SFO's recognition that Gerrard was "up to no good"; the SFO's repetition of unfounded criticisms made by Gerrard of ENRC's corporate advisers; an instruction believed to have been given by the SFO's then Director, Alderman, to keep the ENRC case "off the books" because it was "very messy"; and the SFO's handling and review of a brown envelope of documents which were at least in part obviously subject to attorney-client privilege ("the June 2013 Material"), an episode which was not revealed to ENRC for over five years.

### III.     Developments in the 2019 Proceedings

13.     A trial of the 2019 Proceedings was heard by the Commercial Court in London in 2021 and Mr Justice David Waksman (the "Judge") handed down judgment on May 16, 2022. For the Court's convenience, a true and correct copy of the relevant excerpts from the judgment is attached hereto as **Exhibit 2.** (The full judgment may be found at https://www.judiciary.uk/wp-content/uploads/2022/05/ENRC-v-Dechert-judgment-160521.pdf.) The Judge found in ENRC's favor on most of the key allegations against Gerrard and the SFO addressed above, finding that the SFO had induced breaches of duty to ENRC by Gerrard and, significantly, that three SFO officers had engaged in "bad faith opportunism" by receiving information from Gerrard in the course of the Unauthorized Contacts.[1]

14.     Consistent with ENRC's case set out at paragraph 11 above, the Court found that Gerrard and Alderman had been in contact prior to the publication of the August 2011 Article, that Alderman had received information about the leak to the press which led to the August 2011

---

[1] ¶893 of the Judgment.

Article in a "gross and deliberate breach" of duty, and that Alderman had told Gerrard on August 10, 2011 that the SFO would be writing to ENRC that day.[2]

15. The Court also found that the SFO was in serious breach of its own duties in relation to 15 of the Unauthorized Contacts. Strikingly, the Judge found that SFO officers had engaged in "conspiratorial whispers"[3] with Gerrard behind ENRC's back "again and again"[4] despite knowing that what he said "could not possibly have been authorized by [ENRC]".[5] Those officers "were prepared to receive the information which [Gerrard] should not have given them on the basis that it might prove useful intelligence going forward."[6] SFO witnesses gave dishonest evidence at trial regarding Gerrard's unauthorized disclosure of information to them; the Judge found that, in rejecting the accounts of two former SFO officers in connection with the Unauthorized Contacts, he considered "they were lying."[7]

16. Notably, on the issue of leaks, the Judge found that Alderman was "probably prepared to make judicious leaks to the press when it suited him."[8] The Judge found that "the June 2013 Material was sent to the SFO by or at the instigation of Mr Gerrard… in serious and deliberate breach of duty"[9] and there was a "strong case of negligence"[10] against the SFO officer who received it.

17. The 2019 Proceedings will now continue to determine issues of causation, loss and damages.

---

[2] ¶¶481-483 of the Judgment.
[3] ¶573 of the Judgment.
[4] ¶895 of the Judgment.
[5] ¶¶526 and 823 of the Judgment.
[6] ¶893 of the Judgment.
[7] ¶496 of the Judgment.
[8] ¶479 of the Judgment.
[9] ¶1481 of the Judgment.
[10] ¶1536 of the Judgment.

\\NY - 002507/000004 - 10570751 v2

## IV. The 2021 Proceedings

18. In addition to the matters referred to above, there have been a series of leaks of information relating to the Investigation since it was opened, including:

    (a) On September 9, 2016, Bloomberg published an article which referred to the fact that an officer of one of ENRC's divisions had been interviewed by the SFO (the "September 2016 Article").[11] The nature of this information, and the fact that it was not in the interests of the suspect for this information to be made known, is consistent with the SFO being the source of this leak.

    (b) On December 5, 2016, Bloomberg published an article entitled "SFO probes Israeli Billionaire, Ex-ENRC Directors over Congo," which referred to a letter of request from the SFO to the authorities of the Democratic Republic of Congo (the "December 2016 Article"). Letters of request are highly confidential, as emphasized in guidance produced by the United Kingdom Home Office. *See* "Requests for Mutual Legal Assistance in Criminal Matters, Guideline for Authorities Outside of the United Kingdom — 2015" at page 6, a true and correct copy of which is attached hereto as **Exhibit 3**. Given the highly confidential nature of the letter of request, the inference is that this leak also derived from the SFO.

    (c) On September 15, 2017, *The Evening Standard* (a London newspaper) published an article under the byline of Hollingsworth entitled "SFO is stepping up its Kazakh miner probe," which referred to the fact that the SFO had interviewed the Chairman of the Board of Directors of ENRC's ultimate

---

[11] I have not attached a copy of the September 2016 Article, or the article referred to in subparagraph (b) below, because they are subject to disclosure restrictions in English court proceedings.

(d) parent company, Alexander Machkevich ("Machkevich") (the "September 2017 Article"). A true and correct copy of the September 2017 Article is attached hereto as **Exhibit 4**.

