

Neutral Citation Number: [2022] EWHC 1138 (Comm)

Claim No: CL-2017-000583
Claim No: CL-2019-000644

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**
**Before: The Hon. Mr Justice Waksman**
**Draft Judgment circulated: 14 April 2022**
**Date handed down: 16 May 2022**

Claim No: CL-2017-000583

BETWEEN:

EURASIAN NATURAL RESOURCES CORPORATION LIMITED

<u>Claimant</u>

-and-

**(1) DECHERT LLP**
**(2) DAVID NEIL GERRARD**

<u>Defendants</u>

-and-

THE DIRECTOR OF THE SERIOUS FRAUD OFFICE

<u>Third Party</u>

("the 2017 Action")

Claim No: CL-2019-000644

AND BETWEEN:

EURASIAN NATURAL RESOURCES CORPORATION LIMITED

<u>Claimant</u>

-and-

THE DIRECTOR OF THE SERIOUS FRAUD OFFICE

<u>Defendant</u>

-and-

**DECHERT LLP**
**DAVID NEIL GERRARD**

<u>Third and Fourth Parties</u>

("the 2019 Action")

---

# JUDGMENT

---

**Hearing dates:**

**24-27 May, 7-11, 14-17, 22-24, 28-30 June, 1-2, 5-9, 12-16, 19-22 and 26-30 July,**

**22-24 and 27-30 September 2021**

**Representation:**

**Clare Montgomery QC, Nathan Pillow QC, Anna Boase QC, Tim Akkouh, James MacDonald Jack Rivett, Alyssa Stansbury, Freddie Popplewell, Matthew Hoyle** (instructed by Hogan Lovells International LLP, Solicitors) for the Claimants

**Andrew Onslow QC, Michael Bools QC, Nicholas Purnell QC, Jonathan Barnard QC, Edward Harrison, Kyle Lawson, Rachel Kapila** (instructed by Clyde & Co LLP, Solicitors) for the Defendants in the 2017 Action and the Third and Fourth Parties in the 2019 Action

**Simon Colton QC, James Segan QC, Rachel Scott, Tom Richards, Joyce Arnold, George Molyneaux, Tom Lowenthal** (instructed by Eversheds Sutherland (International) LLP, Solicitors) for the Third Party in the 2017 Action and the Defendants in the 2019 Action

**Timing of the SFO Letter**

467.   I do find it odd that the morning after a newspaper article, the SFO was able to send the SFO Letter. The issue is not how long it would have taken to draft it. Rather it is why the SFO saw it as so urgent to send it out the following day on the assumption they had no advance warning of the August Article. Indeed, the instruction from Mr McCarthy to type up the letter was marked as "URGENT".

468.   The SFO submits that the idea of investigating ENRC had been raised some time before July 2011. It refers to an email from Mr Collins to Mr Morling, Mr McCarthy and Mr McCall on 24 May 2011 after hearing Mr Joyce speak in the Commons about ENRC. It is worth citing almost all of that email:

> "He is quite right re the ownership of ENRC… His summation re the takeover of the Kolwezi mine is almost correct. The problem he has is that he is unaware of the consent SAR submitted on behalf of ENRC. Whilst other organisations may have felt there were issues and possible Proceeds of Crime implications by obtaining consent to the deal from the Met Police ENRC must have felt they had done nothing wrong, and therefore if the appropriation is ruled illegal then it is the government of the DRC who will have to recompense First Quantum.
> That is not to say that ENRC are innocent of all charges, and in respect of there actions in the DRC there are moral issues, but at present there is no evidence of criminality on their part re this deal. That is not to say that when the Bribery Act comes into force we may want to invite them in to tell us of the procedures they have in place to prevent the payment of bribes to overseas officials, but a lot of UK companies deal in natural resources in Africa.
> Re the proposed sacking of non exec directors and Sir Richard Sykes there is no evidence of criminality of a nature which would concern the SFO. This is, in my opinion, an area for the FSA to look into.
> However in view of the names of some of the MP's who were at the House and voted on a earlier motion it may be worthwhile re asserting our commitment to deal with corruption where there is evidence."

469.   Taken in context, that is hardly a clear decision to approach ENRC and indeed the SFO did not do so upon the Bribery Act coming into force on 1 July. So I still find the timing of the SFO Letter odd.

470.   It would be less odd if Mr Alderman already knew, before the article was published, that it was going to appear and would say damaging things about ENRC which perhaps could not be ignored. The only documentary evidence going to the timing is that, by 8:20am on 10 August, Mr McCarthy clearly knew that ENRC was going to be invited to something, because he was emailing about this to Alex Daley, being Mr McCarthy's Staff Officer. Mr McCarthy's instruction to Ms Carlyle to draft up the letter later in the morning also asked her to send a copy to Andrea Johnson who was Mr Alderman's Senior PA. The covering email for that referred to the fact that Mr Alderman had asked Mr McCarthy to invite ENRC in. It is impossible to say if and when Mr Alderman discussed the writing of this letter for the first

time with Mr McCarthy, but overall, I think its timing does suggest some foreknowledge of the article on the part of Mr Alderman.

471. Another matter relied upon by ENRC is that Mr Gould said he was unaware of how the case got to the SFO in the first place. He may have been, but then, on any view, he was not in at the beginning as it were. His involvement only really started in around December 2011. By then, OM1 and OM2 had taken place and ENRC was very much on the SFO's radar. I doubt it would have been of much concern to Mr Gould at the time exactly how the case started. So this does not take the matter much further.

