FT Magazine  Life & Arts

# Silent witnesses: what do three corpses have to do with a corruption case?

Deaths of potential witnesses have alarmed investigators looking into ENRC, the mining house that operates in a dangerous world

**Tom Burgis** OCTOBER 1 2020

At lunchtime on Saturday May 9 2015, the staff at La Quinta Inn in Springfield, Missouri, decided they had better see why the bikers in rooms 216 and 218 had not checked out. The two men had arrived three days earlier, pausing as they rode their Harleys along Route 66 from Chicago to Los Angeles. Their accents were unusual: the clipped vowels of white South Africans. One of them had passed through the lobby the previous evening. But there had been no sign of them since.

At 1.06pm, the police took a call from the motel. In room 216, the staff had found one guest lying naked on his bed. In room 218, the other was on the floor of the bathroom in his underwear. Both were dead but there was nothing to show what had killed them. When they arrived, the emergency responders jumped to a terrifying conclusion. They took one look at the diarrhoea, learnt the men's origins and thought of the deadly African virus that was in the news: was this Ebola?

The local medical examiner turned to the Centers for Disease Control and Prevention, the federal agency that handles such cases. No, this wasn't Ebola. But it was another disease endemic in Africa. Six weeks later, Springfield police announced that the cause of death had been identified as malaria.

Among those who were alarmed by news of the deaths were investigators at the Serious Fraud Office in London who were working on a high-stakes corruption case. Their target was a multibillion-dollar mining house founded by three ex-Soviet oligarchs that had once ranked high in the FTSE 100 list of Britain's most valuable companies: Eurasian Natural Resources Corporation, or ENRC. The men in rooms 216 and 218 — Gerrit Strydom and James Bethel — had held senior positions in ENRC's African arm, the unit at the centre of the suspected corruption. Both Bethel and Strydom were potential witnesses, and the SFO investigators had made contact with at least one of them to arrange an interview. Now their mouths had permanently closed.



Former ENRC executives James Bethel, left, and Gerrit Strydom

Five years on, a Financial Times investigation has found that the malaria diagnosis is now open to serious question, so much so that one leading independent expert believes it cannot have been the cause of death. Medical records and other case documents, as well as interviews with those involved, raise major doubts about the diagnosis. The fact that the Springfield police force has quietly kept its investigation open may suggest even they have an open mind about the causes of the men's deaths. And then, during the past year, the FBI took over.

Like their British counterparts, the US investigators are left with questions to which there are not, and may never be, clear answers: if malaria did not kill the two men, what did? And are their deaths linked in any way to those of others who operated in the same murky world? That world encompasses some of the most dangerous places to do business, both in Africa and the former Soviet Union. Multinationals that operate there are among the riskiest companies to work for.

# £20bn

Valuation of ENRC in 2008, after it entered the FTSE 100

Those who know those places well say that, when the pursuit of profit turns violent, it can be hard to know from which direction the menace comes. Some of those who have died in recent years appear to have been silenced; others may have been taken out by their bosses' rivals, perhaps to send a message, or by those with direct or indirect interests in the businesses in which they operated. Whether the men whose deaths the FT has investigated were killed may never be clearly established, and if they were, the nature of the world they lived in is such that the identity of those responsible, and even the range of potential suspects, may remain forever unknown.

---

**There was nothing untoward** in André Bekker's manner as he and his colleagues shared a bottle of wine after work at their office in Johannesburg on Friday October 28 2016. Another spring evening under the dazzling skies of the Highveld was beginning. Bekker was his usual convivial self. He was getting divorced but had met someone new. Portly as he approached 60, he was what they called a "stone man" — a geologist. One of the best around, in fact. Bekker could tell you if that stretch of scrubland on which you had staked your investors' money really did contain the treasure you hoped for. And he was known for telling it straight, never massaging the data.

At around 8pm, Bekker headed down to the car park. A colleague, driving away, saw him putting his laptop in the boot of his vehicle. It was his pride and joy, an Audi Quattro A4, glimmering white. At 8.16pm, the car pulled out very slowly. It continued west, in the direction of Bekker's house, but after 22 minutes came to a halt on a back street. At about 9pm, a resident noticed the white Audi but thought nothing of it — until, half an hour or so later, he heard explosions. He ran outside. The car was engulfed in flames. Once the blaze had been extinguished, those who dared to approach made out a charred human form within, the skull resting against the door. It took an examination of dental records to confirm that the corpse was Bekker.

