Claim No. CL-2021-000035

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS & PROPERTY COURTS OF ENGLAND & WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N :**

**EURASIAN NATURAL RESOURCES CORPORATION LIMITED**

**Claimant**

**- and -**

**(1) THE DIRECTOR OF THE SERIOUS FRAUD OFFICE**

**(2) JOHN GIBSON**

**(3) TONY PUDDICK**

**Defendants**

───────────────────────────────

**AMENDED PARTICULARS OF CLAIM**

───────────────────────────────

- **Amendments made pursuant to the order of Mr Justice Andrew Baker dated 15 October 2021**
- **Amendments made in connection with the order of Mr Justice Andrew Baker dated 15 October 2021 to join Mr Puddick as a Defendant under CPR 19.2**

**A.     Overview**

1.     The Claimant, Eurasian Natural Resources Corporation Limited ("**ENRC**"), was listed on the London Stock Exchange between December 2007 until November 2013 as the

1

parent company of a diversified natural resources group with (*inter alia*) extensive mining operations ~~and between~~. It remains the UK holding company of numerous trading subsidiaries.

2.    The First Defendant (the "**Director**") is the Director of the Serious Fraud Office ("**SFO**"), a non-ministerial department of state constituted under s.1(1) of the Criminal Justice Act 1987 (the "**1987 Act**"). The Second Defendant, a barrister, was an employee and officer of the SFO between 3 March 2014 and 10 September 2018. The Third Defendant is also an employee and officer of the SFO. The Director is responsible and vicariously liable for the acts and omissions of the SFO's officers, staff and contractors as particularised below.

3.    During 2010, ENRC received an anonymous whistle-blowing email in relation to one of its indirect subsidiaries which prompted an internal review. On 9 November 2011, ENRC acting on the advice of Neil Gerrard, the partner at Dechert who was overseeing such internal review, informed the SFO that it would conduct a review of its operations and engage with the SFO regarding the results of that review ("**Review Process**").

4.    At 1.00pm on 25 April 2013, the SFO announced that the Director had accepted ENRC for investigation ("**ENRC Investigation**"). The conduct of the SFO's officers and staff prior and subsequent to that announcement is the subject of a separate set of proceedings (Claim CL-2019-000644) in which it is alleged that such conduct amounted to (*inter alia*) misfeasance in public office ("**2019 Misfeasance Claim**").

5.    Amongst the numerous acts about which ENRC complains in the 2019 Misfeasance Claim is the fact that one or more employee(s) of the SFO leaked the impending commencement of the ENRC Investigation prior to its public announcement, contrary to an agreement reached between the SFO and ENRC's legal advisers at the time. In particular, it is known that such employee(s) leaked this information to:

    5.1.    Bloomberg LP ("**Bloomberg**"), who subsequently sought comment from ENRC before any public announcement was made about the ENRC Investigation; and

    5.2.    Mark Hollingsworth, a self-described freelance journalist and London-based professional 'intermediary' (*i.e.* a trader who acquires and sells confidential and sensitive information within the private intelligence community) who has cultivated SFO sources from at least 2012 with a view to disclosing

information relating to ongoing SFO investigations (including the ENRC Investigation) to his clients/customers, professional associates and the international media.

6. By these proceedings, commenced following further developments in late 2020 pleaded below, ENRC complains about instances in which officers, staff and/or contractors of the SFO (together, "**SFO Officers**"; individually, "**SFO Officer**") have, whilst acting in that capacity and without the consent of ENRC, covertly and wrongfully provided information relating or purporting to relate to the ENRC Investigation to the press or other third parties for publication, on condition as to preservation of the anonymity of the source of such sensitive information.

7. The Second Defendant was the Case Controller for the ENRC Investigation from 3 March 2014 until ~~7~~ 10 September 2018 in which capacity he exercised overall responsibility for, and day-to-day oversight and governance of, the investigation and prosecution of the case within the SFO, including:

   7.1. Setting and reviewing the investigation and prosecutorial strategy (including identifying potential suspects, witnesses and sources of evidence);

   7.2. Ensuring that the ENRC Investigation and any ensuing legal process was conducted in accordance with the SFO's investigative and prosecutorial standards and policies and in a fashion which was fair and lawful;

   7.3. Ensuring that SFO Officers complied with their obligations not to misuse or disclose information which they acquired as a consequence of their work about the ENRC Investigation and that any leak of such information was treated seriously and subject to prompt investigation;

   7.4. Managing the investigators and lawyers working on the case;

   7.5. Setting the budget for the ENRC Investigation and ensuring that it was resourced and staffed in a manner which was sufficient and appropriate in light of the Second Defendant's perception of the investigation's needs;

   7.6. Liaising with HM Treasury in respect of additional funding requirements sought by the SFO in respect of the Investigation;

   7.7. Supervising related litigation; and

7.8.    Reporting to the relevant Head of Division at the SFO (Bribery and Corruption) in respect of the conduct and progress of the Investigation.

7A.    The Third Defendant is a senior investigating officer within the SFO. He is currently suspended.

8.    Further to the exercise of its powers and duties in relation to the ENRC Investigation (and previously its communications with ENRC and its lawyers for the purpose of the Review Process), the SFO obtained, created or otherwise acquired and held information in relation to such investigatory process and the affairs of ENRC.

9.    The Claimant's case is that from at least 2016 onwards:

9.1.    SFO Officers (including the Second and Third Defendants) repeatedly gave covert briefings to intermediaries and journalists about, or purporting to be about, the ENRC Investigation and/or the affairs of ENRC, with a view to the publication of sensitive case information and on condition that such intermediaries and journalists would not reveal the identity of the SFO Officers and/or the SFO as the source of such sensitive information; and

9.2.    The First and Second Defendants failed to comply with their duties to take prompt steps adequately to investigate any such disclosures, with a view to: (a) protecting the integrity of the ENRC Investigation; (b) ensuring that the independence, objectivity and good faith of the SFO and the SFO Officers was maintained at all times; and (c) to avoid causing further damage to the integrity of the ENRC Investigation and its subjects by preventing further disclosures from occurring in the future; but, instead, condoned or chose to turn a blind eye to such behaviour and its adverse implications.

10.    The Defendants thereby breached ENRC's confidence and violated their statutory duties with the intention of causing harm to ENRC during the currency of the ENRC Investigation. Such unlawful conduct continued pursuant to a conspiracy or conspiracies between SFO Officers (as yet unknown) and the Second Defendant after he ceased to be employed by the SFO, and the Third Defendant. Such unlawful conduct constituted misfeasance in public office on the part of both the SFO and the Second Defendant during his employment, as well as the Third Defendant. The SFO thereby sought to enhance its position and reputation at the expense of ENRC, including with a view to prejudicing public opinion about ENRC; justifying the protracted course of the

4

ENRC Investigation and the substantial 'blockbuster' funding on which it relies; and deflecting criticism which the SFO has justifiably received for its conduct of the ENRC Investigation and other high-profile inquiries which have failed to result in charges or convictions. Such behaviour was deliberate, oppressive and unconstitutional and/or calculated to benefit the SFO to a greater extent than it may be liable in compensatory damages, such that an award of exemplary damages is justified in the interests of justice.

**B.** **Leaks of Information about the ENRC Investigation and/or ENRC's Affairs**

11. Pending disclosure and the provision of further information in this action, ENRC does not know and cannot particularise (a) the full extent of the information which the Defendants have disclosed or caused to be disclosed in respect of the ENRC Investigation and/or ENRC's affairs; or (b) the nature and extent of the damage which those disclosures have caused to ENRC and/or its business. Notwithstanding these constraints, the information which the Defendants are known to have disclosed included that contained or alluded to within the communications and articles identified in paragraphs 12 - 24 below.

*(i)* *Truth Provider Email*

12. On 4 August 2019, an email was sent from "*sam@thetruthprovider.com*" to five SFO email addresses, copied to a large number of generic and individual email addresses associated with enquiry agents, law firms and barristers' chambers ("**Truth Provider Email**"). The Truth Provider Email attached a *.pdf* file with over 2,200 pages of emails apparently sent by or to Mr Hollingsworth.

13. The Truth Provider Email included the following emails (each sent by Mr Hollingsworth, unless otherwise stated) which demonstrated that since at least 2013, Mr Hollingsworth has been able to cultivate a number of SFO Officers as sources, who then covertly passed information relating to the SFO's ongoing investigations to him:

13.1. On 1 July 2013, Mr Hollingsworth emailed Glenn Simpson, the chief executive of a US-based private intelligence firm, Fusion GPS, "*a new report on ENRC, Trio and SFO*". This report contained confidential information about ENRC and its then-largest minority owners, Alexander Machkevitch, Patokh Chodiev and Alijan Ibragimov (who Mr Hollingsworth referred to as "*the Trio"*), and their interactions with the ongoing ENRC Investigation,

much of which he could only have obtained from a senior source within the SFO, including (i) details of sources and witnesses relied on by the SFO for the ENRC Investigation; and (ii) an analysis of "*the Trio and their assets*".

13.2. On 27 June 2016, Mr Hollingsworth emailed Mr Yearsley, accepting an offer which the latter had previously made to introduce Mr Hollingsworth to a new "*SFO contact*". Shortly afterwards, on 20 and 21 July 2016, Mr Hollingsworth emailed two BBC Panorama journalists with whom he was leaking information about a separate SFO investigation into Rolls Royce to inform them that he had persuaded his "*SFO insider*" (it is inferred a reference to the new contact which Mr Yearsley had introduced) to meet at 5.30pm on 21 July 2016. Mr Hollingsworth explained the timing on the basis that his source "*leaves the office at 5pm*" and that he would "*find a pub or hotel bar near to Trafalgar Square which hopefully is not too crowded.*"

13.3. Emails on 21 February 2017, including one to Phillip van Niekerk, the Managing Partner of Calabar Consulting, a private intelligence firm with a particular focus on Africa, in which Mr Hollingsworth attached a report which he noted contained "*new information on the SFO investigation*". In the report itself, Mr Hollingsworth announced that "*I have a new source inside the SFO who briefs me on existing SFO investigations. Last week he told me that the investigation into ENRC is now "their main priority" and "the next big case"*". Mr Hollingsworth again went on to relay information about what he had been informed was the current focus of the ENRC Investigation, the identity of cooperating third-party witnesses, the SFO's assessment of the strength of the evidence, and the expected future course of the ENRC Investigation.

13.4. An email of 17 March 2017, reporting that an "*insider source*" known to Mr Hollingsworth had confirmed that "*the SFO investigation into ENRC is definitely ongoing*" and that "*[i]nside the SFO the case is being handled in extra secrecy – "behind closed doors" ... and is being taken very seriously*".

13.5.   An email of 19 April 2017 referring to "*an inside source at the SFO who is briefing me off-the-record on their investigation into ENRC...*".