(d) On March 26, 2019, Bloomberg published an article entitled "ENRC Sues U.K. Fraud Cops as Corruption Charges Loom" (the "March 2019 Article"), a true and correct copy of which is attached as **Exhibit 5**. This article referred to details of the timing of a charging decision by the SFO and details of the SFO's case theory. The nature of the information, the fact that it is not in the interests of any suspect (or their associates) for this information to be made known, and the reference in the article itself to Bloomberg's source being "people […] who didn't want to be named because the details of the investigation are private", are again only consistent with the SFO being the source of the leak.

(e) On September 2, 2020, and October 1, 2020, the *Financial Times* published articles entitled "*FBI investigates deaths of mining executives in UK corruption probe*" (the "September 2020 Article") and "*Silent witnesses: what do three corpses have to do with a corruption case?*" (the "October 2020 Article", and together with the September 2020 Article, the "FT Articles"), respectively, by the investigative journalist Tom Burgis ("Burgis"). The FT Articles (true and correct copies of which are attached as **Exhibit 6** and **Exhibit 7**) contained numerous references to information about the Investigation which was said to have been obtained from anonymous sources.

7

(f) On or around September 3, 2020, Harper Collins published a book entitled "*Kleptopia: How Dirty Money is Conquering the World*" ("*Kleptopia*") written by Burgis. *Kleptopia* included information about the purported direction and thinking of the Investigation during the period when Gibson was the Investigation's Case Controller, including the names of alleged suspects and witnesses, details of individuals who had been interviewed or contacted, and lines of inquiry and case theories that were purportedly held by the investigation team.

19. On June 22, 2020, ENRC issued an application seeking to amend its pleading in the 2019 Proceedings to expand its allegation that the SFO had leaked information to the press, relying upon (among other things) the matters set out at paragraph 18(a) to (d) above. A true and correct copy of the Judge's ruling in relation to the application is attached hereto as **Exhibit 8**. The Judge did not permit the proposed amendments, for case management and other reasons, and indicated that the "logical thing" for ENRC to do was "to issue a fresh claim".

20. Accordingly, in January 2021, ENRC brought proceedings against both the SFO and John Gibson ("Gibson"), a former SFO case controller, in the English courts (the "2021 Proceedings"). Another officer of the SFO, Tony Puddick ("Puddick"), was joined as a further defendant to the 2021 Proceedings in October 2021. A true and correct copy of the Particulars of Claim in the 2021 Proceedings (as amended) is attached hereto as **Exhibit 9**. A trial date has not yet been fixed for the 2021 Proceedings, but it is anticipated that the 2021 Proceedings will be tried in late 2023.

21. In the 2021 Proceedings, ENRC alleges that the SFO (acting through its officers and employees) engaged in a number of unlawful leaks to the media of confidential information

regarding its ongoing cases, with the consequence that ENRC has been denied an independent and objective investigation. In broad terms, ENRC's contention in these proceedings is that the SFO carried out these leaks and media briefings in order to combat negative press regarding its failed cases, suggest that its cases were progressing and prejudice public opinion about ENRC. This would in turn justify the protracted length of the ENRC investigation and enable the SFO to justify requests for further blockbuster funding from the United Kingdom Government. ENRC contends that the SFO's conduct amounted to misfeasance in public office. ENRC further contends that there was an unlawful conspiracy or conspiracies between SFO officers (as yet unknown), Gibson (after he ceased to be employed by the SFO) and Puddick, with the intent to injure ENRC by disclosing information about the Investigation and/or ENRC's affairs.

22. ENRC's claim identifies Hollingsworth as the SFO's favored media correspondent to receive leaks of information over the course of five years, relying upon (among other things) communications from the Truth Provider Documents. ENRC alleges that Puddick is one of Hollingsworth's sources at the SFO, including being one of the specific sources of information referred to in the September 2017 Article. Notably, the SFO suspended Puddick in 2019, opened an internal professional standards investigation into his conduct, and referred the matter to the Metropolitan Police, before later reinstating Puddick to his role at the SFO without a police interview taking place.

23. ENRC also contends that Gibson leaked damaging information to Burgis prior to the publication of the FT Articles and Kleptopia. Gibson has admitted to a meeting with Burgis in an underground car park in London days before the publication of the October 2020 Article, as well as using the highly private Signal messaging platform to communicate with Burgis.

9

## VI. Facts Relating to the Discovery Sought in This Application

24. ENRC relies upon the facts set out above in connection with leaks from the SFO, in particular in relation to the September 2017 Article. ENRC has discussed the September 2017 Article with its author, Hollingsworth. Hollingsworth has informed ENRC that his immediate source for the September 2017 Article was Phillip van Niekerk ("van Niekerk"), who is located in this district and, according to publicly available sources, resides at 4615 N. Park Avenue, Apt. 1120, Chevy Chase, Maryland. For the avoidance of doubt, ENRC maintains, and does not waive, privilege in respect of its discussions with Hollingsworth.