472. Another piece of evidence concerning Mr Gould is that he agreed that he had heard a rumour that Mr Gerrard was the original informant for the SFO. But that was not at the time of his involvement, but subsequently. I do not think any real weight can be placed on this.

473. ENRC also made the point that the SFO Letter was surprising, not merely because it was only one day after the August Article but also because it represented something of a U-turn in the SFO's view of ENRC. The strength of this point rather depends on whether one is talking about an inclination to start a criminal investigation or something less. Despite Mr Collins' views on the former, there was still intelligence gathering going on by Mr Collins himself. Indeed, ENRC relies upon Mr Collins' continuing involvement. So in an email to Mr Morling, his manager, on 17 June 2011 he lists ENRC as one of his "big pre projects".

474. It should also be recalled that Mr Collins and Mr Alderman met Mr Joyce at Portcullis House on 20 July 2011. It is true that if this meeting was Mr Alderman's idea it could have been sparked by what Mr Gerrard told him, since by then Mr Gerrard would have known of the likelihood of an article. Nonetheless, the distinction between continuing intelligence gathering and any intention to even start to go down the road of a criminal investigation is borne out by the wording of the SFO Letter itself. Also, Mr McCarthy's instruction to Ms Carlyle about the SFO Letter said that Mr Collins should be asked to continue "his discreet, covert, enquiries…".

475. ENRC also relies on what Mr Joyce says he was told by Mr Collins when they met on 20 July, namely that the SFO had a source which was a channel for a rich vein of material from the company, and there was mention of a Kazakh whistleblower. The suggestion is that the former was Mr Gerrard who, as a source, was improperly communicating details of wrongdoing etc. to (at least) Mr Collins. The difficulty with this is that first, Mr Joyce was not a wholly credible witness, but in addition, there is no documentary evidence of this

source at all. Of course, ENRC argues that the absence of any document is because Mr Alderman (and perhaps Mr Collins) knew that they should not have been communicating with Mr Gerrard anyway as he was ENRC's solicitor and his communications were plainly unauthorised. Nonetheless, it is surprising that there is nothing even sketching out the information provided and if it was so sensitive, it is difficult to see why Mr Collins would tell Mr Joyce about it.

476.   Even if something was said about a source, it could have been the source which provided information on 8 September 2010 during an informal interview which was recorded. Further, knowledge of the Kazakh whistleblower who wrote WB1 was extensive within ENRC. Mr Hollingsworth had himself heard about it by 5 April 2011 and it is not implausible that someone mentioned it to the SFO as well. It did not have to be Mr Gerrard.

477.   I do not consider that the SFO wholly reversed its earlier position on ENRC. There was already an amount of information about ENRC, and pressure from an MP like Mr Joyce may well have heightened a sense that the SFO should do something, even though the SFO Letter itself would not be publicised.

478.   ENRC also relies upon the fact that Mr Thompson and Mr Gould seem to have been kept in the dark about the meeting which Mr Alderman and Mr McCarthy had with PwC on 27 October. But that does not really go much beyond Mr Alderman (and Mr McCarthy) not keeping other personnel informed.

479.   It is true that Mr Alderman was probably prepared to make judicious leaks to the press when it suited him. But it does not really show that he had embarked on a series of communications with Mr Gerrard or received actual privileged documents or assisted Mr Gerrard with his aim of kick-starting an investigation.

480.   ENRC places reliance on the apparent instruction to keep the case "off the books". The evidence as to how this is said to have emerged is not straightforward and I have dealt with this generally in paragraphs 435-442 above. But in the context of DC1, it is said that this instruction must have emanated from Mr Alderman and the reason for it was to ensure that there would be no record of Mr Alderman's earlier improper communication with Mr Gerrard. But that does not make much sense. The instruction was only given in November 2011 when the case was most certainly on the books in the sense of OM1 and the notes taken of it. And if there had been an improper meeting between Mr Gerrard and Mr Alderman

much earlier, there was no record of it anyway and no evidence that Mr Alderman (or perhaps Mr McCarthy if he knew) told anybody anyway.

**Conclusion on the Facts**

481.    In my view, the true position was this: Mr Gerrard knew Mr Alderman well enough to have a quiet chat with him. He did tell him at some point before the article that it was going to be published and at the very least said that it would contain important and damaging information about ENRC which had been leaked. In addition, Mr Alderman must have understood that Mr Gerrard was involved in the leak. That is either because Mr Gerrard said or implied as much or because it was obvious, given that he was tipping-off Mr Alderman in advance about a significant article based on leaked information.

482.    Mr Alderman was thus alerted to this and in the context of other information about ENRC, although it did not justify (in the eyes of Mr Collins) a criminal investigation either then or shortly thereafter, it would justify the SFO taking a formal interest especially in the light of the introduction of the Bribery Act. Mr Alderman probably then gave thought to the writing of a letter sometime before the article was actually published. When it was published, he was ready to move. He probably told Mr McCarthy about this, too.

483.    He then returned the favour to Mr Gerrard by telling him on 10 August that a letter was coming out. That explains how Mr Gerrard knew this on that day but he was hardly likely to tell anyone at ENRC then, for obvious reasons.

484.    But DC1 goes no further than that. I have no doubt that, absent the tip-off, the SFO would still have written the letter although a little time later. I deal with the question of breach of duty on the part of the SFO here at paragraph 485 below and with causation on this point at paragraph 1678 below.