A few days after Bekker's death, his employer, an American mining investor called Preston Haskell, hired a private detective. Clement Jackson was a leathery Afrikaner, a former police colonel. Jackson, the records of his investigation show, soon discovered that the hopelessly overstretched police were unlikely to solve Bekker's murder. A murder it clearly was, so far as Jackson was concerned: Bekker's body had been found on the back seat of the car and Jackson established that it would have been almost impossible to commit suicide by igniting the vehicle from there. Johannesburg was plagued by violent robbery. But what kind of thief boosts a vehicle then immediately torches it on a suburban road with its owner, his laptop, his phone and even his expensive watch still inside? As for his family, they all had alibis.



André Bekker beside his Audi; the burnt-out car after his death

An attendant at a garage told Jackson that at precisely the time Bekker's car was parked two blocks away, two white men had approached him and asked to borrow a canister to buy five litres of fuel. They promised to return it but never did. If they were the killers, that could explain the intense heat of the fire, which had scorched away any trace of DNA evidence. It might also explain why the vehicle's tracking system suggested the key fob had left the car for

a few minutes before it was set alight. But the attendant could give only vague descriptions and the CCTV footage had not been stored.

Then, Jackson's reports show, his contacts in the local crime gangs claimed to have a source who said a contract on Bekker's life had been paid out. Even if that was true, and not just some gangland chancer's attempt to secure a reward, there was not enough to identify any hitmen or whoever might have instructed them.

A few weeks into his inquiries, Jackson went to see a sensitive source in Johannesburg's business district. That was when he heard of ENRC. The multinational mining corporation had been founded by three businessmen from Central Asia, who had secured rich mines in Kazakhstan during the post-Soviet shotgun privatisations. In 2007, the UK market regulator had allowed them to sell some of their shares on the London Stock Exchange, even though they were under investigation in Belgium — later settled without any admission of wrongdoing — for suspected money laundering. The company swiftly entered the FTSE 100, valued at £20bn. The billionaire founders — Alexander Machkevitch, Patokh Chodiev and Alijan Ibragimov, known as the Trio — were soon at odds with the non-executive directors of ENRC plc. One called [the oligarchs' approach "more Soviet than City"](#).

> **If Bekker knew about any manipulation of geological data, he 'could have been a target for a hit to silence him'**
>
> **Clement Jackson, private detective**

When an anonymous whistleblower at one of the Kazakh mines alleged in 2010 that bosses there were on the take, ENRC's management in London hired a City lawyer called Neil Gerrard to conduct an internal investigation. Gerrard would later state in a court filing that he discovered that there were potentially still more troubling problems in the African mines ENRC had bought after listing in London. He unearthed what he believed was evidence of bribery overseen by certain ENRC executives close to the Trio in the acquisition of its African assets. Gerrard was due to hand his findings over to the UK's Serious Fraud Office in the hope that ENRC could achieve a settlement when, in early 2013, the company's executives fired him.

It was at this point that the SFO's investigators announced their own criminal investigation into ENRC "focused on allegations of fraud, bribery and corruption around the acquisition of substantial mineral assets". That investigation is still going. [ENRC has sued both the SFO and Gerrard](#), accusing them of conspiring to cook up a scandal, in response to which Gerrard filed a defence that revealed his account of the internal investigation.

According to that filing, before he was fired Gerrard had spotted something strange in one of ENRC's African acquisitions. It proved to be a pattern that is borne out by the company's corporate filings, reviewed by the FT. ENRC would spend hundreds of millions of dollars at a time to buy a prospect, mine or smelter that turned out to be worth far less. The transactions transferred huge sums from the London-listed public company ENRC to the owners of the assets being acquired. In some cases, these owners were the Trio themselves. In others, the owners were hidden behind anonymously held offshore companies.