13.6.   An email of 20 April 2017 referring to "[m]*y SFO insider*", who was reported by Mr Hollingsworth to have informed him that the SFO "*have been told that they will be able to use the secret Decherts documents which were given to the SFO by ENRC's former lawyers*". The same email also identified the names of individuals associated with ENRC who were said to be attracting particular focus from the SFO's investigators and noted that *"there is more to come".*

13.7.   Emails dated 19 and 26 May 2017 (including to Mr Hollingsworth's wife) referring to a meeting with "*my SFO contact*", "*my SFO insider*" and "*my source*".

13.8.   An email dated 7 June 2017 sent by a very senior SFO officer, Grant Cherrington, to Mr Hollingsworth, referring to "*Tony P.*" (a reference which, for the reasons set out at paragraphs 25.12 – 25.14 below, it is inferred is to the Third Defendant) having put Messrs Cherrington and Hollingsworth in contact.

13.9.   An email dated 13 June 2017 reporting on matters discussed at a meeting which Mr Hollingsworth had attended with ~~Mr Cherrington,~~ "Tony P" (i.e. the Third Defendant), as well as officers from the SFO's Intelligence Unit, ~~and~~ including Mr Cherrington and an individual identified as "*Vince*" (a reference which ENRC understands is to Vince Payne, a Principal Intelligence Officer at the SFO). The meeting, which took place on 8 June 2017, was described by Mr Hollingsworth as "*a strictly off-the-record meeting with two officials from the Intelligence Unit of the UK Serious Fraud Office and its Head of Disclosure*". Mr Hollingsworth's report of the same disclosed information which he had received from the said officials about the direction and focus of the ENRC Investigation, including the SFO's internal assessment of the evidential merits of different parts of the case and its understanding of how any proposed penalty could be enforced against ENRC. It also made reference to the outcome of the Privilege Proceedings at first instance as follows:

*'... Mrs Justice Andrews ruled broadly in favour of the SFO... The only exception was a key presentation made to the board in March 2013 by the law firm Dechert on its findings during an investigation into ENRC's*

> *dealings in Africa, which the Judge said was covered by privilege. Dechert was fired two weeks after that presentation and the SFO launched a formal criminal probe soon after. My sources say that the SFO investigation was initially based on that report by Decherts…'*

13.10. An email dated 6 July 2017 stating: "*I have an inside track at the SFO who tip me off on the status of investigations and who is being targeted…*".

13.11. An email dated 4 August 2017 in which Mr Hollingsworth stated that he "*did not have a Deep Throat at the NCA – unlike the SFO…*".

13.12. An email dated 29 August 2017 apparently pasting a copied email from Mr Hollingsworth's "*SFO source*" called "*Tony*" (a reference which it is again inferred is to the Third Defendant for the reasons set out at paragraphs 25.12 – 25.14B below) concerning a meeting.

13.13. On 25 October 2017, Mr Hollingsworth emailed Mr van Niekerk with "*an update from my SFO source*".

13.14. Emails on 27 and 29 November 2017 referring to "[m]*y source inside the SFO*" and a "*meeting* [with] *my SFO source on Friday afternoon*".

13.15. On 19 April 2018, Mr Hollingsworth emailed a contact at the non-governmental organisation Global Witness, Daniel Balint-Kurti, and informed him about an *"inside source at the SFO"* who he stated was *"briefing me off-the-record about their investigation"* into ENRC. Mr Hollingsworth noted that he was *"happy to share all information"* with Mr Balint-Kurti in this regard *"as usual"*.

*(ii)*    ***Financial Times July 2016 "scoop"***

14.    On 3 July 2016, the Financial Times published an article headlined *"UK awards extra funds for SFO probe into ENRC's mining deals"* ("**2016 Financial Times scoop**"). The said article:

14.1. Reported that the SFO had recently *"won"* *"special"* ring-fenced *"blockbuster"* funding from the UK Government to pursue the ENRC Investigation;

14.2. Claimed that this was "*a signal that the agency's three-year investigation has shifted up a gear*" (an assertion which was attributed to "*people familiar with*

*the probe*") and that the funding had followed the SFO having called "*suspects in for a fresh wave of interviews earlier this spring*";

14.3.   Alleged (a) that the SFO investigators were focusing on *"transaction documents"* relating to ENRC's acquisition of certain mines and prospects; and that (b) the SFO had only ever received one of two internal reports which ENRC had allegedly produced into its operations as part of its own internal investigations; and

14.4.   Was further promoted by a tweet published at 9.12pm the same day by Tom Burgis, (one of the journalists who authored the article and to whom further reference is made in paragraphs 22 - 24 below) in which Mr Burgis referred to the information about the ENRC Investigation in the article as a *"scoop"*.

*(iii)*   ~~July~~ *2016 Bloomberg Articles*

15.   On 4 July 2016, *Bloomberg* published an article entitled *"U.K. Prosecutors Said to Seek More Funds for ENRC Bribery Probe"* ("**July 2016 Bloomberg Article**"). The said article reported on:

(a) The SFO's attempts to seek £21m in additional "*blockbuster funding"* for the ENRC Investigation; and

(b) The fact that another round of interviews had been recently conducted (information which was attributed to an unnamed *"person"*).

15A.   Subsequently in 2016, *Bloomberg* published two further articles containing the information set out at paragraphs 1 and  2 of Confidential Annex A to these Amended Particulars of Claim.

*(iv)*   **March 2017 Intelligence Online Article**

16.   On 22 March 2017, Intelligence Online published an article headlined "*After Rolls Royce, new priorities for SFO"* ("**March 2017 Intelligence Online Article**"). That article reported the following information:

16.1.   *"According to our sources",* the SFO "*has received a boost to its human and financial resources, which have been beefed up to elucidate allegations of corruption at ENRC now that the investigation of Rolls-Royce has concluded"*;

16.2. *"Sources close to the SFO have confirmed to Intelligence Online that this investigation is now their first priority"*; and

16.3. The SFO had yet to receive any response to a request for judicial assistance which was submitted at the end of 2016.

*(v)*   **September 2017 Articles**

17. In September 2017, information about purported developments in the ENRC Investigation were leaked to Mr Hollingsworth by his SFO sources (including specifically by the Third Defendant for the reasons pleaded at 25.12 – 25.14B below) with the intention of enabling Mr Hollingsworth to place an article or articles in the media disclosing that information.

17.1. On 12 September 2017, Mr Hollingsworth emailed Marcus Leroux, a journalist at *The Times* who was covering the ENRC Investigation, with the subject line "*Exclusive on SFO and ENRC*". Mr Hollingsworth promised Mr Leroux that he should have *"the inside track on recent developments"* in the ENRC Investigation, including *"who the SFO have been interviewing very recently and the details of those questions".*

17.2. On 14 September 2017, Mr Hollingsworth was emailed by Jim Armitage, Business Editor of the London *Evening Standard.* Mr Armitage had evidently already been approached by Mr Hollingsworth about publishing an article containing the leaked information, in the course of which Mr Hollingsworth had emphasised the strategic urgency of the information being published promptly from his source's perspective. In response, Mr Armitage asked Mr Hollingsworth to "[p]*lease reassure your source that the piece is going in. We have another SFO story running in tomorrow's paper, so will package them up together*".

17.3. On the same day, Mr Hollingsworth also emailed Pierre Gastineau, the Editor-in-Chief of the private intelligence trade website, *Intelligence Online*, with a proposed article for publication. The draft article disclosed the following matters:

(a) The identity of the individuals who had recently been interviewed and the nature of the questioning which they faced;

(b) That these interviews represented *"a major new intensification of the investigation into ENRC"*, an investigation in respect of which *"the SFO has received new funding"* from the UK Treasury;

(c) That, according to an *"SFO insider"* who was quoted in the article, the Investigation was *"our* [i.e. the SFO's] *next big case and number one priority"*, that "*any future settlements with companies under investigation will be at a much higher level than previous deals"*, and that the ENRC Investigation was *"being done behind closed doors and is very hush-hush"*; and

(d) That the SFO had still not received a response to a letter which it had sent and that it was also working closely with the Department of Justice in the USA.

17.4.   On 15 September 2017, the London *Evening Standard* published an article written by Mr Hollingsworth headlined "*SFO is stepping up its Kazakh miner probe*", which contained direct quotations from "*an SFO source*" and "*the SFO insider*". The information disclosed in this article included that Mr Machkevitch had been one of the individuals who had been questioned by the SFO ("**2017 Evening Standard Article**").

17.5.   On 20 September 2017, Mr Hollingsworth:

(a) Exchanged emails with Marc Champion, a reporter for *Bloomberg* about an article which the latter was proposing to write on Mr Machkevitch. In the course of offering to sell Mr Champion a selection of confidential documents and information relating to ENRC, he also promised to disclose details of the ENRC Investigation *"and how it implicates AM"* [*i.e.* Mr Machkevitch];

(b) Exchanged emails with Mr Gastineau in which he stated that "[m]*y source is adamant*" that the cited SFO interviews had taken place *"in the past two weeks",* and that his source had been able to provide "*precise dates and locations*" for those interviews; and

(c) Contacted the Guardian journalist, Rob Evans, to inform him that he had just spoken to an SFO source, who had provided the information for the 2017 Evening Standard Article of the previous week and who had *"just told*

*me"* that two new Kazakh witnesses had agreed to testify for the purpose of the ENRC Investigation (the identities of which he then disclosed to Mr Evans).

17.6.   On 27 September 2017, Mr Hollingsworth emailed Mr Gastineau confirming that his information on the recent SFO interviews was "*rock solid*".

17.7.   On or shortly before 4 October 2017**,** an article was published in *Intelligence Online* in substantially similar form to that which had been prepared and forwarded by Mr Hollingsworth on 14 September 2017 in the circumstances set out in paragraph 17.3 above ("**October 2017 Intelligence Online Article**").

17.8.   On 23 October 2017, Mr Hollingsworth emailed Mr Champion, disclosing further information about the dates on which Mr Machkevitch had been interviewed by the SFO, details of those interviews, and the focus of the questioning which he faced about ENRC's affairs.

17.9.   On 27 November 2017, Mr Hollingsworth emailed an investigative journalist, Christian Eriksson, in order to relay information which he had received from one of his SFO sources relating to the principal targets and current focus of the ENRC Investigation. Mr Hollingsworth sent a further email to the same journalist on 29 November 2017, noting that he would be speaking to his SFO contact that Friday, 1 December 2017 (it is inferred in connection with the ENRC Investigation which was clearly of interest to the journalist).

*(vi)*   *May 2018 Financial Times Article*

18.   On 18 May 2018, the Financial Times published an article headlined *"Glencore shares fall on SFO probe concerns"* ("**May 2018 Financial Times Article**"). That article disclosed that the SFO was scrutinising the dealings of the mining company, Glencore, and that according to *"two people familiar with the matter"*, this investigation had come out of the ENRC Investigation.

*(vii)*   *August 2018 Telegraph Article*

12

19.   At 7.02pm on 16 August 2018, the *Daily Telegraph* published an online article headlined *"SFO seeks court summons for ERG boss Benedikt Sobotka"* ("**August 2018 Telegraph Article**").