25. As of September 2017, van Niekerk was employed at Calabar Consulting, LLC ("Calabar"), which is a firm located in Chevy Chase, Maryland. I understand that Calabar provides a range of consultancy services, including 'public relations' advice.

26. The Truth Provider Documents include communications between Hollingsworth and van Niekerk which refer to the September 2017 Article. In one communication, Hollingsworth appears to refer to van Niekerk as his source for the information in the September 2017 Article, and in another communication Hollingsworth informs van Niekerk that the September 2017 Article "*will be published today*", saying "*job done*" and suggesting that they "*talk later after publication.*" A true and correct copy of these communications (in the *.pdf* format in which they appear in the Truth Provider Documents) is attached hereto as **Exhibit 10**.

27. For the sake of completeness, I note that:

   a. I am aware that van Niekerk (through Calabar) was historically engaged by ENRC and/or an affiliated entity to provide certain consultancy services. Without waiving any applicable privilege, I can confirm that ENRC does not believe van Niekerk's former engagement, which pre-dated all of the Articles

listed above, to be relevant to the present application (although it makes his alleged involvement with the September 2017 Article all the more concerning).

b. Shortly after the Truth Provider Email was circulated, in October 2019, ENRC brought separate proceedings against Hollingsworth, alleging that Hollingsworth had conspired with a series of third parties in order to acquire, trade and disclose confidential and privileged information which had been unlawfully misappropriated from ENRC. The proceedings against Hollingsworth were subsequently discontinued by ENRC in October 2021.

28. The principal matter reported in the September 2017 Article, namely the fact that the SFO had interviewed Machkevich, was by its nature highly confidential. Outside of the SFO, that fact was known only to Machkevich himself and Machkevich's attorneys. It was not in the interests of Machkevich for this information to be made known. ENRC infers that one or more SFO officer(s) was or were the ultimate source(s) of the leak that led to the September 2017 Article, and that the information on which the September 2017 Article was based was provided to Hollingsworth either directly by that or those source(s), or indirectly by using van Niekerk as a conduit in the manner described at paragraph 24 above.

29. More specifically, in the 2021 Proceedings ENRC contends that Puddick is one of the specific sources of the information on which the September 2017 Article was based. In any event, it is clear from the communications referred to at paragraph 26 above that van Niekerk had an interest in the publication of the September 2017 Article, and can be expected to have evidence as to the source(s) of the information in the September 2017 Article. In view of the wider pattern of leaks of information relating to the Investigation set out above, ENRC believes that Hollingsworth's ultimate source (or sources) at the SFO also is (or are) likely to have been involved

11

in the leaks that led to the September 2016 Article, the December 2016 Article, the March 2019 Article, the FT Articles and *Kleptopia*, and that van Niekerk may be able to provide further information regarding the leaks for those articles as well.

30. Under English law, *prima facie*, a suspect has a reasonable expectation of privacy in relation to a criminal investigation. *Richard v British Broadcasting Corporation* [2018] EWHC 1837 (Ch)) and *ZXC v Bloomberg LP* [2022] UKSC 5. If an SFO officer was the ultimate source of the leaks that led to the Articles, it is to be inferred that (s)he acted in bad faith and knew that these leaks would probably injure ENRC. Leaks of this kind, which give rise to public allegations of criminal conduct notwithstanding the absence of any charges (let alone conviction), necessarily prejudice ENRC's rights and reputation. In circumstances where the leaks were not in the SFO's own legitimate interests (as illustrated by the United Kingdom Home Office guidance on letters of request referred to above), ENRC is concerned that they may have been instigated by a third party (possibly a business competitor) intent on causing harm to ENRC. Nevertheless, irrespective of van Niekerk's motivations, and the identity of any client for whom he may have been acting, an SFO officer must still have been the ultimate source of the leaks.

31. In those circumstances, and as set out in ENRC's claim in the 2021 Proceedings, the leaks would constitute the tort of misfeasance in public office by the SFO and could lead to further claims by ENRC under English law against both the SFO and any other parties involved. At a minimum, evidence regarding leaks would lend additional support to the allegations in the current proceedings in England.

32. Thus, proof (if it is the case) that an SFO officer was the source of the leaks for the Articles would constitute significant and relevant evidence for purposes of the claim that ENRC has brought in the English courts against the SFO.

33. ENRC, therefore, seeks — for use in the 2021 Proceedings — the production of documents from van Niekerk and deposition testimony regarding (a) any communications between January 1, 2016 and January 28, 2021 (the date of the commencement of the 2021 Proceedings) that (1) are between van Niekerk (or his agents) and any officer or agent of the SFO and/or (2) refer to one or more of ENRC, ERG, Alexander Machkevich, Alijan Ibragimov or Patokh Chodiev (the latter three individuals being the founders of ERG); or (b) the articles and publications referred to in paragraph 18 above.

34. The form of subpoena that ENRC wishes to serve on van Niekerk is attached hereto as **Exhibit 11**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2022 in London, England.

_____
Michael Gordon Roberts