**Breach of duty by the SFO in relation to DC1**

485.    In my judgment, by at least entering into a conversation with Mr Gerrard, who must at least have said he was acting for ENRC (otherwise Mr Alderman would not have understood why he was there) and receiving the information about the leak to the press, Mr Alderman acted in gross and deliberate breach of his Independence Duty. He would have known that Mr Gerrard could have had no authority to be involved in any kind of leak, nor would he have had authority to speak to the SFO about it. On my findings, Mr Alderman clearly did receive information about the leak and as a quid pro quo, he told Mr Gerrard that the SFO Letter, or

at least a letter from the SFO to ENRC, was on its way. Mr Alderman should never have dealt at all with Mr Gerrard at this stage and in those circumstances.

**Breach of Duty by Dechert on DC1**

486.   It also follows from the facts found above that Mr Gerrard was, again, in gross and deliberate breach of duty by communicating with Mr Alderman in the way set out above in respect of the forthcoming article and the SFO Letter.

## CONTACTS: DC2-DC13

**Introduction**

487.   I turn first to the DCs which followed DC1 up to DC13. I shall deal with them chronologically and intersperse, as necessary, other relevant events. These will include in particular the various OMs between the SFO and ENRC. I then pause, as it were, to deal with the Depel Interview claim against the SFO because it is important to deal with it when it arises in the chronology. I then revert to the remaining DCs.

488.   I make the following introductory observations applicable to all the DCs considered.

489.   Sometimes, it will be necessary to consider one DC in the context of a later (or earlier) DC or OM. This is not merely to provide context and a sense of chronology. It is also because it assists in determining the credibility or otherwise of Mr Thompson and Mr Gould (as well as Mr Gerrard).

490.   Of course, in normal circumstances and in a conventional SR process, one starts with a strong presumption that when a solicitor communicates with the SFO purportedly on behalf of his client, he is indeed acting with that client's authority. But as the whole process of engagement with the SFO here shows, this was far from a normal engagement. See the remainder of this section, the DCs considered hereafter, and the discrepancies between what was said in the DCs and in the OMs also considered hereafter. But that presumption is why the focus has been on occasions when Mr Gerrard was <u>plainly</u> acting without authority (or not) so far as the SFO officers were concerned (see paragraph 180 above).

491.   It may be one thing if there is an isolated occasion where an SFO officer fails to spot or even suspect that someone like Mr Gerrard is plainly acting beyond his authority or against his client's interests. It is quite another if there is a series of such occasions as there was here.

492.   Nor is it in dispute that the SR process will usually involve disclosure of wrongdoing on behalf of the company – indeed that is usually the start of the process, although not here. But that does not mean that the disclosures made by Mr Gerrard here and the way that they were

made was a natural part of the process. (Indeed the whole process here was not a typical one. See in particular paragraphs 141-146 above, and 996-1014 below.) To take but two examples, it is very hard to see how an SFO officer could assume that a solicitor was acting within his client's authority when he imparted information he did not know "officially" or expressed concerns about his own professional position as against that client. Equally, as I explain below, simply to invoke the concept of being "full and frank" in the SR process, without more, does not assist. See paragraph 1017 below.

493.   I now turn to Mr Thompson. As will be seen hereafter, I have rejected his account of what he thought at the time in relation to Mr Gerrard's unauthorised communications at DC8-10, DC15 and DC23-24. These span the period 30 November 2011 to 28 February 2013. All of these matters bear upon each other in terms of Mr Thompson's credibility. He is obviously no one's fool. He is a Cambridge graduate and a qualified accountant and was at times a plausible and persuasive witness. However, in relation to the relevant DCs, his evidence simply did not stack up in my view and was implausible. He was plainly not as naïve as he sometimes suggested.

494.   As for Mr Gould, I have rejected his account of what he thought in relation to DC13, DC15 and DC19A-20, which ran from 9 May to 20 December 2012 although he had been involved in the investigation prior to DC13. His particular problem, apart from the implausibility of his evidence in relation to these matters, was that he got far too close to Mr Gerrard as I shall explain below.

495.   In addition, of course, as matters moved on, while there was between Mr Thompson and Mr Gould some friction after the former became the latter's superior, they both worked together on ENRC and both attended one of the relevant meetings together where I have rejected their accounts. It is impossible that they did not talk about Mr Gerrard and share a view of him which included appreciating or at least suspecting (but doing nothing about it) that he sometimes acted out of line, as it were.

496.   The upshot of all of this is that in rejecting their accounts I consider that they were lying.

497.   I should also deal here with a point which Mr Gerrard often made when dealing with particular DCs and the question of authority to say or impart what he did. Indeed, it became something of a mantra. This was that he had ENRC's authority to "manage" the SFO as he thought fit. However, there is no clear evidence of any such authority having been given in such wide terms and secondly, it is not clear, on analysis, what it means. It could mean a

degree of discretion as to what or what not to say, or what strategy to adopt in respect of the SFO, at any given time where all of those matters would have been authorised. That is one thing, but it could not encompass saying (and I think this was Mr Gerrard's case) something which on its face was not in ENRC's interests and which he could not have had authority to say. He could not possibly have genuinely thought that ENRC was empowering him to do that, especially in the absence of any express indication and especially where the thrust of ENRC's own, plausible, evidence was that it did not do so.

498.   I therefore do not, in any particular instance, consider that if Mr Gerrard was otherwise in breach of duty (including being reckless or deliberate), he can be saved by some supposed general power to manage the SFO in any way he saw fit.