The billionaire founders of ENRC, from left: Patokh Chodiev; Alijan Ibragimov; Alexander Machkevitch

One such deal had taken place in December 2011. According to a statement to the London Stock Exchange, ENRC had agreed to pay $295m to buy from a company registered in Mauritius a company registered in the British Virgin Islands, which in turn owned the Kongoni manganese prospect in the South African stretch of the Kalahari Desert. Within two years, ENRC had written down the prospect's value by $64m more than it had paid for it. The company's annual report blamed "downward pressure on prices". But a geologist who had made an assessment of Kongoni believed that the data had never supported the huge price

ENRC had paid. He had been telling people in the industry as much, according to two of those he spoke with — a claim that suggested the deal had been deliberately inflated. His name was André Bekker.

**After piecing together details of the Kongoni transaction**, Clement Jackson recorded in one of his investigation reports, shown to the FT, that if Bekker knew about any manipulation of geological data to facilitate a business deal, he "could have been a target for a hit to silence him". But Jackson knew he would be unable to investigate that possibility alone. In April 2019, he flew to London and made his way to the SFO headquarters off Trafalgar Square. He spent two days talking the investigators on the ENRC case through what he had learnt.


Private detective Clement Jackson

He told them about the host of businessmen, fixers and middlemen involved in the Kongoni deal. They included Mike Nunn, a mining entrepreneur who was the founder and executive chairman of the mining company, Amari, which had sold the Kongoni prospect to the anonymously owned company in Mauritius which then sold it on to ENRC. The deal had left others who stood to profit angry. A fixer who said he had made introductions claimed that Nunn had calculated the fixer's percentage based on a sale price of about $150m, half what ENRC had paid. Nunn disputes that. Other shareholders also had concerns about the transaction, including how much was actually paid and to whom. Nunn told the FT: "The transaction was concluded to the appropriate international standards of governance, supported by leading firms of lawyers, accountants and industry consultants and the

valuation was agreed based upon independent assessments in-line with best practice M&A in the sector."

# $295m

Amount ENRC paid to buy a South African mining prospect in 2011. Then within two years, ENRC had written down the prospect's value by $64m more than it had been purchased for

Clement Jackson left London with the impression that the SFO had been looking into the Kongoni transaction before he got in touch. From the way the investigators talked about Bekker, it even seemed to Jackson that they might have been in contact with him — meaning that he would have been an active witness in the corruption investigation at the time of his death. Jackson's own source — the one who had first alerted him to the ENRC case — had told him that several witnesses to the alleged corruption were in fear of their lives and others were dead.

The SFO declined to answer the FT's questions about the ENRC case but a person with knowledge of it confirmed that at least one potential witness was too afraid to talk to the investigators. And then there were the witnesses who would never speak again.

---

**When, after listing their Kazakh mining company in London**, the Trio decided to expand into Africa, they had given the job to a hefty American called [Victor Hanna](). They trusted him. In time, he would leave his wife and children and marry one of their daughters. And he could cut deals. But he needed someone to oversee the technical business of extracting metal from the ground. For that, he found Jim Gorman, a likeable Scot who had spent a lifetime in the industry, much of it in the vast expanse of poverty, war and immense natural riches where Hanna was securing mining rights for ENRC: the Democratic Republic of Congo.

Gorman, like his colleagues, found his boss's past a closed book. Some believed that Hanna had served in the US military. Gorman, who got on well with him, once remarked that he thought he had been in the CIA. He was certainly able to forge relationships with the gatekeepers to Africa's bounty of minerals. Among them, according to Neil Gerrard's court filing and interviews with former ENRC staff, was an [Israeli businessman called Dan Gertler](). Gertler, according to a US Treasury statement when it later imposed sanctions on him, was making a fortune by acting "for or on behalf of" Congo's president Joseph Kabila in "opaque

and corrupt" mining deals between 2010 and 2012.

According to his court filing, Neil Gerrard uncovered questionable payments running to tens of millions of dollars that Hanna had authorised to companies connected to Gertler. Gorman might have been concentrating on digging ores from the great seams of copper and cobalt that lay beneath Congo's red soils but he knew plenty about the money side too. Indeed, as the scandal around ENRC worsened in the City in 2012, Gorman was privy to a plan to spin off the African business Victor Hanna had built into a separate listed company.