19.1.   The said article concerned developments which followed from the SFO's decision to seek and obtain an arrest warrant in respect of Benedikt Sobotka in July ~~2016~~ 2018 over Mr Sobotka's alleged failure to attend a witness interview ("**Sobotka Arrest Warrant**"). Mr Sobotka is the Chief Executive of Eurasian Resources Group, ENRC's parent company. The SFO widely publicised the Sobotka Arrest Warrant at the time of its issue, including statements which were published on the SFO's website and its social media channels.

19.2.   The August 2018 Telegraph Article was published shortly after the announcement that Westminster Magistrates Court had withdrawn the Sobotka Arrest Warrant.

19.3.   In its original form, the article falsely alleged that in place of the withdrawn arrest warrant, *"Westminster Magistrates' Court instead are issuing Mr Sobotka with a summons to appear before the court for the offence of failing to comply with an SFO direction."*

19.4.   In fact, no such summons had been, or was in the process of being, issued by Westminster Magistrates' Court (a fact which the *Daily Telegraph* was forced to correct in an amended version of the article which was published on 6 September 2018 and which made it clear that even by that date, *"the summons has been sought but not yet issued"*).

19.5.   No application for a summons had been notified by the SFO to ERG, Mr Sobotka or ENRC at the time when the August 2018 Telegraph Article was published. The fact that the SFO was now contemplating seeking a summons in place of the withdrawn arrest warrant was therefore information which would have been known on 16 August 2018 only to those responsible for the conduct of the ENRC Investigation (including, in particular, the Second Defendant given his responsibilities as Case Controller).

19.6.  In November 2018, the SFO closed its case against Mr Sobotka and removed previously published references to having secured the Sobotka Arrest Warrant from its website and social media platforms.

19.7.  In the circumstances, it is inferred that the information that the SFO was now seeking a court summons against Mr Sobotka on 16 August 2018 (and the false claim that this summons had been granted by Westminster Magistrates' Court) was leaked by the SFO in order to deflect from and counter adverse publicity occasioned by the withdrawal of the Sobotka Arrest Warrant, which it had obtained and widely publicised in July 2018.

*(viii)*   *2019 Bloomberg Articles*

20.   On 26 March 2019, Bloomberg published an article authored by Franz Wild and headlined "*ENRC sues U.K. Fraud Cops as Corruption Charges Loom*", which cited "*two people familiar with the case*" and "*investigators… who didn't want to be named because the details of the investigation are private*" ("**March 2019 Bloomberg Article**"). That article disclosed the following information about (or purporting to be about) the ENRC Investigation and ENRC's affairs:

20.1.  In addition to ENRC, "*SFO investigators*" were "*considering charges*" against Mr Machkevitch and "*business partner Dan Gertler, whose mining assets ENRC bought, according to two people familiar with the case.*";

20.2.  The SFO was "*close to making a final decision on Machkevitch, Gertler and other executives at the company*";

20.3.  That "*investigators believe Machkevitch is ENRC's key decision-maker*" (a clear allusion to the SFO's case theories which could only have been known to those on the ENRC Investigation team);

20.4.  That "*investigators have quietly proceeded with their case*" (a disclosure which carries a suggestion that the source of the leak was favourably disposed to the SFO); and

20.5.  That "*people familiar with*" a Swiss court judgment (a reference which, it is inferred, was to the same SFO sources) were able to confirm the names of individuals who were referred to in anonymised parts of that ruling.

21.     On 6 December 2019, *Bloomberg* published an article headlined *"U.K. Prosecutors'*
        *Glencore Probe Is Perfect Retort to Critics"* (the "**December 2019 Bloomberg**
        **Article**") which reported on the SFO's recent decision to launch a formal investigation
        into Glencore. In so doing, the article alleged that the SFO had first considered such a
        step *"when suspicions emerged during their seven-year bribery probe into mining*
        *company Eurasian Natural Resources Corp., people with knowledge of the case have*
        *said."*

*(ix)    2020 Burgis Publications*

22.     On or around 3 September 2020, Harper Collins published a book written by a
        *Financial Times* journalist, Tom Burgis, entitled "*Kleptopia: How Dirty Money is*
        *Conquering the World*" ("**Kleptopia**"). The matters disclosed by Mr Burgis in
        Kleptopia included the following information about (or purporting to be about) the
        ENRC Investigation and ENRC's affairs:

        22.1.   Details of a confidential report which ENRC's then-solicitors, Dechert LLP,
                had prepared and submitted to the SFO in February 2013;

        22.2.   Information about the purported direction and thinking of the ENRC
                Investigation during the period when the Second Defendant was that
                investigation's Case Controller, including the names of alleged suspects and
                witnesses; details of individuals who had been interviewed or contacted; and
                lines of inquiry and case theories which were purportedly held by the
                investigation team, including:

                22.2.1. The SFO *"investigators had sent word"* to one of ENRC's former
                        employees, James Bethel, that *"they wanted to meet him"*;

                22.2.2. A detailed account of what investigators believed were the movements
                        of Mr Bethel and another former ENRC employee, Gerrit Strydom,
                        shortly before their deaths in Springfield, Missouri, in May 2015;

                22.2.3. The claim (designed to cultivate the false impression that ENRC had
                        itself somehow been involved in the deaths of Mr Bethel and Mr
                        Strydom) that when the news of the deaths of Bethel and Strydom had
                        *"reached SFO headquarters in London, the investigators on the case*
                        *were alarmed"*. The SFO investigators had allegedly *"scrambled to*
                        *contact the Springfield police and ask them to secure the evidence"* but

15

had discovered that the local police *"were dealing with a representative of ENRC, who was assisting them."*;

22.2.4. The contention that if the local Springfield police had ever checked the mobile phones of Bethel and Strydom for evidence, *"no one told the SFO investigators"*;

22.2.5. The SFO investigators were said to have *"regarded the provenance"* of samples taken from Bethel and Strydom "*with suspicion*" and they had not been able to confirm if the chain of custody had been maintained;

22.2.6. A detailed account of various medical analysis and theories which were said to be held by investigators and which were alleged to cast doubt on whether the official cause of Bethel and Strydom's deaths (cerebral malaria) was correct;

22.2.7. "*[W]ord had been sent to the British authorities*" to open a criminal case against Mukhtar Ablyazov, pursuant to which the Kazakh government had indicated that "*we'll give you what you want on the Trio*";

22.2.8. A claim that Jon Mack, the Second Defendant's successor as Case Controller of the ENRC Investigation, "*was familiar with the Springfield deaths and knew of suggestions that Bethel and Strydom might have been poisoned*"; and

22.2.9. The further claim that Mr Mack had collapsed on the morning of a court hearing held in connection with the ENRC Investigation and had subsequently quit his position because he "*feared*" that he had been poisoned (a claim which was not in fact endorsed by Mr Mack's own doctors).

22.3.  A number of the disclosures made in Kleptopia were made on an anonymous and non-attributed basis (a fact acknowledged by Mr Burgis in a foreword, entitled "*A Note on Truth*"). In particular, the information referred to at paragraphs 22.2.1 – 22.2.6 and 22.2.8 – 22.2.9 is recorded in the footnotes to Kleptopia as having been divulged to Mr Burgis in "*confidential interviews*". The information in paragraph 22.2.7 is said to have been amplified by Mr Burgis in the course of "*an interview with a person with knowledge of the discussions*".

23.    On 2 September 2020, the *Financial Times* published an article written by Mr Burgis headlined "*FBI investigates deaths of mining executives in UK corruption probe*" ("**September 2020 Financial Times Article**"). In the course of making a series of false claims about a possible link between the SFO's Investigation and the deaths of Mr Strydom and Mr Bethel, the article repeated parts of the information which Mr Burgis had disclosed in Kleptopia about the SFO's purported interest in the deaths of Mr Bethel and Mr Strydom who, according to the opening sentence of the article, "*British prosecutors saw as potential witnesses in one of the UK's biggest corruption probes*". In this regard, the September Financial Times Article asserted that:

    23.1.    The "*SFO's investigators were keen to learn what they* [Messrs Bethel and Styrdom] *knew*";

    23.2.    The SFO's investigators "*had made contact with Bethel by the time the men departed for a holiday in the US, according to three people with knowledge of the matter*";

    23.3.    One of "*these people*" had said that "*the SFO was also interested in Strydom*"*,* albeit it was understood that the SFO had not contacted him before his death; and

    23.4.    In relation to samples taken from the two men from which the US authorities concluded that the cause of death was cerebral malaria, the article reported that "*[i]nvestigators at the SFO fear the samples may not have been reliable, according to a person familiar with the investigation*".

24.    On 1 October 2020, the *Financial Times* published another article written by Mr Burgis headlined: "*Silent witnesses: what do three corpses have to do with a corruption case?*" ("**October Financial Times Article**"). That article, which was published both on the FT's website and also as the cover story of the *FT Magazine* on 3 October 2020, again made a series of false claims regarding ENRC's alleged involvement in the deaths of its ex-employees. In so doing, it relied upon, and provided further information in respect of, the matters which had previously been disclosed in Kleptopia and the September Financial Times Article about: (a) the information which the SFO's investigators had purportedly held in respect of Mr Bethel, Mr Strydom and Mr Bekker in the context of the ENRC Investigation; (b) the conclusions which they were said to have drawn; and (c) the lines of inquiry allegedly pursued as a consequence. In particular, the October

Financial Times Article advanced an intentionally sensational account of the relevant matters in which it reported that:

24.1.   Investigators at the SFO "*fear that the samples* [obtained from the bodies of Mr Bethel and Mr Strydom] *may not have been reliable, according to a person familiar with the investigation*";

24.2.   Both Bethel and Strydom "*were potential witnesses, and the SFO investigators had made contact with at least one of them to arrange an interview*";

24.3.   The SFO investigators had questions to the effect that "*if malaria did not kill the two men, what did*?";

24.4.   While the SFO declined officially to answer questions posed by the *Financial Times* about the case, "*a person with knowledge of it confirmed that at least one potential witness was too afraid to talk to the investigators*";

24.5.   The SFO investigators had "*kept digging*" and identified Mr Bethel as "*a potentially important witness, according to a person with knowledge of the investigation*";

24.6.   By 2015, the SFO's investigators had decided they needed to interview Bethel. Moreover, the investigators "*had mentioned him during their inquiries – so much so, said one person with knowledge of the investigation, that the Trio and their lieutenants would have been aware of the SFO's interests*";

24.7.   When the SFO investigators in London heard about the deaths, "*according to a person familiar with the matter, they hoped that the Springfield police would make sure any evidence that might be useful in their corruption case was secured. But they were not on the scene. A representative of ENRC was…*";

24.8.   The SFO investigators were said to have concerns about the systems which the US Center for Disease Control and Prevention had in place to ensure that the samples which it tested were reliable;

24.9.   According to "*a person with knowledge of the SFO's investigations*", witnesses who dared to come forward were claimed to face "*creeping, enduring, never-ending fear*";

24.10.   The SFO's investigators were "*keen to learn what they* [Mr Bethel and Mr Styrdom] *knew*";

24.11.   The SFO's investigators "*had made contact with Bethel by the time the men departed for a holiday in the US, according to three people with knowledge of the matter*"; and

24.12.   The SFO "*was also interested in Strydom*", although it had not contacted him before his death.

**C.      Individuals Responsible for Leaked Information**

25.   It is to be inferred that the individuals who leaked the above information to journalists and the media set out above included the Second Defendant, Mr Mack and "Tony P" the Third Defendant. This inference is to be drawn by reason of the facts and matters set out below, which are based on the evidence currently available to ENRC pending disclosure and the provision of further information, as well as admissions made by the Second Defendant himself in correspondence.