499.   There might even have been times when, somewhat perversely, Mr Gerrard actually believed that some ultimate interest of ENRC might be best served by him persuading the SFO that they could trust him as ENRC's lawyer and effectively a negotiation partner, and was halfway to being "one of them" precisely <u>because</u> he was prepared on occasion to "tell tales out of school", and thus it would assist him to deliver for ENRC a beneficial result which would be the avoidance of a criminal prosecution after a perhaps lengthy SR process. But if he had that sort of motive, it cannot excuse him either, because he would still have known that he had no actual authority and that when he actually said something that was at that point clearly against his client's interests he knew it was so, or was recklessly indifferent to that.

500.   Furthermore, as already noted above (and see below), I do not believe that any such motive was wholly "pure" in any event. It was tainted by Mr Gerrard's desire to fuel the work that needed to be done and also a separate desire to ingratiate himself with the SFO for personal reasons, unconnected with ENRC.

501.   Many of the DCs require consideration of the meaning of the particular words used. But that does not mean over-interpreting them. They should be looked at objectively, and not speculatively, and in fact their meaning is often obvious.

502.   Much has been made of the fact that, especially under Mr Alderman, the SR process could be relatively informal. Further, it would involve the disclosure of criminal wrongdoing on the part of ENRC. However, that cannot override a breach of duty on the part of a solicitor communicating information without authority. Moreover, part of the problem here was the nature of the actual engagement undertaken by ENRC. I have discussed this in detail in paragraphs 920-1070 below.

> -
> Must build confidence or ??
> - This is not a threat → cooperation
> with DoJ.
> - range of issue re Africa
> - issues pre date article.
> - Advisors"

522.  I deal with the first note first. As a preliminary point, I consider that this was Mr Alderman's note of what Mr Gerrard told him, not what he told or suggested to Mr Gerrard. The latter possibility does not seem to me to make much sense and the note is drafted as a record of what Mr Alderman and Mr McCarthy heard as opposed to, for example, any action plan on the part of the SFO.

523.  As for the phrase "Jones Day too close", ENRC suggest that this was plainly damaging to ENRC's interests and in effect was criticising its own lawyers in a way that could not have been authorised. This was of course reflecting some of the things that Mr Gerrard had already been saying about JD though not directly to ENRC. I am quite sure that he was keen to plant the seed of doubt in the minds of the SFO at an early stage, because, whether there was anything in the point or not, he wanted to ensure that he would have control over the engagement with the SFO. After all, as this was meant to be nothing more than an introductory conversation, to get some idea of what the SFO was really interested in, it is very hard to see why he needed to mention JD at all. What he said about them was particularly damaging to his client's interests if JD were later to attend SFO meetings (as indeed they did, as Mr Gerrard must have known was likely or possible). It was also plainly confidential, if not privileged, information that (if true) they were too close on the basis that he was suggesting that he had already so advised, as ENRC's lawyer. Accordingly, this was a serious and reckless breach of duty on his part.

524.  There is a telling reflection of this in the recorded January 2012 telephone conversation between Mr Gerrard and Mr Findlay. Mr Gerrard at one point says that the SFO is:

> "...not happy with Jones Day.
> CF: Why..is this incompetence or...?
> NG: No no, I think they..they think they're too close to the company.
> CF: Which is probably true.
> NG: Which is true. Er I assume..."

525.  It was, however, Mr Gerrard who had planted that seed of doubt in Mr Alderman's mind rather than the other way round.

526.  So far as Mr Alderman is concerned, he must have appreciated that Mr Gerrard could not possibly have been authorised to say this about other lawyers involved with ENRC.

**DC6: Telephone call between Mr McCarthy and Mr Gerrard on 7 October 2011 (P)**

566. On 6 October, Mr Ehrensberger wrote to Mr McCarthy and Mr Alderman to say that he would discuss the matters raised at OM1 with the Board and senior management at ENRC and its advisers, and would revert to the SFO "shortly". Mr Ehrensberger also authorised Mr Gerrard to contact the SFO to find out how they thought the meeting had gone.

567. On 7 October, there was a telephone call between Mr Gerrard and Mr McCarthy. Following that call and on the same day, Mr McCarthy sent an email to Mr Alderman as follows:

> "I have just spoken to Neil G and he has confirmed that our tactics worked and the main Board are to meet early next week and company will make a voluntary disclosure to us next week. The voluntary disclosure will come through Neil G acting independently of Jones Day (who were originally asked to do the compliance review as explained when we met them) on behalf of the audit committee and main Board.
> A full forensic audit of the Books and records will be undertaken. Neil G has said that he would like to talk about the work going forward and its structure, after next week, particularly once he has a clearer picture. He indicated that there were lots of red flags and 'lots to tell'"

568. Mr Alderman's response was "excellent" and then a few minutes later, he emailed:

> "But don't forget the public statement of commitment by the Board."

569. Mr Gerrard's only written communication to ENRC about the telephone call was his email to say that the meeting "was a good discussion and achieved our purpose." He then briefed Mr Ehrensberger about it the following Monday. Neither he nor Mr Ehrensberger could recall exactly what he said, although he accepted that when reporting to Mr Ehrensberger he might not have used the language actually used in his call with Mr McCarthy (as recounted by Mr McCarthy in his email). I am sure that he did not.

570. On 10 October, Mr Gerrard also told JD that he had discussed with Mr Ehrensberger a call he had had with Mr McCarthy and that (I infer) the SFO were comfortable with the meeting. Mr Ehrensberger wanted to emphasise that he wished to do the right thing and they were happy with that. Mr Gerrard may well have made that last point to the SFO which, by itself, is innocuous enough.