Former ENRC Africa boss Victor Hanna; Dan Gertler, middleman close to the Democratic Republic of Congo's former president Joseph Kabila

If the SFO's investigators had wanted to speak to Jim Gorman when they launched their criminal case the following year, they were too late.

In May 2012, Gorman and some of his colleagues had flown down to Johannesburg for a meeting. They checked into the Southern Sun hotel in the business district and went for dinner at a nearby steakhouse. One member of Gorman's circle recalled that in the preceding weeks he had looked "skittish and almost fearful, which was very unlike him". He seemed "extremely tired and stressed" and "had become completely secretive".

Gorman could put away wine by the bottle. He was fond of a Cuban cigar too, despite the orders of the doctors who had diagnosed circulatory problems, for which he had had a stent inserted. After a merry evening, he retired to bed. The next morning, the others gathered for breakfast. There was no sign of Gorman. Eventually they asked the hotel management to check his room. Gorman had died in the night. Following an autopsy that found his arteries were clogged with clots, he was cremated. The small group of people who could have shed light on the shadowy pursuit of African riches had grown still smaller.

---

**Jim Gorman's successor as Victor Hanna's number two** in ENRC's Africa operation was a South African called James Bethel. Six foot and well built, Bethel had previously looked after some of ENRC's most lucrative — and controversial — Congolese ventures. An ENRC corporate filing described him as a "key contributor to the business" who "played a significant role in new business development and expansion". The promotion meant he was in possession of the kind of information the Serious Fraud Office team had begun to seek. "If you're the head of copper-cobalt in the Congo, you know things, you have to," said a colleague.

Shortly after the Serious Fraud Office's criminal investigation began in April 2013, the Trio took ENRC private again. With the help of the Kazakh state, they bought back the shares they had sold on the London Stock Exchange and shifted their company to Luxembourg. But the SFO investigators kept digging. James Bethel was a potentially important witness, according to a person with knowledge of the investigation. He dealt with Congolese ventures connected to Dan Gertler, the middleman close to President Kabila. And he had overseen a subsidiary that Neil Gerrard suspected, according to his defence filing, of being a channel to breach international sanctions by sending money to a crony of Robert Mugabe, then president of Zimbabwe, where ENRC had acquired a platinum prospect.

By 2015, the SFO's investigators had decided they needed to interview Bethel. They had mentioned him during their inquiries — so much so, said one person with knowledge of the investigation, that the Trio and their lieutenants would have been aware of the SFO's interest. The investigators had made contact with him, according to two people with knowledge of their communications, to arrange a meeting. They were also interested in the next man down in the ENRC Africa hierarchy, Gerrit Strydom.



A copper mine operated by ENRC in Katanga province, Democratic Republic of Congo

An Afrikaner with a thick accent, Strydom was based in Zambia, where Neil Gerrard had, according to his defence, gathered first-hand evidence that Victor Hanna ordered bribe payments to top politicians. Strydom had taken over from Bethel as head of the subsidiary where, according to Gerrard's defence, suspected sanctions violations occurred. But he was a mining engineer, not a money man, a long-serving ENRC employee who had been at dinner with Jim Gorman the night of his death in 2012. Strydom struck one of those involved in investigating the alleged corruption at ENRC as a friendly family man, "straight as straight can be".

When Bethel and Strydom decided to leave ENRC in 2015, their colleagues settled on various explanations. One thought the new management the Trio had appointed after delisting ENRC wanted to bring in their own people. Another thought the two were cooking up some new

venture with Victor Hanna, who had left in 2014 but remained close to the Trio.

> **'If you're the head of copper-cobalt in the Congo, you know things, you have to'**
> A colleague of James Bethel

First, though, the pair needed a holiday. They did what many a middle-aged motorcycle enthusiast had done before them: flew to the US, hired Harley-Davidsons and hit Route 66. They both felt a little off colour during the flights to Chicago — achy, nauseous and feverish — but put it down to jet lag. By Wednesday May 6 they had reached Springfield, Missouri, and checked in to La Quinta Inn. They were still feeling unwell but seemed perfectly compos mentis on the phone and in emails. On the Friday evening, having arranged to stay another night, Bethel was seen buying bottled water in the lobby. By the following lunchtime, they were dead.