*The Second Defendant*

25.1.   The Second Defendant's repeated contacts with Mr Burgis, the author of a number of publications about ENRC, including those referred to at paragraphs 22 - 24 above in respect of which it is inferred, for the reasons further set out below, that the Second Defendant was one of the SFO sources relied upon. In this regard:

(a) On 29 September 2020, the Second Defendant met with Mr Burgis for several hours, having made prior arrangements to do so via the Signal messaging app. The said meeting took place in an underground car park near the National Theatre in London, from where the Second Defendant collected Mr Burgis in his car and drove him to a location which the Second Defendant has stated was the Second Defendant's home. The Second Defendant and Mr Burgis did not return to the car park for another three hours. The meeting was therefore arranged and conducted in a clandestine

fashion with a view to avoiding any record being created or anyone witnessing the same (ostensibly well-rehearsed precautions which would have been wholly unnecessary if, as the Second Defendant has since claimed, that meeting was to assist Mr Burgis's understanding of non-sensitive and generic aspects of criminal investigation and criminal procedure relating to the SFO's investigative functions);

(b) When pressed to explain this meeting, the Second Defendant, while denying that he had ever "*communicated with any journalist, private investigator of* [sic] *individual about confidential matters concerning ENRC or the ENRC investigation*" or that he knew about or had ever communicated with Mr Hollingsworth, claimed by way of purportedly comprehensive admissions which he made in a letter to ENRC's solicitors, Quinn Emanuel Urquhart & Sullivan UK LLP, dated 29 December 2020, that:

    i.    He had been introduced to Mr Burgis during his time as Case Controller at the SFO's offices, where Mr Burgis was meeting with another SFO Officer or Officers;

    ii.    In July 2019, he had invited Mr Burgis to make an appointment to come and talk to him about a book, which Mr Burgis had described to him during a previous encounter in the street as being about *"a number of Kazakh families and their business dealings"* (*i.e.* Kleptopia). On the Second Defendant's account, he subsequently met Mr Burgis for "*about an hour*" on 25 July 2019 for the purpose of discussing this book. As the Second Defendant must have anticipated when he arranged the meeting, Mr Burgis sought the Second Defendant's assistance about matters concerning ENRC and Mr Machkevitch. The Second Defendant made no attendance note or record of this meeting (which, if true, must have been a conscious decision on his part in circumstances where he had agreed to meet with a journalist who he knew was researching a book about matters which were the subject of an SFO investigation for which the Second Defendant had been responsible for more than four years as Case Controller and in respect of which the Second Defendant remained under duties of confidence and non-disclosure);

iii.    He has been willing to speak to Mr Burgis about SFO investigations on other unspecified occasions;

iv.    He and Mr Burgis exclusively used the highly private Signal messaging platform to communicate with one another and that he understood Mr Burgis's messages on that platform to be programmed to expire after 7 days (again, unnecessary concerns if the said meetings were to discuss non-sensitive aspects of criminal investigation and criminal procedure relating to the SFO's operations); and

v.    At the 29 September 2020 meeting, he had discussed an article which Mr Burgis was intending to publish shortly about the ENRC Investigation in the *Financial Times* (*i.e.* the 1 October Financial Times Article).

25.2.   It is apparent from the footnotes to Kleptopia that the information about the ENRC Investigation which were disclosed therein (and repeated in the 2 September Financial Times Article) had been divulged to Mr Burgis by an anonymous source in the course of "*confidential interviews*" (a reference, it is to be inferred, to the Second Defendant's admitted meetings with Mr Burgis, including the 25 July 2019 meeting).

25.3.   The Second Defendant is described in Kleptopia as "*a chipper barrister who displayed a twinkling delight in legal duelling and had taken a large pay cut to join the SFO and lead the ENRC case*" (an insight into the Second Defendant's motivation and personal financial circumstances which, it is further to be inferred, came directly from conversations about the ENRC Investigation between the pair).

25.4.   Following the undocumented meeting with Mr Burgis on 29 September 2020, Mr Burgis published the October Financial Times Article, which contains numerous references to information about the ENRC Investigation which was said to have been obtained from anonymous sources. It is again inferred that the Second Defendant was one of those said sources having regard to:

(a) The timing of the article, which was published just two days after the Second Defendant had held his undocumented meeting with Mr Burgis; and

(b) The precise nature of Mr Burgis's description of his sources, including that those relied upon were "*close to*" or "*with knowledge of*" the ENRC Investigation – *i.e.* a source who was privy to sensitive operational information and who claimed to be able to speak about lines of inquiry which had been pursued by an investigation which was being conducted in circumstances of elevated secrecy, but could not be described as an 'SFO source' or member of the investigation team. Mr Burgis's formulation accurately described the Second Defendant's position and knowledge at the date of publication, both as: (i) the investigation's former Case Controller during the periods relevant to the events described by Mr Burgis; and (ii) someone who was now working outside the SFO in private practice.

25.5. The Second Defendant's failure to record or minute his meetings with Mr Burgis, notwithstanding his professional duties as both a lawyer and an ex-SFO employee to ensure that any contacts with a journalist to discuss matters which had been subject to SFO investigations were documented and auditable.

25.6. The fact that the information disclosed in the 2020 Burgis publications concerned sensitive operational developments and alleged lines of inquiry in the ENRC Investigation which had taken place during the Second Defendant's time as Case Controller.

25.7. The Second Defendant's personal interest in seeking to deflect attention from legitimate criticism which could otherwise be levelled at his record as Case Controller of the ENRC Investigation and to embellish his professional credibility in that context. That personal interest continued after the Second Defendant's departure from the SFO, particularly in circumstances where he left the SFO just days after the Court of Appeal had found in ENRC's favour in the Privilege Proceedings, which took place during the Second

22

Defendant's period as Case Controller and for which he had personal oversight. In this regard:

(a) The Second Defendant had falsely averred in a witness statement served in the Privilege Proceedings that the SFO had reviewed a manuscript notebook covering the period 21 July 2011 to 30 November 2011. That notebook belonged to the former Chief Investigator of the ENRC Investigation, Keith McCarthy, but subsequently went missing in 2012. The said notebook is highly relevant to the Misfeasance Claim in circumstances where Mr McCarthy had reviewed materials held by the SFO in relation to ENRC in 2011 and concluded that there was no basis for the SFO to initiate action against ENRC;

(b) The Court of Appeal's judgment in the Privilege Proceedings, which had forced the SFO to concede that it could not use ENRC's privileged documents for the purpose of its Investigation; and

(c) In addition to upholding ENRC's appeal in respect of the Privilege Proceedings, the Court of Appeal had made an adverse costs order against the SFO, which was subsequently agreed in a sum totalling £1.6m.

25.8. The Second Defendant's admission in his 29 December 2020 letter that he has willingly met with journalists on other occasions to discuss the SFO's investigations.

25.9. The 2016 and 2019 Bloomber*g* articles evidence a close and trusted relationship between SFO sources and *Bloomberg* in which sensitive operational information about (or purporting to be about) the ENRC Investigation and ENRC's affairs has been repeatedly leaked to *Bloomber*g. Again, it is inferred that the Second Defendant was a source for the said articles:

(a) The ~~July~~ 2016 Bloomberg Article~~s was~~ were published while the Second Defendant was the ENRC Investigation's Case Controller and concerned sensitive operational developments in that investigation for which the Second Defendant had direct oversight and responsibility, including the matters set out in paragraph 1.1 and 2.1 – 2.3 of Confidential Annex A. The information obtained and disclosed to the

journalists would only have been known to those with responsibility for that investigation. It is not reasonable in the circumstances to suppose that operationally sensitive information of this nature would have been leaked by an individual acting independently of the ENRC Investigation's Case Controller, a contention which is further bolstered by:

    i.   The strict obligations of confidentiality imposed on SFO staff (and the need for employees to obtain express authorisation from senior management before disclosing such information outside the organisation (as to which paragraphs 27.3 and 30 below are repeated);

    ii.   The fact that notwithstanding the leak of the said information, the SFO chose not to initiate any internal investigation into the same (an inexplicable omission if those in senior positions, including the Second Defendant, had not been aware of the decision to leak these matters beforehand);

    iii.   At around the time of the publication of the ~~July~~ 2016 Bloomberg Article~~s~~, the Second Defendant had led efforts to persuade HM Treasury to release substantial additional 'blockbuster' funding for the ENRC Investigation and therefore had an additional reason to cultivate the impression that the ENRC Investigation was worthy of such support (both at that time and in the future); ~~and~~

    iv.   The matters set out in paragraphs 2.4 – 2.5, 3 and 4 of Confidential Annex A.

(b)  The March 2019 Bloomberg Article was attributed to sources who were described as two individuals who were *"familiar with the case"*, a formulation which is again consistent with the Second Defendant's status and knowledge by that time.

25.10.  The evident urgency of the 2017 Evening Standard article in the eyes of Mr Hollingsworth's SFO source, a fact which again indicates that the information was leaked by the SFO for strategic reasons relating to the ENRC

Investigation, of which the Second Defendant must have considered and approved in advance given his position as that investigation's Case Controller.

25.11. The nature of the information contained in the 2016 and 2019 Bloomberg Articles and the 2020 Burgis publications, which were uncritically favourable to the SFO to the detriment of ENRC and ostensibly designed to validate the SFO's longstanding pursuit of the ENRC Investigation in the eyes of the public and interested parties to the mutual benefit of the SFO and the Second Defendant (whose professional reputation was intimately connected to his prominent role as Case Controller of the ENRC Investigation).

### *"Tony P"* *The Third Defendant*

25.12. The references to *"Tony P"* and *"Tony"* in emails pleaded in paragraphs 13.8, 13.9 and 13.12 above.

25.13. The fact that, after the SFO's receipt of (*inter alia*) the Truth Provider Emails, the SFO identified *"Tony P"* the Third Defendant as the *"primary suspect"* in an internal professional standards investigation on the basis that he was the *"Tony P"* to whom reference had been made, and later contacted the Metropolitan Police regarding the opening of a criminal investigation into his conduct.

25.14. The fact that the said investigation was opened on the basis of the Truth Provider Emails and also other information and intelligence in the SFO's possession.