571. As to the actual content of Mr McCarthy's email, I refer first to the point about "our tactics worked". I agree that this was probably a reference by Mr McCarthy to the SFO's tactic of sending the SFO Letter, saying what it did at OM1 and so on, in order to get ENRC to engage with it. Confirmation by Mr Gerrard of the SFO's tactics does not seem to me to be a breach of duty on his part, and it was not unlawful for the SFO to record that.

572. As for the references to a voluntary disclosure "next week" and the disclosure coming through Mr Gerrard and the audit of the books, Mr Ehrensberger said that these remarks were

not authorised and indeed formal decisions in that regard had not yet been taken. It may be that not much turns on this (and indeed a more detailed picture was presented at DC7) but Mr Gerrard was clearly going further than instructed and he must have known that. Mr Gerrard's response to this in cross-examination was to invoke the notion of being entitled to "manage the SFO as best I could". That does not assist, in my view. Here, Mr Gerrard was telling the SFO that the Board was to meet and that there <u>would be</u> voluntary disclosure the following week.

573.    As for reference to red flags, it is said that this was innocuous, since Mr Richards had already referred to them (without objection from Mr Ehrensberger) in OM1. That is true, but context is everything. To say that there were lots of red flags and also "lots to tell" implies that Mr Gerrard had found matters of serious concern which might not be the same as or limited to the matters mentioned at OM1, otherwise why say this? It is rather like a conspiratorial (in a non-legal sense) whisper. It was not in ENRC's best interests to say this sort of thing and Mr Gerrard knew it.

574.    Accordingly, Mr Gerrard was clearly in breach of duty in respect of DC6.

575.    As for the SFO, Mr McCarthy (and Mr Alderman) could not be supposed clearly to know that Mr Gerrard had no authority to provide the information about disclosure and the Board meeting or that it was necessarily inaccurate, or being reckless as to that fact. But as to the references to red flags and "lots to tell", I do think that Mr McCarthy could not possibly have seen Mr Gerrard as being authorised to say this and the same goes for Mr Alderman's receipt of the information. Accordingly, there was a relevant breach of duty on the part of the SFO here.

576.    Again, all the relevant breaches of duty here were at least reckless.

**DC 7: Telephone call between Mr McCarthy and Mr Gerrard on 21 October (P)**

577.    There are no notes available of this call. However, Mr McCarthy later emailed Mr Alderman about it as follows:

> "I have just spoken to NG on telephone.
> He has confirmed that our meeting truly shook the company. They have an extraordinary Board meeting on Tuesday and will in his view agree to enter the Self Disclosure process. NG stated that they will be writing to us on Wednesday next week to confirm formally.
>
> On a separate matter NG raised a 'hypothetical' issue concerning a large multinational, who he said may have approached him, that might be upset with the behaviour of a 'white collar' law firm in dealing with SFO enquiries. The hypothetical company were being advised to prevaricate rather than assist. I told NG that he should seek to speak with you personally on a hypothetical basis to discuss matters informally, (certainly before the 26th October)."

the suspension of individuals which Dechert was going to recommend to ENRC while the Africa investigation continued. Even here, the risk of suspension of individuals could be that they remove evidence of wrongdoing that could be alleged either against ENRC or themselves. Further, it would seem odd to share the intended suspension of individuals with the SFO, in advance, at least without the clear authority of the client.

820.    So, on a careful analysis, the company/individuals distinction, if it was intended here by Mr Gerrard (and I think it was not) is in fact irrelevant to the issue of whether what he said was clearly against his client's interests.

821.    For all those reasons, therefore, I reject the "individuals" explanation given by Mr Gerrard and Mr Thompson.

822.    Mr Thompson also made the point that, having reported the conversation as a whole to Mr Rappo and Mr Coussey, neither suggested that he should stop his work on the investigation. I see that but merely because they did not react to his email in that way or in relation specifically to Mr Gerrard's point about continuation of his work, it does not mean that what Mr Gerrard was telling Mr Thompson was not plainly unauthorised. It is further submitted that the very fact that Mr Thompson wrote up a file note for both this DC23 and DC24 recording the essence of what Mr Gerrard had told him shows that he did not have a "guilty mind". I do not agree. Mr Thompson might well not have seen any reason not to record valuable intelligence coming from Mr Gerrard even if unauthorised, especially if, at the end of the day, he knew that without a settlement, the SFO would need to obtain actual evidence. In other words, this is another example of seeking the "greater good" of improving the SFO's position as against ENRC.

823.    In my judgment, Mr Thompson clearly knew that Mr Gerrard was talking about putting at risk the investigation into ENRC and if so, he must have known and did know that what Mr Gerrard said could not possibly have been authorised by his clients from whom he was now trying to distance himself. I should add that in my view, it is hopeless to suggest that the disclosures made here could not be viewed as unauthorised because they were simply part and parcel of a normal SR process. See further, my general observations at paragraphs 490-492 above.

824.    In that context, Mr Gerrard's wish to come and see the SFO to discuss his concerns further is part of the information which was against the interests of ENRC. He could have no possible authority on the part of ENRC to discuss a matter with the SFO of which he would obviously

887.  In those circumstances, I think it can fairly be said that Mr Alderman and Mr Thompson respectively still induced Mr Gerrard's breaches of duty in the DCs attributed to them here (i.e. DC5-7 and DC9). But, in any event, they were certainly part of the inducement in the overall or cumulative sense referred to in paragraphs 882-883 above.