When the SFO investigators in London heard what had happened, according to a person familiar with the matter, they hoped that the Springfield police would make sure any evidence that might be useful in their corruption case was secured. But they were not on the scene. A representative of ENRC was — and was liaising with Brian A Smith, the Springfield violent crimes detective on the case. Shawn McCormick was a former US intelligence official at the White House. He had done a stint at an oil company in Moscow before taking a contract to work with Victor Hanna on ENRC's African operations. Among his tasks was to debrief ENRC employees after they had spoken to Neil Gerrard, according to one of them. Arriving in Springfield, police emails released under freedom of information rules show, McCormick made himself the go-between the police and the dead men's families.

McCormick was not the only emissary from ENRC to arrive in Springfield after the deaths. Victor Hanna travelled there too. So did Michael Baden, a celebrity coroner periodically hired to work on sensational cases. Baden flew in at the company's request and joined the investigation that Jeff Harkey, the local medical examiner, had begun. They could make out abnormalities in certain cells, but Harkey had run out of the oil required to examine microscopic slides in more detail. He was "at the mercy of a cumbersome bureaucracy", he recalled, and had been unable to get fresh supplies. Harkey also had a low opinion of the laboratory that had the contract for toxicology testing. Sure enough, when he sent off samples from Bethel's and Strydom's bodies, results for only two of the four tests he had requested

came back.

Lawrence Kobilinsky, a leading forensic scientist at the John Jay College of Criminal Justice in New York, said that regardless of whether the men had malaria, "you can't rule out foul play without a toxicology report". Yet, according to a spokesperson for Springfield police, a toxicology report was never added to the case file.

Both the pathologists, Harkey and Baden, told the FT they were unable to identify the cause of death — and recorded as much in their reports at the time — so they called in the CDC. Neither doctor had clear recollections of what, if any, chain of custody procedure was maintained to safeguard evidence. The CDC did not reply to questions about how it ensures that samples it tests are reliable, an area the SFO investigators in London came to be concerned about.

> **Regardless of whether the men had malaria, 'you can't rule out foul play without a toxicology report'**
>
> **Lawrence Kobilinsky, forensic scientist**

The CDC's specialists tested the samples they received. They found malaria parasites but did not, according to internal emails, conclude that malaria was the cause of death. Nonetheless, on June 22, Springfield police issued a statement that cerebral malaria had killed the men. It has made no further announcement on the matter since. And yet the case remains an active investigation. When the FT asked about its status in May 2020, a spokesperson for Springfield police referred enquiries to the FBI, "as they have taken over the investigation of this case". The CDC also referred questions to the FBI. An FBI spokesperson said the agency had no comment, "in keeping with our standard practice of neither confirming nor denying the existence of our investigations".

There is at least one reason why the investigation might have remained open: a contradiction in the scientific evidence that appears to rule out malaria as the cause of death. From the outset, Bethel and Strydom's former colleagues found it implausible that they would have died of malaria within hours of each other. True, they had been on a fishing trip to Zambia two weeks earlier. Say they had been bitten then: that would have allowed about the usual length of time for malaria parasites to multiply to lethal levels. But, says Sam Wassmer, associate professor in malaria pathogenesis at the London School of Hygiene & Tropical Medicine, a multitude of factors affect the speed at which malaria develops over many days,

as well as its severity. The only remote possibility of the disease progressing at a matching pace in two hosts would be if they had been bitten by the same mosquito. Just maybe, that was what had happened to Bethel and Strydom on their fishing trip.

After their initial tests showed malaria parasites, the CDC's scientists delved deeper. In the emails they exchanged, obtained under freedom of information rules, they discussed further findings. "An analysis with 7 microsatellite markers indicated the parasites were of different genotypes and in fact one patient had multiple genotypes," wrote one CDC scientist to his colleagues a couple of days after Springfield police announced the cause of death. In other words: different mosquitoes injected different parasites into different bodies, and yet there was an apparently near-identical progression of disease over hundreds of hours to the point that the hosts died within hours of one another. Wassmer, who reviewed the CDC material, rated the chances of that having happened as "almost certainly nil".