25.14A In his email to Mr Evans of 29 August 2017 pleaded at paragraph 13.12 above with the subject line "*Update on SFO Source*", Mr Hollingsworth refers to *"Tony"* as *"my SFO source"*. The email further records that *"Tony"* was in the process of recovering from an ostensibly serious heart condition for which he was receiving frequent medical treatment, a state of affairs which accords with that of the Third Defendant, who had suffered a heart attack less than 3 months previously, on or around 8 June 2017.

25.14B In the circumstances, ENRC will contend that the Third Defendant was:

(a) one of Mr Hollingsworth's unnamed SFO sources referred to in the emails and articles pleaded at paragraphs 13.2 – 13.7, 13.10 – 13.15, 17.1 – 17.9 above;

(b) one of the immediate conduits through whom Mr Hollingsworth acquired the confidential and operationally sensitive information about the ENRC Investigation disclosed in the emails referred to at paragraphs 13.3, 13.6, and 17.3 – 17.5 and 17.7 – 17.9 above.

*Jon Mack*

25.15. The information about Mr Mack's fears, his medical treatment and his knowledge of the SFO's alleged thinking about Mr Bethel and Mr Strydom in paragraphs 22.2.8 and 22.2.9 above which, given its intrinsically personal and sensitive nature, is likely to have been confirmed to Mr Burgis by Mr Mack and which must have been disclosed with his express authority.

**D.      Misfeasance in Public Office**

26.    The SFO is liable to compensate ENRC for the losses suffered as a result of the misfeasance in public office committed by SFO Officers, including the ~~Second~~ Defendants. In addition, the ~~Second~~ Defendant~~s is~~ are also personally liable for ~~his~~ their own misfeasance during ~~his~~ their times as ~~an~~ SFO Officers. This liability arises from the unlawful acts and omissions of the SFO Officers and the ~~Second~~ Defendants, carried out with knowledge of or subjective reckless indifference as to: (a) the lawfulness of those acts and omissions; and (b) the probability of harm being caused to ENRC as a result of those acts and omissions.

**Defendants' Statutory Duties**

27.    As a public body with the statutory power under the 1987 Act to enquire into and investigate allegations of serious and complex fraud and (where appropriate) to bring proceedings in respect of the same, the SFO (including the Director, the Third Defendant and, for the period of his employment with the SFO, the Second Defendant) were under a continuing duty to persons affected by any such enquiry, investigation or proceeding:

27.1.   to act strictly in accordance with and in furtherance of the SFO's primary statutory powers (for convenience, the "**Powers Duty**");

27.2.   to act independently, objectively and in good faith (for convenience, the "**Independence Duties**"); and

27.3.   to protect the confidentiality of information which they had obtained or acquired in the course of the exercise of the SFO's powers relating to any affected third party, which would include ENRC (for convenience, the "**Confidence Duty**").

(The three (sets of) duties identified above are referred to compendiously as the "**Statutory Duties**").

28.   At all material times, the ~~SFO~~ Director and the SFO Officers (including the Third Defendant and, for the period of his employment, the Second Defendant): (a) acted as public officers; and (b) owed the Statutory Duties described in paragraph 27 above. Further, the Second Defendant continued to be bound by the Confidence Duty after he ceased to be an SFO Officer in September 2018.

29.   To the extent that the ~~SFO~~ Director and ~~its~~ SFO officers (including the Third Defendant and, for the period of his employment, the Second Defendant) acted in breach of any of the Statutory Duties, or otherwise committed tortious conduct or acted *ultra vires*, they acted unlawfully for the purposes of the tort of misfeasance in public office.

**Elements of Misfeasance**

<u>Unlawful Conduct</u>

30.   The making of unofficial statements or provision of sensitive information by SFO Officers (including, without limitation, the Second Defendant and ~~"Tony P"~~ the Third Defendant as set out in paragraphs 12 - 24 above) to journalists and other third parties with a view to causing, permitting or enabling the publication of information about (or purporting to be about) ENRC as the subject of an ongoing criminal investigation and/or precipitating further coverage and publicity of that nature, constitutes a self-evident breach of the Statutory Duties, particularly where those statements are (a) prejudicial and/or damaging to ENRC and (b) leaked on condition that such journalists would not reveal the identity of the SFO Officer and/or the SFO as the source of such sensitive information. In this regard:

27

30.1. **Powers Duty.** Any such statements which ENRC is able to establish constituted a breach of the Powers Duty. Leaking of information to the press does not constitute the provision of information for the purposes of a criminal investigation, and as such is not sanctioned by s.3(5)(c) of the 1987 Act or by any other enactment. In addition, such leaking is prohibited by:

(a) The Civil Service Code, to which all SFO Officers are bound and which requires SFO Officers *inter alia*:

    i. To obtain authorisation for any contact with the media;

    ii. Not to disclose official information without authority (a duty which continues to apply after their employment);

    iii. To keep accurate official records and handle information as openly as possible within the legal framework;

    iv. To deal with the public and their affairs fairly, efficiently, promptly, effectively and sensitively;

    v. To comply with the law and uphold the administration of justice; and

    vi. Not to misuse their official position, including by using information acquired in the course of their official duties to further the private interests of themselves or others;

(b) The SFO's own internal policies, including:

    i. The SFO's policy on managers' security responsibilities, which places an onus on SFO managers and supervisors to ensure that all SFO staff understand and follow SFO Security Policies and Procedures and that managers *"are accountable for ensuring security messages are promulgated to staff and that staff understand and comply with security requirements"*. To that end, staff are "*required to abide by the Official Secrets Act. They must ensure that any information they acquire in the course of their work is not misused or disclosed outside the SFO without authorisation.*"

    ii. The SFO's *"policy on security and acceptable use"*, which defines a *"security breach"* as including a *"leak of information"* and a "*loss of*

*classified material",* all of which will be treated seriously by the SFO and requires swift investigation; and

iii. The SFO's *"policy on misconduct"*, which gives a non-exhaustive list of examples of "gross misconduct" (*i.e. "conduct so serious it destroys the employer/employee relationship and merits dismissal without pay or notice"*). That list includes sending or being involved in sending classified, government information or any personal data outside the SFO without encryption and password protection, as well as the unauthorised use or disclosure of official information; and

(c) The guidance on *"Media Relations"* which was issued by the College of Policing in May 2013, and subsequently revised in June 2017, as part of its Authorised Professional Practice (standards which the SFO has confirmed in a response to a request under the Freedom of Information Act 2000 dated 31 October 2019 informs the professional training on proper investigative practice which it provides to SFO Officers in conjunction with the College of Policing). The said guidance recognises that the police service (and, by analogy, other law enforcement agencies such as the SFO holding equivalent powers) have *"a duty to safeguard the confidentiality and integrity of the information"* which they hold. In so doing, it emphasises that:

i. Suspects should not be identified to the media (by disclosing names or other identifying information) prior to the point of charge except where justified by clear circumstances (*e.g.* a threat to life, the prevention or detection of crime or a matter of public interest and confidence);

ii. Good practice requires that whenever an officer is interviewed by a media representative or provides information verbally or in writing to a journalist for a matter for which they are responsible, a record of the conversation and its subject matters should be created and maintained; and

iii. In the absence of exceptional circumstances, communications with the press which are made with a view to publication should take place on a reportable and attributed basis.

30.2. **Independence Duties.** The leaking of information to the press or third parties about the subject of an ongoing criminal investigation constitutes, by its very nature, a failure to act independently, objectively and in good faith in accordance with the Independence Duties, particularly where that information is damaging or prejudicial to the subject of such criminal investigation. If such a disclosure was justified in the public interest, it would have been made openly (such as by way of press release or entry on the SFO's website) and/or by officially attributed SFO statements.

30.3. **Confidence Duty.** SFO Officers were obliged to keep confidential the information which they obtained, received, created or otherwise acquired or held about ENRC as part of the ENRC Investigation in the exercise of its legal powers and in furtherance of its public duties and to use such material only for the purposes of the investigation and prosecution of crime. The leaking of information to the press is neither of these things. Accordingly, any such leaks as ENRC is able to establish must (by definition) constitute a breach of the Confidence Duty.

31. Further, the First and Second Defendants were obliged pursuant to their Independence Duties and, further, by the terms of the SFO's own internal policies, to take prompt steps adequately to investigate any unauthorised disclosure which SFO Officers had or may have made in connection with the ENRC Investigation with a view to ensuring that confidence in the integrity of the investigation was maintained and to prevent further disclosures occurring in the future to the detriment and damage of ENRC. Any failure on the part of the First and Second Defendants to take such steps in circumstances where there were grounds to suspect that such disclosures may have occurred therefore constitutes a further breach of the Independence Duties. In this regard:

31.1. The nature of the information in the articles and emails referred to at paragraphs 12 - 24 above and the frequent references to the Third Defendant and anonymous SFO sources contained within them give rise to a clear inference that SFO Officers with responsibility for, and knowledge of, the ENRC Investigation were repeatedly leaking information about such formal investigation to the media and interested third parties, including Mr Hollingsworth. Such leaks would, if established, constitute a serious security breach and potentially gross misconduct which, according to the SFO's own

internal policies, demanded swift investigation. Paragraph 30.1 above is repeated.

31.2. The First and Second Defendants were on notice of the fact that there were grounds to believe that SFO Officers had repeatedly leaked information related to the ENRC Investigation and ENRC's affairs to journalists, as well as interested third parties such as Mr Hollingsworth as a result of the information contained within these articles. In the SFO's Director's case, ~~its~~ her awareness of the same (including the Third Defendant's involvement) would have been further confirmed by ~~its~~ SFO's receipt of the Truth Provider Emails referred to in paragraphs 12 - 13 above.

31.3. The fact that there were cogent reasons to believe this was further emphasised to the SFO in correspondence from ENRC's legal representatives, including:

(a) A letter from Quinn Emanuel Urquhart & Sullivan UK LLP addressed to the Second Defendant, dated 6 December 2016, which highlighted *inter alia* the matters set out in Paragraph 5 of Confidential Annex A;

(b) Letters sent by Fulcrum Chambers to Mr Mack (the ENRC Investigation's then-Case Controller) and Raymond Emson (the SFO's Associate General Counsel), including those dated 29 March, 23 April, 3 May and 28 June 2019 which highlighted *inter alia* the matters set out in Paragraph 6 of Confidential Annex A; and

(c) A letter from Hogan Lovells LLP to the Director, dated 22 August 2019, which highlighted the sustained pattern of leaks by SFO Officers evident in the Truth Provider Emails, which highlighted *inter alia* the matters set out in Paragraph 7 of Confidential Annex A.