888.  I have considered in this context whether, for each of Mr Alderman, Mr Thompson and Mr Gould, I should decline to find an actionable inducement at least on the first of their respective encounters because in truth there was not much they could have done to stop him saying what he did. However, I do not think that would be correct. First, they could have stopped the conversation as it was happening, even on the first encounter. Second, Mr Alderman already knew of Mr Gerrard's ability to act against his client from DC1. He would have known pretty quickly from DC4 that he was again not acting in his client's interests. As for Mr Thompson, his first encounter, DC8, contained seriously damaging information including references to what Mr Gerrard said he did not know "officially" and saying that he might have to resign. Again, he could have, but did not, stop it there and then. As for Mr Gould, his first meeting was DC13. By then, he had already had other contact with Mr Gerrard sufficient (on his own evidence) to know that Mr Gerrard would take things to "the very edge". That was Mr Gould's explanation of the "up to no good" email of 23 March. And again, he could have stopped any particular conversation. By DC13, he must have been aware of what had been happening when Mr Thompson spoke to him as well.

889.  As for DC1 itself, on the basis of what I have found in paragraphs 485-486 above, Mr Alderman's actions in engaging with Mr Gerrard were quite sufficient to establish the relevant inducement.

890.  None of the above can be dismissed as mere facilitation of Mr Gerrard's breach of duty nor the simple acceptance of a "bounty".

891.  Accordingly, inducement is made out.

**Intention**

892.  Since the analysis of whether there is a relevant intention requires an examination of what the SFO officers' "end" or aim was, this needs to be addressed first.

893.  As to why the SFO individuals were prepared to act as they did where I have found them to have been in breach of duty, I think this may best be described as "bad faith opportunism". I have rejected any notion of consciously assisting Mr Gerrard to expand the work of the investigation so that he could earn more fees. The truth is more prosaic: they were prepared

to receive the information which he should not have given them on the basis that it might prove useful intelligence in going forward. That does not mean that they thought that they could use it in any future prosecution as evidence or even incorporate it in any settlement negotiations. Almost certainly, they thought they could not. As has been seen, Mr Thompson's questions of Mr Depel in the Depel Interview suggest that he realised that Mr Gerrard was for some reason unable or unwilling to say officially what he had said unofficially.

894.    But that does not mean that the information was worthless. For the most part, I think the SFO officers simply banked the information they were given without any clear idea as to how they might use it later on. As it happens, there were at least some examples of the SFO making use of the information. This included how they presented matters at OM5 and OM6 to ENRC. I would also accept that it seems likely that some of the information referred to in the statement of reasons for doing Mr Depel's interview were in fact drawn from what Mr Gerrard had previously said.

895.    The above is relevant to the question of whether the Intention Requirement is satisfied here. On the basis that the SFO individuals were prepared - again and again - to act as Mr Gerrard's willing audience when his client was not present and when he might well disclose unauthorised information, it means that they saw there was some value in continuing to receive it. If so, then their aim was the continued receipt of that information. But if so, almost by definition, the means to that aim was Mr Gerrard's very breach of contract which enabled this to occur. They could not have got that information without his breach which was an essential part of it. This squarely satisfies the Intention Requirement here. The breach of Mr Gerrard's retainer was not a mere by-product; it was the very means of providing the information.

896.    I appreciate that ENRC's pleaded case as to why the SFO officers were engaging in this way with Mr Gerrard is put in slightly more concrete terms ie to achieve a satisfactory settlement or a criminal prosecution- whereas I think it was more generalised opportunism. However, in my judgment that does not make any difference.

**The SFO's Overarching Point**

897.    In the context of considering both inducement and intention, I have considered an overarching argument made by the SFO which is to the effect that overall, it was Mr Gerrard who was taking the initiative in the DCs and not the SFO. In support of that point, the SFO set out numerous references from the evidence to show that it was Mr Gerrard who was

now not have cared whether a criminal investigation would follow, but I do think he now positively wanted to try and secure his own position with the SFO going forwards. To that extent, he would now distance himself as much as possible from his client. He would be prepared to put further damaging information or suggestions into circulation.

1461. In that context, the March 2013 Leak is all of a piece with DC23-25. Moreover, the particular additions put into the Amended Slides with their focus on Ms Zaurbekova, chimed with his continued hints at wrongdoing by her in DC23 and DC24. This was a matter that, at the time, Mr Thompson certainly thought was potentially interesting. In his email to Mr Rappo dated 1 March, he said, having read the executive summary of the Kazakhstan report, "Even the CFO's involvement may not be as interesting as first thought, but we await Neil's final conclusion on that."

1462. Furthermore, the form of the Amended Slides, as a purported pre-July 2012 draft, would fit with the notion that ENRC was in fact suppressing important information and if so, the conclusion in the Kazakhstan Report of Ms Zaurbekova's innocence might not be true.

**Conclusion**

1463. For all those reasons, regrettable though it is, but as with the August and December Leaks, the facts point irresistibly to Mr Gerrard being the source of the March 2013 Leak. Accordingly, he was in gross breach of his duties to ENRC.

**THE JUNE 2013 MATERIAL: CLAIM AGAINST DECHERT**

1464. It is common ground that on 4 June, 2013 a brown envelope addressed to the ENRC Investigation was delivered to the SFO. It contained 25 pages from the annotated copy of the HS Report. As already noted in paragraphs 414-422 above, the only redactions were in relation to Mr Gerrard's annotations. It also included 30 pages from the PP Report, a copy of Mr Gerrard's letter to ENRC of 12 April, 2013 in relation to the criticisms made of Dechert's handling of the ENRC investigation, and finally, hard copies of the Amended Slides, dealt with above in the context of the allegation about the March 2013 Leak. All of this is referred to collectively as "the June 2013 Material".