---

**ENRC, the Trio and Victor Hanna** vigorously challenge any suggestion that there are grounds to suspect them of any kind of wrongdoing in relation to either the alleged corruption or the deaths. Regarding Bethel and Strydom, they point to US authorities having stated that malaria was the cause of death. They did not answer the FT's questions about whether they have sought to investigate the deaths of their former employees.

# $6.8bn
The estimated collective wealth of the Trio according to Forbes

The Trio's company still mines rich seams in Kazakhstan and Africa. Forbes puts their collective wealth at $6.8bn. They have fought back hard against the Serious Fraud Office's investigation into their affairs. First, their lawyers persuaded an English court that the SFO should be denied access to the records of Neil Gerrard's investigation on the grounds that he had been ENRC's lawyer and it was therefore legally privileged information. Then, in a series of lawsuits, ENRC claimed that Gerrard, his law firm Dechert and an expanding cast of private eyes and reporters conspired with the top brass of the SFO to cook up the corruption allegations and [leak them to the press](#) in order to secure more fees for Gerrard and a win for the SFO. When Gerrard and Dechert filed their defence alleging that their investigation had

uncovered corruption connected to the company's African acquisitions, ENRC responded that their filing "relies heavily on hindsight and speculation" and lacks "any, or any proper, particulars" in support of the serious allegations it contains about the company.





© Mark Watkins

ENRC's version of events is due to be tested in court in 2021. Meanwhile, the SFO's investigation is now in its eighth year. A series of case controllers have come and gone. Jon Mack led the investigation from September 2018 to September 2019. On his watch, the SFO went to court to try to force Alexander Machkevitch's daughter Anna to hand over some documents. On the morning of the first hearing, according to two people with knowledge of the matter, Mack collapsed and was taken to hospital. He was familiar with the Springfield deaths and knew of suggestions that Bethel and Strydom might have been poisoned. Mack feared that he had been too. Although his doctors never confirmed as much, he was so shaken he wanted nothing more to do with the ENRC case and moved to a different job at the SFO.

Lisa Osofsky, who took over as head of the SFO two years ago, now faces a big decision on whether to bring charges, seek a settlement or drop the case. A person with knowledge of the SFO's investigation says that witnesses who dare to come forward face "creeping, enduring, never-ending fear". That fear is multiplied by not knowing who to be afraid of: those who wish to keep ENRC's affairs secret, any rivals who might wish to harm the company and its oligarch owners, or figures from the perilous regions where it does business.

Like many others working in this world, the Trio have, in the course of amassing their fortunes, forged alliances with forces which have shown themselves risky to cross. Patokh Chodiev once told a journalist that the trading house where he and Machkevitch started out in capitalism around the end of the Soviet Union "stank of the KGB". Machkevitch, according to a former ENRC director and two well-sourced experts in Russian organised crime, has maintained contact with Semion Mogilevich, a senior Moscow gangster who once appeared on the FBI's top 10 most-wanted list. The Trio grew rich during the reign of Nursultan Nazarbayev, the strongman who ruled Kazakhstan from Soviet days until 2019. It was a violent time. At least two of Nazarbayev's political challengers were murdered, another claims to have been the target of an abortive assassination attempt and two members of his own family have turned up dead after revealing details of his illicit fortune. The Trio also have enemies within the Kazakh ruling class, among them spies, politicians and rival oligarchs, one of whom has been convicted of ordering the murder of a business partner.

## Witnesses who dare to come forward face 'creeping, enduring, never-ending fear'

**A person with knowledge of the SFO's investigation**

The second source of ENRC's billions — central Africa — is no safer than the Kazakh steppe. Decades of venal dictatorship after independence from rapacious Belgians were followed by two wars, fuelled by pillaged mineral wealth, during which millions died. President Kabila's predecessor — his father — was assassinated. Augustin Katumba Mwanke, Kabila's chief aide and architect of Dan Gertler's murky mining deals, perished in a plane crash after telling a close associate that he feared for his life.

Those who knew James Bethel, Gerrit Strydom and André Bekker know they moved in this precarious world. They want to discover whether that cost them their lives.

*Tom Burgis is an FT investigations correspondent. His new book "Kleptopia: How Dirty Money Is Conquering the World" (HarperCollins) is available now*

Copyright The Financial Times Limited 2022. All rights reserved.