31.4. Notwithstanding the First and Second Defendants' awareness of the above facts and matters, no investigation was commenced by the SFO until it was effectively forced to do so following the widespread dissemination of the Truth Provider Email in September 2019 (and even then only in respect of the role played by ~~"Tony P"~~ the Third Defendant, whose conduct was referred to the Metropolitan Police and which the SFO has apparently concluded, despite not having yet interviewed him, is allegedly unconnected to leaks of information about the ENRC Investigation). Instead, the SFO's approach was

31

consistent with that set out in a letter which was sent by Mr Emson to Fulcrum Chambers, dated 11 June 2019, which stated *inter alia* that:

(a)  The SFO rejected ENRC's concerns;

(b)  There would be "*no internal investigation*";

(c)  The matter would not "*be passed to Sir David Calvert-Smith*" (who the SFO briefly commissioned to undertake an independent review of the serious allegations of wrongdoing which had arisen in respect of the ENRC Investigation, but whose review was then suspended before it could report); and

(d)  The SFO considered the matter "*to be closed*".

31.5.  In the circumstances, ENRC will contend that the protracted refusal of the SFO to conduct any adequate and prompt investigation into the said leaks of information about the ENRC Investigation constituted a clear breach of the Duties.

32.  But for the said unlawful actions of the Defendants set out under paragraphs 30 - 31 above, a number of damaging leaks and press reports relating to the ENRC Investigation and ENRC's affairs would not have been published.

State of Mind: Knowledge or Subjective Recklessness

33.  The SFO and, in particular, the SFO Officers who leaked or caused information about, or purporting to be about, the ENRC Investigation to be leaked to the press and Mr Hollingsworth (including, without limitation, ~~"Tony P"~~ the Third Defendant, Mr Mack and the Second Defendant) and who failed to investigate when they were put on notice of the same (including the Second Defendant, Mr Mack, the Director, and Mr Emson) knew that their conduct was unlawful, or were subjectively reckless as to the same:

33.1.  SFO Officers (including ~~"Tony P"~~ the Third Defendant, Mr Mack and the Second Defendant) knew that they were under a duty to keep confidential the information about the ENRC Investigation and ENRC's affairs which they obtained, received, created or otherwise acquired or held in the exercise of the SFO's powers and in furtherance of its public duties and not to disclose the same outside of the SFO without express authorisation.

33.2.   By its very nature, leaking material is a complex and covert process that is unnecessary if the information can be provided in a lawful, open and transparent manner (such as at a press conference or by publication on the SFO's website). A person leaking or causing information to be leaked to the press accordingly has knowledge of, or is subjectively reckless as to, the unlawfulness of his or her own conduct.

33.3.   Such disclosures were expressly prohibited by the Civil Service Code, the SFO's own internal policies, and by the College of Policing's Media Relations guidance, all of which would have been familiar to all SFO Officers. Paragraph 30.1 above is repeated.

33.4.   Consistently with the knowledge that the SFO could not provide information relating to the ENRC Investigation in a lawful, open and transparent manner, the articles referred to in paragraphs 14 - 15, 17.4, 18 - 19 and 23- 24 above all recorded that the SFO was not able to comment in relation to the matters referred to therein.

33.5.   The obligations which fell on the Director as well as the Second Defendant and Mr Mack (as the ENRC Investigation's Case Controllers during relevant periods) to take prompt steps adequately to investigate the fact and circumstances of potential leaks as part of their Independence Duties would have been similarly obvious. Their awareness of the same would have been further emphasised by:

(a)   The fact that the relevant QUT01 investigation team were supposedly working *"in private"*, *"behind closed doors"* and according to strict procedures which were notionally designed to prevent the disclosure of information regarding its course or intended direction from being disclosed outside the small team charged with overseeing the ENRC Investigation (measures which reflected the heightened sensitivity of information relation to the ENRC Investigation even within the SFO and the corresponding need to take prompt and adequate steps to investigate any possible leaks); and

(b)   The SFO's own internal *"policy on security and acceptable use"* which, as stated at paragraph 30.1(b)(ii) above, emphasises that a *"leak of*

*information"* and a "*loss of classified material*" should be treated seriously by the SFO and requires swift investigation.

34.  Further, the SFO Officers who leaked or caused information to be leaked to the press (including the Second Defendant, Mr Mack and ~~"Tony P"~~ the Third Defendant) and/or who failed to investigate such leaks despite being on notice of the same (including the Second Defendant, Mr Mack, the Director and Mr Emson), knew as a result of information in the public domain as well as their involvement with ENRC, that:

> 34.1.  ENRC was a mining company with the characteristics described in paragraph 1 above;
>
> 34.2.  The repeated leaking of information in the media about the ongoing fact and nature of a criminal investigation is inherently damaging to a business, particularly where the information which is leaked is prejudicial and damaging to that investigation's subject; and
>
> 34.3.  The publication of such information relating to the ENRC Investigation would probably cause material damage to ENRC, including by:
>
> > (a)  Having to incur the costs and lost management time involved in seeking to investigate and address the leaks, including the legal costs occasioned by corresponding with the SFO about the same and engaging legal and public relations advice to counter the damaging consequences of the same for ENRC's business;
> >
> > (b)  Damaging ENRC's trading reputation as a mining company;
> >
> > (c)  Discouraging third parties from entering into business transactions with ENRC; and
> >
> > (d)  Causing lenders to be unwilling to lend funds to ENRC and/or unwilling to enter into transactions with ENRC save on terms which were less favourable to ENRC than they would have been absent the publication of such information.

35.  In the premises, the Defendants (as the case may be) took each of the unlawful acts set out above with knowledge of, or with recklessness as to, the probability of material damage being caused to ENRC as a consequence.

36.     Further or alternatively, and so far as may be necessary in light of the foregoing, the SFO Officers who leaked or caused information to be leaked about (or purporting to be about) the ENRC Investigation to the press which insinuated that ENRC was a legitimate target for the SFO's long-running investigation and/or was otherwise calculated to damage ENRC's reputation (including the Second Defendant, Mr Mack and ~~"Tony P"~~ the Third Defendant) acted with a view to:

36.1.   Promoting the false narrative that the ENRC Investigation:

(a)     had made meaningful and worthwhile progress, notwithstanding the SFO's protracted failure to establish the evidential basis necessary to bring criminal charges against ENRC; and

(b)     constituted a proportionate use of the substantial public funds which the SFO had previously secured and which it required to receive from HM Treasury in the future if the ENRC Investigation was to continue further.

36.2.   Diverting public attention from the serious questions and concerns which had been caused by:

(a)     the SFO's record generally, following its failure to secure convictions in a number of a high-profile investigations (including those brought in respect of the businessman Victor Dahdelah in 2015, the majority of the defendants in the Libor interest rate rigging case in 2016, Tesco in 2018, Rolls Royce and GlaxoSmithKline in 2019, and Barclays Bank in March 2020); and

(b)     The propriety of the First and Second Defendants' specific conduct in respect of the ENRC Investigation, including that evident in the Misfeasance Claim, the Privilege Proceedings and the Sobotka Arrest Warrant.

36.3.   Facilitating the pursuit by journalists in this or other jurisdictions of lines of inquiries or investigations without the legal and procedural duties and constraints which the SFO was bound to observe, thereby encouraging further hostile coverage and publicity in the media, prejudicing public opinion against ENRC and bringing pressure to bear on ENRC and its officers.

37.   In so acting, the Defendants acted with the specific intent of harming ENRC, subordinating its interests as a suspect of an ongoing criminal investigation to those of the SFO itself.

**E.     Breach of Confidence**

38.   At all material times, the SFO and each of the SFO Officers (including the Second Defendant both during and after his employment, and the Third Defendant) owed ENRC a duty to keep confidential any and all material information obtained, received, created or otherwise acquired and held in the exercise of the SFO's legal powers and in furtherance of its public function.

39.   From at least July 2016 onwards, confidential information about the ENRC Investigation and ENRC's affairs was disclosed to various third parties, including on the following occasions which, pending disclosure and further information, are known to ENRC:

   39.1.   The information in the "*report on ENRC, Trio and SFO*" (paragraph 13.1);

   39.2.   The information about the ENRC Investigation in the report provided to Mr van Niekerk (paragraph 13.3);

   39.3.   The update regarding the understanding of the ENRC Investigation team in respect of "*the secret Dechert documents*" and the identity of individuals associated with ENRC who were attracting particular focus (paragraph 13.6);

   39.4.   The update about the direction and focus of the ENRC Investigation, including the SFO's assessment of the evidential merits of different parts of the case and its understanding of how any proposed penalty could be enforced (paragraph 13.9);

   39.5.   The information that the ENRC Investigation had secured "blockbuster" funding following a fresh wave of interviews earlier in the year in the Financial Times July 2016 "scoop" and July 2016 Bloomberg Article (paragraphs 14 and 15);

   39.6.   The update regarding the response to the SFO's letter in the March 2017 Intelligence Online Article (paragraph 16);

   39.7.   The information about the identity of the individuals recently interviewed in the ENRC Investigation, the nature of questioning which they faced and the

update regarding the response to the SFO's letter in the articles and communications referred to at paragraphs 17.3 - 17.5 and 17.7 -17.9;

39.8.   The detail given as to the alleged link between the SFO's probe into Glencore and the ENRC Investigation in the May 2018 Financial Times and December 2019 Bloomberg Articles (paragraphs 18 and 21);

39.9.   The update given as to the focus and progress of the ENRC Investigation and identities of those who the SFO were contemplating charging in connection with it (paragraphs 20.1 and 20.2); and

39.10.  The information revealed as to the ENRC Investigation's focus and the opinions and theories of the investigating team in the 2020 Burgis Publications (paragraphs 22.1 - 22.3, 23.1 - 23.4 and 24.1 - 24.12);

39.11.  The information disclosed in Paragraphs 1.1 and 2.1 – 2.3 of Confidential Annex A.

(The information described above is referred to compendiously as the **"ENRC Sensitive Information"**.)

40.   For the reasons set out in paragraph 25 above, it is to be inferred that the Second Defendant, Mr Mack and "Tony P" the Third Defendant were among the individuals who disclosed the ENRC Sensitive Information and/or caused, enabled or permitted other SFO Officers to do so.

41.   A reasonable person in the Defendants' position would have realised, and the Defendants did in fact know, that the ENRC Sensitive Information was confidential and that the unauthorised disclosure of that information for purposes other than the proper and lawful conduct of the ENRC Investigation was a misuse of the same. In addition to the circumstances of the particular individual disclosures identified above, ENRC will also rely on the following facts and matters, all of which SFO Officers (including the Second Defendant, Mr Mack and "Tony P" the Third Defendant) would have known or recognised:

41.1.   At all material times, and in line with the Duties and policies referred to at paragraph 27 and 30.1 above, SFO Officers knew that information which was held further to the exercise of the SFO's investigatory powers must not be

disclosed outside the organisation and/or to any third party without authorisation;

41.2. The heightened secrecy attaching to information concerning the ENRC Investigation was equally obvious to SFO Officers, with the assigned QUT01 investigation team working *"in private"*, *"behind closed doors"* and according to strict procedures which were notionally designed to prevent information regarding the ENRC Investigation's course or intended direction from being disclosed outside that team;

41.3. The refusal of the SFO to make any official statement or confirmation in respect of these disclosures when asked to do so by the journalists responsible for the articles at paragraphs 14 - 15, 17.4, 18 - 19 and 23 - 24 above;

41.4. The fact that it was clearly a precondition of all of the disclosures set out in paragraphs 13 - 24 above that they took place on a non-attributable and/or *"off-the-record"* basis (reflecting the fact that those who disclosed the information were aware that it was not information they were permitted to disclose); and

41.5. The measures specifically taken by the Second Defendant to ensure that his disclosure of information and document about the ENRC Investigation remained covert and untraceable, including: (a) the highly irregular nature of his meetings with Mr Burgis in paragraph 25.1 above; (b) his exclusive use of forms of communication which left no permanent record when communicating with Mr Burgis; and (c) his alleged failure to make any record or note of his interactions with journalists. Such measures would have been unnecessary if the Second Defendant had not appreciated the confidentiality attaching to the information which he was choosing to divulge.