1465. ENRC alleges that the sender of the June 2013 Material was Mr Gerrard. If he was, it is not seriously suggested that he would not have been in gross breach of duty in so doing even though, by then, the retainer had been terminated. This is because, on any view, most of the material was privileged, namely at least some of the HS Report, the PP Report, and what

purported at best to be a draft presentation to the SFO. Even if the material had been merely confidential to ENRC and not privileged, there would be the same breach of duty.

1466. Rather, the issue is whether the June 2013 Material was sent by or at the instigation of Mr Gerrard.

1467. In that regard, it will be recalled that I have already found that he was prepared to and did instigate the March 2013 Leak, which included the Amended Slides.

1468. By June, of course, there really was no love lost between Mr Gerrard and ENRC. Indeed, in one of the emails collected by "sam@thetruthprovider.com" from Mr Hollingsworth dated 17 April 2013, Mr Hollingsworth stated that Mr Gerrard was "spitting blood and has asked Dick Gould… to serve him with a Section 2 letter so that he can reveal all to the SFO!!!".

1469. In addition, Mr Gerrard had also, by this time, assisted Mr Depel in writing his letter to the SFO dated 15 April, 2013, described in paragraph 243 above. Further, Mr Gerrard's own letter of 12 April to ENRC, defending his firm's conduct, was included in the package. It is difficult to see why anyone other than he would want to include it. Given his previous conduct and motives as set out above, Mr Gerrard had a clear motive for sending this material to the SFO.

1470. Assuming he wanted to send it, he obviously could because he would have had all the relevant materials. Here, it is important to note that it was only his own annotations on the HS Report which were now blanked out.

1471. A further point concerns the brown hair found stuck between two of the unfranked stamps on a brown envelope containing the June 2013 Material. On 10 March, 2020 ENRC's solicitors, Hogan Lovells, wrote to Dechert's solicitors, Clyde & Co. LLP, to ask whether they would permit a comparison of that hair with Mr Gerrard's admitted hair or that of his PA. They said this:

> "In principle, the hair may have become affixed to the Brown Envelope at any point in time before we received it, including while it was in the SFO's custody. Nevertheless, forensic testing of the hair may provide evidence as to the identity of the person responsible for sending the Brown Envelope to the SFO. We therefore propose that the Brown Envelope should be made available to a suitably qualified expert to carry out a comparison of the hair to Mr Gerrard's hair and the hair of his personal assistant(s). In circumstances where our client has no samples of these individuals' hair, ENRC is willing to make the Brown Envelope available to an expert of your clients' choosing (subject to ENRC's prior approval of the expert's credentials)."

1472. Clyde & Co. declined, saying that:

> "As you acknowledge, "the hair may have become affixed to the Brown Envelope at any point in time". Accordingly, our clients do not accept that "forensic testing of the hair may provide evidence as to the identity of the person responsible for sending the Brown Envelope to the SFO." Given that the

results of any tests on the hair would carry no evidential weight, our clients decline your client's proposal."

1473.  A similar point was made at paragraph 218 of Dechert's written Closing.

1474.  However, first, I do not think that Hogan Lovells were making any concession as to the non-utility of the exercise. I simply think they were recognising that if the hair could have got stuck at any particular stage, then it could have belonged to anybody. However, if it was shown to have come from Mr Gerrard, that would be important. The reason is because, on the face of it, it would be hard to see why a hair from Mr Gerrard should have got stuck to the stamps at any time after the brown envelope was sent. There could be no sensible basis for saying that it could somehow have arrived while the envelope was in the custody of the SFO. The same would be true once the original became part of the documents for this litigation. Accordingly, it did not seem to me that the point being made by Dechert as to why it refused a comparison, carried much weight. I raised this in oral argument on Day 47 and invited Dechert to clarify the objection to the comparison if it wished to do so. The result was a note produced after the end of closing submissions, on 7 October, 2021.

1475.  I have read that document carefully, but I am afraid that I am really none the wiser as to why a comparison with a hair admittedly from Mr Gerrard would be of no value. At paragraph 3, the suggestion seems to be that the sending of the June 2013 Material was part of a further attempt (like WB2) to smear Mr Gerrard. Moreover, for a hair to end up between two stamps could hardly be careless. It would require a deliberate act. Although not stated expressly, the suggestion seems to be that even if this was Mr Gerrard's hair, it could somehow have been obtained by someone else (perhaps Dechert had Mr Findlay in mind) and then deliberately placed in between so as to implicate Mr Gerrard. I have to confess that I find this a quite implausible speculation. And certainly, if Dechert really meant to say that this was done by Mr Findlay, it did not put that to him.

1476.  In any event, I see no reason why, in principle, a hair from Mr Gerrard's head could not have fallen down on the envelope prior to him fixing both stamps.

1477.  Paragraph 4 of the document then makes the point about the chain of custody, especially when the envelope was with the SFO. But as already stated, it is hard to see why a hair from Mr Gerrard would have arrived there in the first place.

1478.  Finally, the document says that there was no evidence put before the court that it was even forensically possible to test the hair some 7 years after it was affixed (i.e. 2020, when ENRC first proposed the exercise). However, that is not what Clyde & Co. LLP said in their letter of

1 April. Moreover, given the sophistication of DNA testing, it is very hard to see why any comparative exercise would not be efficacious. In any event, Hogan Lovells invited the comparison to be done with experts when no doubt all of this could be gone into.

1479.   Accordingly, had I needed it, I think there is a strong inference from all of the above that the reason why the comparison was declined was because it might have shown that the hair did indeed come from Mr Gerrard.