42. In the circumstances, the Defendants owed a duty to ENRC to maintain the confidence in the ENRC Sensitive Information and not to disclose or use it save where authorised to do so for the proper and lawful conduct of the ENRC Investigation.

43. In breach of that duty, the Defendants disclosed and/or caused the ENRC Sensitive Information to be disclosed to the media and other third parties as set out above.

**F.    Unlawful Means Conspiracy**

44.    Following the cessation of his employment with the SFO in September 2018, the Second Defendant conspired and combined together with person(s) whose identities are presently unknown within the SFO with the intent to injure ENRC by unlawful means.

45.    The inference that person(s) within the SFO conspired and combined with the Second Defendant in this period is to be drawn from the following overt acts:

45.1.    The Second Defendant's willingness to arrange and conduct undocumented meetings with journalists following his departure from the SFO (including Mr Burgis and other journalists at the *Financial Times*) with a view to disclosing matters pertaining to the ENRC Investigation and/or ENRC's affairs, notwithstanding his continuing obligations as a former SFO employee to maintain the confidence in information which he had acquired during his period of employment at the SFO and not to disclose such information without express authorisation from senior managers or officers at the SFO;

45.2.    It is to be inferred that the Second Defendant's readiness to meet journalists in this context was a consequence of his knowledge that current SFO Officers had authorised his conduct in advance and/or encouraged him to leak information about the ENRC Investigation which was favourable to the SFO's strategic objectives and damaging to ENRC. It is inherently unlikely that the Second Defendant would have 'gone rogue' / on a frolic of his own without some kind of assurance of institutional protection;

45.3.    The SFO's corresponding failure to commence any internal investigation into the source of the leaks arising from the ENRC Investigation, ~~at any point~~ save for the limited investigation which was brought into the conduct of the Third Defendant in 2019 and which quickly and unjustifiably concluded that the Third Defendant had no case to answer before the SFO had interviewed him in person (and/or to widen the scope of the independent review being conducted by Sir David Calvert Smith to address such matters), notwithstanding:

(a)    its awareness as a consequence of the information contained in the articles and correspondence set out at paragraphs 13 - 24 and 31.3 above that SFO Officers with access to confidential information about the ENRC

Investigation and ENRC's affairs were ostensibly leaking sensitive parts of that information to the media or third parties; and

(b) the fact that any such disclosures would, if occurring, constitute a serious security breach and potentially gross misconduct on the part of the SFO Officer(s) concerned, including under the SFO's own internal codes, and therefore required swift investigation according to the same policies (paragraph 30 above is repeated);

45.4.   ENRC will contend that the SFO's reluctance to initiate such an internal investigation in these circumstances is indicative of:

(a) a concern amongst SFO Officers with oversight and responsibility that such an inquiry would expose the conduct of senior SFO Officers who were known to be involved in such leaking; and/or

(b) an internal policy pursuant to which targeted leaking of information in respect of the ENRC Investigation was authorised, encouraged and/or condoned;

45.5.   The Second Defendant's admission (as set out in paragraph 25.1(b)(i) above) that he had first been introduced to Mr Burgis at the SFO's offices, where Mr Burgis had been meeting other SFO employees;

45.6.   The longstanding nature of the relationship between the SFO and *Bloomberg*, pursuant to which *Bloomberg* journalists have regularly acted as a channel through which SFO Officers have been able covertly to leak information about the ENRC Investigation on a non-attributable basis. As set out at paragraph 5 above, that relationship pre-dated the commencement of the Second Defendant's employment at the SFO and, it is inferred, was a relationship which the Second Defendant was encouraged by person(s) unknown within the SFO to exploit and utilise for the purpose of leaking information about the ENRC Investigation and/or ENRC's affairs, both during his period as Case Controller (paragraph 15 above) and afterwards (paragraphs 20 - 21 above);

45.7.   The selective and partisan nature of the allegations contained in the 2019 Bloomberg Articles and the 2020 Burgis publications, which were:

(a) uniformly favourable to the SFO to the detriment of ENRC;

(b) ostensibly timed in order to validate the SFO's continued pursuit of the ENRC Investigation and to counter criticism and public concern which had arisen about the SFO's conduct of both the ENRC Investigation itself and its caseload or behaviour more generally; and

(c) mutually beneficial to the reputations of both the SFO and the Second Defendant personally, whose own professional credibility and status remained linked to the public perception of the ENRC Investigation as a result of his lengthy and prominent role as its Case Controller; and

45.8.   The irregular nature of a meeting which was arranged in June 2017 between Mr Hollingsworth and senior SFO Officers (as well as subsequent communications made by the parties to that meeting about the same), which suggests an internal policy within the SFO whereby the leaking of confidential information about the SFO's investigations (including the ENRC Investigation was effected, facilitated and encouraged by (the most) senior SFO Officers. In this regard:

(a) In or around early June 2017, Grant Cherrington, a senior executive officer at the SFO, approached Mr Hollingsworth with a view to arranging a meeting between themselves, another member of the SFO's Intelligence Unit SFO named *"Vince"* (it is inferred a reference to Mr Payne), and the SFO's Head of Disclosure.

(b) Mr Cherrington's introduction to Mr Hollingsworth was effected by Mr Hollingsworth's source, ~~"Tony P"~~ the Third Defendant (a fact which evidences that the latter's relationship with Mr Hollingsworth, a well-known intermediary, was known about and condoned by senior personnel within the SFO). Despite this, the decision to meet Mr Hollingsworth was approved in advance by at least one senior SFO Officer (most likely, the SFO's Principal Intelligence Officer, Colin Croucher).

(c) The meeting between Mr Hollingsworth, Mr Cherrington, ~~"Vince"~~ Mr Payne, ~~"Tony P"~~ the Third Defendant and the SFO's Head of Disclosure took place on 8 June 2017 at the SFO's offices (the "**8 June 2017 meeting**"). As set out in paragraph 13.9 above, it was described by Mr Hollingsworth

41

as "*a strictly off-the-record meeting with two officials from the Intelligence Unit of the UK Serious Fraud Office and its Head of Disclosure*". Mr Hollingsworth's reports of the same further record that:

i.      He had been given information from the said officials about the direction and focus of the ENRC Investigation, including the SFO's internal assessment of the evidential merits of different parts of the case and its understanding of how any proposed penalty could be enforced against ENRC;

ii.     The fact that the SFO Intelligence Unit act as *"recipients of intelligence which are given on a confidential basis to the case team"*; and

iii.    That the purpose of the meeting had been *"mainly to establish the terms of reference for my* [i.e. Mr Hollingsworth's] *relationship with the SFO."*

(d)  On 10 January 2018, Mr Cherrington belatedly emailed Mr Hollingsworth, purportedly by way of response to the proposals discussed some 6 months earlier at the 8 June 2017 meeting. Mr Cherrington thanked Mr Hollingsworth for the *"report which he had provided on Cottage Consultants et al"* (the latter term implicitly acknowledging that the said report had not been confined to information relating to a separate investigation, involving a company named Cottage Consultants, but that it also covered other matters of interest to the SFO).

(e)  Mr Cherrington nonetheless purported to inform Mr Hollingsworth that the SFO had concluded that it was not able to enter a regularised arrangement whereby it would provide Mr Hollingsworth with intelligence and updates about ongoing cases in return for Mr Hollingsworth's own *"information"* (a reply which, even if taken on its face, evidences a willingness on the SFO's part to contemplate such an improper arrangement at the time of the 8 June 2017 meeting).

(f)  Instead, Mr Cherrington emphasised that the SFO *"would gratefully appreciate any information you* [Mr Hollingsworth] *are able to provide"*, explaining that the SFO would classify it as *"Intelligence Only"*, it is to be

inferred to ensure that the covert channel of communication between the SFO and Mr Hollingsworth would not be at risk of disclosure.

(g) Mr Hollingsworth responded the following day, claiming that his request for information had not related to specific cases and that he understood that the *"SFO were governed by strict rules"*. He further offered to provide information which he had *"with no conditions attached"* and invited the SFO to arrange a meeting at which documents in Mr Hollingsworth's possession could be handed over. In the circumstances, it is inferred that either:

    i.    Mr Hollingsworth did indeed proceed to disclose the material which he had in his possession that was relevant to the SFO's ongoing investigations (including ENRC) in the hope that it would nonetheless encourage the provision of further inside information from the SFO in the future; or

    ii.    more probably, given the established nature of Mr Hollingsworth's existing relationship with "Tony P" the Third Defendant and the SFO, Mr Hollingsworth had already disclosed the said material to the SFO as part of a pre-existing and mutually beneficial exchange of information and Mr Cherrington's very belated *"reply"* of 10 January 2018, more than 6 months after the meeting in question, constituted a retrospective attempt to place the SFO's receipt of documents and information from Mr Hollingsworth on a one-way and superficially unconditional footing.

45A    Further, the Third Defendant also conspired and combined together with person(s) whose identities are presently unknown within the SFO with the intent to injure ENRC by unlawful means.

45B    The inference that person(s) within the SFO conspired and combined with the Third Defendant is to be drawn from the following overt acts:

45B.1    The Third Defendant's willingness to arrange and conduct undocumented meetings with Mr Hollingsworth with a view to disclosing matters pertaining to the ENRC Investigation and/or ENRC's affairs, notwithstanding his continuing obligations as a serving SFO Officer to maintain the confidence in information

which he had acquired as a result of his employment at the SFO and not to disclose such information without express authorisation from senior managers or officers at the SFO. Again, it is to be inferred that the Third Defendant's readiness to disclose such information in such circumstances was a consequence of (a) the fact that senior SFO Officers had authorised those disclosures in advance and/or (b) his knowledge that senior SFO Officers had encouraged him to leak information generally about the ENRC Investigation which was favourable to the SFO's strategic objectives and damaging to ENRC. It is inherently unlikely that the Third Defendant would have 'gone rogue' / on a frolic of his own without such an instruction or some kind of assurance of institutional protection from senior SFO Officers.