1480.   As it so happens, in my judgment the case against Mr Gerrard is quite powerful enough without recourse to the argument about the hair; but if it had not been, this would have made it so.

1481.   Accordingly, I find that the June 2013 Material was sent to the SFO by or at the instigation of Mr Gerrard. He was therefore in serious and deliberate breach of duty.

**FAILURE BY DECHERT TO REPORT ITS OWN BREACHES OF DUTY TO ENRC**

1482.   It follows that there was also a major failure by Dechert to report its own breaches of duty to ENRC in such instances (being most of them) where I have found that it was reckless.

**FURTHER BREACHES OF DUTY ALLEGED AGAINST THE SFO: INTRODUCTION**

1483.   I deal below with the following other allegations against the SFO (in misfeasance only), namely,

(1)   WB2;

(2)   The leak of the criminal investigation decision;

(3)   The June 2013 Material;

(4)   The Beige Notebook;

(5)   The Website Statement.

1484.   I will consider the issue of knowledge of loss after considering the individual breaches of duty.

**WB2**

1485.   In July 2012, not long after Sir David took over as Director of the SFO, an anonymous letter ("WB2") was received in his office. It read as follows:

"London July 2012

Dear Mr Green,

329

they were waiving privilege or not. He could not recall sharing knowledge of the material with the investigation team in 2013 and had not done so with the current (2018) team. He did not know when the material had been placed in the safe but he did not recall putting it there. He very much regretted what had occurred. On the face of that note, if it is to be believed, it is not as if Mr Coussey was unacquainted with the concept of privilege. Rather, at the time, he assumed privilege had been waived.

**Analysis**

1529.   ENRC alleges that Mr Coussey acted at least recklessly in relation to what was privileged material in the brown envelope. In other words, he did not honestly believe that any privilege had been waived because it had been voluntarily sent to the SFO. Instead, either he knew that it had not been, or he turned a blind eye to that possibility.

1530.   Unfortunately, and as already noted, because of ill-health Mr Coussey was not called to give evidence and the SFO was permitted to rely upon his WS dated 10 December 2020, made in anticipation of the trial, as a hearsay statement. So he was not cross-examined. In his WS he deposed to the truth of what he had said in his September 2018 note and repeated that he took the view that the material had been authorised by Dechert to be sent to the SFO.

1531.   He added that although he had said in the Coussey Note that the material should be put on the database, he was simply doing a review of it; he did not himself put it on any database nor did he instruct anybody else to do so. He wrote his WS without seeing the June 2013 Material but thought that from the Coussey Note, although not a detailed analysis of the material, the documents mainly related to wrongdoing in Kazakhstan which was not likely to be investigated.

1532.   He could not recall what happened to the Coussey Note or the material after he wrote it. Indeed, as at September 2018, he could not recall that he had read it. While acknowledging the possibility of discussing the matter with Mr Rappo or Mr Mallela, he had no actual recollection of doing so. He did not recall a safe on the 4th floor at Canada House, which is where he worked back in 2013, but he thought there was one on the 6th floor which was given over to the investigation some two years later. He had absolutely no recollection of placing the materials there himself. He ended by saying that he carried out his duties in good faith, was not dishonest and did not intend to jeopardise ENRC or the investigation.

1533.   If what Mr Coussey said in his September 2018 Note and in his WS is correct, there can be no misfeasance through him.

1534. ENRC placed much emphasis on the fact that Mr Coussey was very experienced and had many dealings with questions of privilege, including in the weeks preceding the arrival of the June 2013 Material. It also relied on Mr Mack's concession in oral evidence that it was perhaps not reasonable for Mr Coussey to have assumed that the material came to the SFO in compliance with a s2 Notice. Unsurprisingly, ENRC also relies on the fact that this particular package did not come with any covering letter or anything of that kind, which was obviously unusual. Equally, that Mr Coussey did not take the simple step of checking with Dechert whether it had sent it.

1535. Mr Wagstaff thought Mr Coussey's actions in dealing with the June 2013 Material were out of character. ENRC also noted the later expression of regret by Mr Coussey in 2018.

1536. I see all of that, and it makes a strong case of negligence against Mr Coussey. Of course I take into account that the ENRC has not had the opportunity to cross-examine Mr Coussey. Nonetheless, I do not accept that he was in knowing or reckless breach of duty. I cannot see what motive there would have been and I bear in mind the high regard in which he was generally held, according to a number of witnesses. ENRC says that Mr Coussey's reference to a need to get the investigation going means that he could plausibly have recklessly sacrificed ENRC's right to LPP for the end of a good result for the SFO investigation. I do not accept that. It is also said that Mr Coussey's comment that the SFO had no interest in gaining access to privileged documents was "belied" by the reference in the Coussey Note to seeing Dechert's work on the DRC transactions. I do not agree. I think his earlier comments just meant that if the material was viewed as privileged the SFO had no interest in seeking to use it when they would have been unable to.

1537. Moreover, if Mr Coussey was indeed knowingly or recklessly in breach, it would mean that, quite apart from his WS, his September 2018 note was also deliberately false as to what he thought. I do not think it was.

1538. For all the above reasons, I do not find any knowing or reckless breach of duty on the part of Mr Coussey in dealing with the June 2013 Material. Nor do I find that he was at least reckless as to any loss to be suffered by ENRC if he had been and indeed this was not something expressly submitted although, of course, it could not be put to him.

1539. However, in addition, ENRC alleges that on the basis that some or all of the June 2013 Material was in fact privileged without any waiver, the SFO made use of it during the investigation at least in the period before it was notified to ENRC in September 2018.