45.B.3 The irregular nature of the 8 June 2017 meeting which the Third Defendant arranged between Mr Hollingsworth and senior SFO Officers (as to which paragraph 45.8 above is repeated) and which suggests:

(a) that senior SFO Officers were aware of and condoned the Third Defendant's relationship and contact with Mr Hollingsworth, notwithstanding the latter's interests as an intermediary and a journalist in obtaining access to confidential information about ongoing SFO investigations (including the ENRC Investigation);

(b) an internal policy within the SFO whereby the leaking of confidential information by the Third Defendant about the SFO's investigations (including the ENRC Investigation) was encouraged and condoned by senior SFO Officers.

45B.4 The Third Defendant's knowledge of operational information about the ENRC Investigation (including that pleaded in paragraphs 13.3, 13.6 and 17.3 – 17.5 and 17.7 – 17.9 above), notwithstanding the fact that he was not himself a member of the QUT01 investigation team. As set out at paragraph 33.5(a) above, the QUT01 investigation team was working *"behind closed doors"* and in *"private"*. As such, the Third Defendant would not have been privy to operational information about the ENRC Investigation unless the QUT01 team itself and/or other senior SFO Officers with responsibility and oversight for the ENRC Investigation had chosen to brief the Third Defendant about specific

44

developments. In circumstances where there was no proper professional justification for the Third Defendant to be briefed about these matters, it is inferred that the decision to relay such information to him was taken in the knowledge or expectation that the Third Defendant would leak the same. That inference is further sustained by:

(a) the fact that the Third Defendant continued to receive and impart operationally sensitive information about the ENRC Investigation to Mr Hollingsworth after the 8 June 2017 meeting, including that referred to in paragraphs 17.3 – 17.5 and 17.7 - 17.9 above;

(b) the evident concern on the Third Defendant's part that the 2017 Evening Standard article was published urgently, a concern which indicates that the information was leaked for strategic reasons relating to the ENRC Investigation (as to which paragraphs 17.2 and 25.10 above are repeated).

45B.5   The SFO's decision rapidly to conclude that the Third Defendant had no case to answer in respect of leaking information about the ENRC Investigation, notwithstanding:

(a) the clear references made by Mr Hollingsworth to the Third Defendant as *inter alia "my SFO source"* who was briefing him at this time about ongoing SFO investigations in the emails referred to in paragraphs 13.8 and 13.12 above and the information about developments in the ENRC Investigation which the emails and articles in paragraphs 13.3, 13.6 and 17 above indicate that Mr Hollingsworth was privy as a consequence;

(b) the fact that any such disclosures would, if occurring, constitute a serious security breach and potentially gross misconduct on the part of the SFO Officer(s) concerned, including under the SFO's own internal codes, and therefore required swift investigation according to the same policies (paragraph 30 above is repeated);

(c) the fact that the SFO has still not even interviewed the Third Defendant in person about these matters.

45B.6 ENRC will again contend that the SFO's reluctance to pursue its internal investigation against the Third Defendant despite these circumstances is indicative of:

(a) a concern amongst SFO Officers with oversight and responsibility that such an inquiry would expose the conduct of senior SFO Officers who were known to have authorised, encouraged and/or condoned the Third Defendant to leak information about the ENRC Investigation and ENRC's affairs; and/or

(b) an internal policy pursuant to which targeted leaking of information in respect of the ENRC Investigation was authorised, encouraged and/or condoned.

46. The intention of the parties to the aforesaid conspiracy or conspiracies was to injure ENRC. In particular, their aim was to:

46.1. Insinuate that ENRC was a legitimate target for the SFO's long-running investigation, thereby promoting the false narrative that such ongoing criminal investigation:

(a) had made meaningful and worthwhile progress, notwithstanding the SFO's protracted failure to establish the evidential basis necessary to bring criminal charges against ENRC; and

(b) constituted a legitimate or proportionate use of the substantial public funds which the SFO had previously secured and which it required to receive from HM Treasury in the future if the ENRC Investigation was to continue further;

46.2. Divert public attention from the serious political and public concerns surrounding the SFO, as described in paragraph 36.2 above, at the expense of ENRC; and/or

46.3. Facilitate collateral independent lines of inquiry and investigation into ENRC and hostile coverage about ENRC here or abroad by third parties, as described in paragraph 36.3 above, at the expense of ENRC.

47. Further to their common intention, the parties to the aforesaid conspiracy or conspiracies employed or endorsed unlawful means to injure ENRC. In particular, in disclosing information about the ENRC Investigation and/or ENRC's affairs as set out

under paragraphs ~~20~~ 12 - 24 above and in failing promptly or adequately to investigate the same, the parties to the aforesaid conspiracy or conspiracies:

47.1. As pleaded at paragraphs 38 - 43 above, committed the civil wrong of breach of confidence (and/or caused, enabled and/or permitted that wrong to be committed);

47.2. As pleaded at paragraphs 27 - 37 above, acted *ultra vires* and/or in breach of the statutory and administrative duties owed by the SFO and the SFO Officers; and

47.3. In disclosing the information about Mr Machkevitch and Mr Gertler which was published in the March 2019 Bloomberg Article and which is set out under paragraphs 20.1 and 20.2 above, committed the civil wrong of misuse of private information and, further, acted in breach of the obligations of the SFO and its Officers pursuant to s.6(1) Human Rights Act 1998 not to act incompatibly with Article 8 of the European Convention on Human Rights (the "**Convention**") by disclosing information about the alleged status of those individuals as suspects in the ENRC Investigation in circumstances where:

(a) Both Mr Machkevitch and Mr Gertler held a reasonable and objectively founded expectation of privacy at common law and under Article 8(1) of the Convention in respect of the alleged fact that they had come under suspicion by an organ of the state, as well as any expressed basis for that suspicion;

(b) No grounds existed which would exceptionally have warranted the disclosure of that information prior to any official decision to charge; and

(c) The leaking of this information was neither in furtherance of a legitimate aim under Article 8(2) of the Convention, nor was it necessary or proportionate in the circumstances.

**G.   Loss and Damage**

48.   The Defendants' aforesaid wrongful conduct has caused ENRC loss and damage:

48.1. ENRC has incurred legal and other costs seeking to identify the source of leaked information and require the SFO to take steps to investigate or prevent such conduct.

48.2.   ENRC has suffered disruption to its ordinary business and wasted management time dealing with these events. Management and employee time has been spent responding to, collating information for, and attending meetings in relation to the leaks set out in paragraphs 13 - 24 above and in investigating the same.

47.2   ENRC has been forced to instruct professional advisors (including in the legal and public relations sectors) in an attempt to address and respond to these events.

47.3   In addition, the leak to the press of confidential information relating to the SFO's ongoing criminal investigation has damaged ENRC's reputation and resulted in losses in the form of its failure or loss of a chance to: (a) enter into business transactions with, or on more advantageous terms with, third parties who have been put off by the negative publicity; and (b) borrow funds from, or on more advantageous terms from, lenders who have declined to deal with ENRC and/or demanded increased rates of interest for the same reasons. Such losses are continuing and are presently incapable of precise calculation.

49.   ENRC is entitled to and claims damages and/or equitable compensation for such loss and damage on the basis of Misfeasance in Public Office (Section D above) and/or Breach of Confidence (Section E above) and/or Unlawful Means Conspiracy (Section F) above, to be assessed.

## H.   Exemplary Damages

50.   The sustained or repeated conduct comprising the substantive wrongdoing pleaded above was: (a) deliberate, oppressive and unconstitutional; and/or (b) calculated to benefit the wrongdoers to a greater extent than they (contemplated that they) would be held liable by way of compensatory damages. An award of exemplary damages is appropriate in the interests of justice and in order to mark the Court's disapproval of the serious misconduct perpetrated by and within the SFO over an extended period of time.

## I.   Other Relief

51.   Further, ENRC seeks a declaration that the SFO and the Second and Third Defendants have committed the tort of misfeasance in public office, as alleged above. Such a declaration is necessary, on the grounds that, *inter alia*:

51.1.   The SFO has repeatedly refused to commence and/or pursue an investigation into allegations that SFO Officers (including the Third Defendant) have leaked information to the press (as to which paragraph 31 above is repeated).

51.2.   Absent such a declaration, there is reason to believe that SFO Officers will continue to make unlawful disclosures of matters relating to the ENRC SFO's Investigation.

52.   Unless restrained by this Court, there is a real prospect that the Second and Third Defendants will continue to misuse sensitive information relating to the ENRC Investigation and/or ENRC's affairs, including by continuing to disclose it to third parties. In the premises, ENRC seeks injunctive relief to prevent further misuse of such information.

53.   ENRC claims interest on such sums as are awarded to it, pursuant to s.35A of the Senior Courts Act 1981 and/or the court's equitable and/or inherent jurisdiction, at such rate(s) and over such period(s) as the Court deems just.

**AND THE CLAIMANT CLAIMS:**

(1) Compensatory and/or exemplary damages, to be assessed.

(2) A declaration as aforesaid or as appropriate.

(3) An injunction to restrain the Second and Third Defendants, whether acting directly or indirectly, or by his their servants, agents or otherwise howsoever, from communicating or disclosing to any third party, copying, or in any way using information obtained in the context of the ENRC Investigation.

(4) Delivery up by the Second and Third Defendants, confirmed by a Statement of Truth, of all documents and data (whether in hard copy or electronic form) in his their possession relating to the ENRC Investigation.

(5) Orders for:

(a) Confirmation, verified by a Statement of Truth, that the Second Defendant and Third Defendants has have:

(i)   ceased using any information obtained in the context of the ENRC Investigation for any purpose;

(ii)   Deleted any and all information obtained in the context of the ENRC Investigation which cannot be subject to the order for delivery up in (4) above.

(b) Information in the form of a witness statement from the Defendants (and each of them) verified by a Statement of Truth identifying, to their best of their knowledge and understanding, each and every third party to whom the Defendants disclosed any information obtained in the context of the ENRC Investigation for purposes other than the legitimate conduct of the ENRC Investigation; the time, nature and extent of any such disclosure; and the objectives and use to which they understand that third party put said information.

(c) Information in the form of a witness statement from the SFO setting out the steps it has taken to preserve the security of information obtained in the context of the ENRC Investigation which remains in its possession and control.

(6) Interest, to be assessed.

(7) Such further or other relief, including costs, as the Court deems appropriate.

**STEPHEN HOUSEMAN QC**

**DAVID GLEN**

**28 January 2021**

<span style="color:red">**STEPHEN HOUSEMAN QC**</span>

<span style="color:red">**DAVID GLEN**</span>

<span style="color:red">**15 October 2021**</span>

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in this Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Claimant to sign this Statement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Felix Vulis**

Director, for and on behalf of Eurasian Natural Resources Corporation Limited

Address for delivery of documents:

Quinn Emanuel Urquhart & Sullivan UK LLP

90 High Holborn,

London, WC1V 6LJ

UNITED KINGDOM

Attn: Justin Michaelson

Ref: 10184-00003